Long X. Do (SBN 211439)
ATHENE LAW, LLP
5432 Geary Blvd. #200
San Francisco, California 94121
Telephone: (415) 686-7531
long@athenelaw.com

Shari Covington (SBN 312078)
CALIFORNIA MEDICAL ASSOCIATION
CENTER FOR LEGAL AFFAIRS
1201 K Street, Suite 800
Sacramento, California 95814-3933
Telephone: (916) 444-5532
scovington@cmadocs.org

*Attorneys for Amicus Curiae California Medical Association*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| ELI LILLY AND COMPANY,<br><br>    Plaintiff,<br><br>    vs.<br><br>MOCHI HEALTH CORP., MOCHI MEDICAL CA P.C., MOCHI MEDICAL P.A., AEQUITA PHARMACY, LLC, AEQUITA CORPORATION,<br><br>    Defendants. | Case no. 3:25-cv-3534-JSC<br>Action Filed: April 23, 2025<br><br>**AMICUS CURIAE BRIEF BY THE CALIFORNIA MEDICAL ASSOCIATION IN SUPPORT OF PLTFF. LILLY'S OPPOSITION TO DEFS.' MOTION TO DISMISS**<br><br>Hr'g Date:    August 28, 2025<br>Time:    10:00 am<br>Courtroom:    8, 19th Floor<br>Judge:    Hon. Jacqueline Scott Corley |

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

INTERESTS OF THE AMICUS CURIAE .......................................................................... 2

DISCUSSION ...................................................................................................................... 3

    A.  CPOM Traditionally Was Designed to Thwart Open Interference with the Practice of
        Medicine by Non-Licensed Individuals and Entities .......................................................... 3

    B.  CPOM Has Evolved to Regulate Modern Arrangements and Structures that Create
        Unacceptable Risks of Interference with the Practice of Medicine ................................... 5

    C.  Lilly's Complaint Presents Serious Violations of CPOM That Potentially Could Interfere
        in the Practice of Medicine for Many Patients ................................................................... 8

    D.  CPOM Has Always Been Advanced and Developed through Private and Public
        Enforcement. ....................................................................................................................... 9

        1.  The Medical Practice Act Expressly Recognizes Private Enforcement of CPOM ...... 10

        2.  The Medical Board Has Openly Acknowledged Private CPOM Enforcement ........... 11

        3.  Enforcement of CPOM in this Case Does Not Require the Medical Board's Unique
            Agency Expertise ........................................................................................................ 14

CONCLUSION .................................................................................................................. 15

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Acad. of Emergency Med. Physician Grp., Inc. v. Envision Healthcare Corp.*,
   no. 22-cv-421-CRB ...................................................................................... 3, 13

*American Academy of Emergency Medicine Physician Group, Inc. v. Envision
   Healthcare Corporation*,
   no. 22-cv-00421-CRB, 2022 WL 2037950, at *8 (N.D. Cal. May 27, 2022)........................ 10

*Benjamin Franklin Life Assurance Co. v. Mitchell*,
   14 Cal. App. 2d 654 (1936)............................................................................... 5

*Blank v. Palo-Alto-Stanford Hospital Center*,
   234 Cal. App. 2d 377 (1965)............................................................................. 5

*California Association of Dispensing Opticians v. Pearle Vision Center, Inc.*,
   143 Cal. App. 3d 419 (1983)............................................................................. 5

*California Physicians' Service v. Aoki Diabetes Research Institute*,
   163 Cal. App. 4th 1506 (2008)........................................................................... 5

*Complete Service Bureau v. San Diego Med. Soc.*,
   43 Cal. 2d 201 (1954) (Spence, J., dissenting)...................................................... 3, 5

*Conrad v. Medical Bd.*,
   48 Cal. App. 4th 1038 (1996)............................................................................ 5

*Marik v. Superior Court*,
   191 Cal. App. 3d 1136 (1987)............................................................................ 6

*Pacific Employers Ins. Co. v. Carpenter*,
   10 Cal. App. 2d 592 (1935)............................................................................... 4

*People v. Cole*
   (2006) 38 Cal. 4th 964 (2006)........................................................................... 6

*People v. Superior Court (Cardillo)*,
   218 Cal. App. 4th 492 (2013)........................................................................... 6, 7

*People ex rel. State Bd. of Med. Examiners v. Pacific Health Corp.*,
   12 Cal. 2d 156 (1938) ................................................................................. 3, 6, 15

**Statutes**

Bus. & Prof. Code §125.7 ............................................................................... 10

Bus. & Prof. Code §125.8 ................................................................................................ 10

Bus. & Prof. Code §2052 ...................................................................................... 3, 10, 13

Bus. & Prof. Code §2311 ................................................................................................ 10

Bus. & Prof. Code §2400 .......................................................................................... 3, 13

Bus. & Prof. Code §2402 .................................................................................................. 8

Bus. & Prof. Code §2406 .................................................................................................. 8

Bus. & Prof. Code §17200 .............................................................................................. 10

Cal. Corp. Code §13401.5 ................................................................................................ 8

Cal. Corp. Code §13406 .................................................................................................... 8

**Other Authorities**

54 Ops. Cal. Atty. Gen. 126 (1971) ................................................................................ 7

55 Ops. Cal. Atty. Gen. 103 (1972) ................................................................................ 7

65 Ops. Cal. Atty. Gen. 223 (1982) ............................................................................ 4, 7

83 Ops. Cal. Atty. Gen. 170 (2000) ................................................................................ 7

Cal. Corp. Code §13406 .................................................................................................... 8

FRAP 29 ............................................................................................................................ 1

Jane M. Zhu et al., "A Doctrine in Name Only - Strengthening Prohibitions against
    the Corporate Practice of Medicine," 39 New Engl. J. Med. 11; 389:965-968
    (Sep. 9, 2023) ......................................................................................................... 14

Medical Bd. of Cal., Sunset Review Oversight Report (2020)
    <https://www.mbc.ca.gov/Download/Reports/sunset-report-2020.pdf> ...................... 11, 12

Medical Board of California, "Legislative Proposals 2012," Agenda Item #20B, at
    1-2 (Oct. 28, 2011)
    <https://www.mbc.ca.gov/About/Meetings/Material/29981/brd-
    AgendaItem20B-20111028.pdf> ............................................................................... 13

The California Medical Association ("CMA") hereby submits this amicus curiae brief in support of plaintiff Eli Lilly and Company's ("Lilly") opposition [dkt. 68] to the motion to dismiss [dkt. 45] by defendants Mochi Health Corp. ("Mochi Health"); Mochi Medical CA P.C. and Mochi Medical P.A. (collectively "Mochi Medical"); and Aequita Pharmacy, LLC and Aequita Corporation (collectively, "Aequita") (all defendants collectively, "Defendants").

## INTRODUCTION

For more than 150 years, CMA has served as the voice of California's House of Medicine to advocate for the medical profession against incursions and transgressions on the ability of physicians to provide the highest levels of medical care to their patients. A bedrock doctrine in such efforts is a century-old California law prohibiting lay entities and non-licensed individuals from practicing medicine in this State. This law, prohibiting the "corporate practice of medicine" ("CPOM"), has abided through many decades and has been affirmed, confirmed, and reinvigorated through scores of opinions in the state courts and regulatory agencies. CPOM is squarely and expressly raised in this action brought by Lilly to challenge an alleged scheme by Defendants to market and provide weight management drugs and services.

CPOM is a broad and robust law that touches on nearly every aspect of the delivery of medical care by licensed physicians in California. It springs from a fundamental public policy to protect and preserve the independence of California-licensed physicians' professional judgment in the care of their patients, free from external forces that can interfere with the physician-patient relationship and undermine public health. In its classic form, CPOM prohibits lay entities and individuals from employing doctors or otherwise directly dictating the manner, scope, or type of care that doctors provide. CPOM has also adapted to keep pace with the modernization, if not the corporatization, of medicine to address joint ventures and other business alignments that improperly interfere with the practice of medicine in indirect ways.

CMA's briefly explains below how Lilly's Complaint satisfies the pleading requirements to state actionable CPOM violations. But that is not the crux of Defendants' attack, they instead call on the Court to exercise discretion and decline to entertain the CPOM claims on the basis that

the Medical Board of California ("Medical Board" or "Board") has primary or exclusive jurisdiction to enforce CPOM. This is a potentially dangerous proposition to public health and the medical profession because it could stunt CPOM's natural evolution and impair its benefits. CMA agrees with Lilly's arguments that the Court should not abstain or defer to the Medical Board under the pertinent federal jurisprudence. *See* Lilly's Opp'n to Mtn. to Dismiss at 7-11 [dkt. 68]. CMA bolsters Lilly's arguments below with a more robust explication of CPOM's evolution over more than a century of practice and jurisprudence.

Defendants' misguided arguments for abstention put into sharp relief the continuing need for robust CPOM enforcement. In short, it is through private and public enforcement that CPOM has been able to adapt to the modernization of medicine while abiding by the original policy underpinnings to preserve physician independence and protect the public. That is why the Medical Board has never, to CMA's knowledge, attempted to thwart or assert exclusive jurisdiction over private actions. CMA accordingly urges the Court to reject Defendants' request to short-circuit CPOM enforcement in this action.[1]

## INTERESTS OF THE AMICUS CURIAE

CMA is a non-profit, incorporated professional physician association of over 45,000 members, most of whom practice medicine in all modes and specialties throughout California. CMA's primary purposes are "to promote the science and art of medicine, the care and well-being of patients, the protection of public health, and the betterment of the medical profession." CMA and its members share the objective of promoting high quality, safe, and cost-effective health care for the people of California.

For many decades, CMA has been the leading voice advocating for robust enforcement of CPOM by private and government actors. CMA consistently engages in legislative advocacy concerning CPOM doctrine by supporting measures that reinforce its protections, opposing

---

[1] CMA takes no position on the other allegations and causes of action in Lilly's Complaint. CMA also takes no position on whether Lilly will be able to meet its burden to prove violations of CPOM. Those are issues outside the scope of the motion to dismiss and this brief.

efforts that erode or eliminate it, and evaluating proposed exceptions with careful attention to their impact on physician autonomy and the integrity of patient care. CMA also regularly files amicus briefs in federal and state courts on issues impacting the practice of medicine, including cases like this involving interpretations and application of CPOM. In fact, Judge Breyer permitted CMA to file an amicus brief in a case that is prominent in both sides' briefing around the motion to dismiss – *Am. Acad. of Emergency Med. Physician Grp., Inc. v. Envision Healthcare Corp.*, no. 22-cv-421-CRB ("*Envision*"). The CPOM issues raised by Defendants' motion directly bear upon the interests and work of CMA on behalf of its physician members and constituents.

## DISCUSSION

### A.     CPOM Traditionally Was Designed to Thwart Open Interference with the Practice of Medicine by Non-Licensed Individuals and Entities.

The CPOM doctrine is not new. California first codified its prohibition on the unauthorized practice of medicine in 1913, shortly after rejecting legislation that would have allowed corporations to employ physicians directly. Over the ensuing century, the principle evolved into a bedrock protection against economic and managerial pressures compromising medical judgment. The case books show that California courts recognized CPOM as essential to preserving the independence and integrity of medical care in the first half of the 20th century. *See, e.g.*, *People ex rel. State Bd. of Med. Examiners v. Pacific Health Corp.*, 12 Cal. 2d 156, 160 (1938) ("[T]he principal evils attendant upon corporate practice of medicine spring from the conflict between the professional standards and obligations of the doctors and the profit motive of the corporation employer"). By 1954, judges had recognized an expanding reach of CPOM doctrine to "consistently condemn[]" schemes involving lay individuals "intervening as a 'middleman' for profit in establishing the professional relationships between a [medical] group … and members of the public." *Complete Service Bureau v. San Diego Med. Soc.*, 43 Cal. 2d 201, 218 (1954) (Spence, J., dissenting).

Notwithstanding the developing case jurisprudence, it must be remembered that CPOM is a statutory doctrine that springs from the California Medical Practice Act, particularly Business

and Professions Code sections 2052 and 2400. Those provisions prohibit any person from practicing medicine without a license issued by the Medical Board of California. Together, they establish that corporations and other artificial legal entities may not hold professional rights, privileges, or powers (i.e., hold medical licenses). These statutes form the foundation of CPOM, which broadly prohibits corporations and other lay entities from directly or indirectly practicing or controlling the practice of medicine, whether through influence, control, or direct intervention.

The California Attorney General has articulated a different dimension to the purposes underlying CPOM, rooted in the ability of regulatory bodies to protect the public:

> [F]irst, that the presence of a corporate entity is incongruous in the workings of a professional regulatory licensing scheme which is based on personal qualification, responsibility and sanction, and second that the interposition of a lay commercial entity between the professional and his/her patients would give rise to divided loyalties on the part of the professional and would destroy the professional relationship into which it was cast.

65 Ops. Cal. Atty. Gen. 223, 225 (1982) (emphasis added). In other words, CPOM ensures that medical care is delivered by physicians who are licensed and subject to regulatory control and accountability. Otherwise, patients may be vulnerable to practitioners that answer to no licensing body. CPOM thus ensures that those who make decisions which affect, generally or indirectly, the provision of medical services comply with the standards for state licensure: 1) understand the quality of care implications of those decisions; 2) have a professional ethical obligation to place the patient's interest foremost; and 3) are subject to the full panoply of the enforcement powers of the Medical Board, the state agency charged with the administration of the Medical Practice Act. That is why CPOM applies to individuals who may hold medical degrees but are not licensed by the Medical Board, such as the owners of Mochi Health.

CPOM today is recognized to be robust and broad, touching upon virtually all aspects of the modern practice of medicine to prohibit practices, schemes, and arrangements that directly or indirectly affect how physicians care for their patients. The case law to enforce CPOM and develop its application is legion. *See, e.g.*, *Pacific Employers Ins. Co. v. Carpenter*, 10 Cal. App. 2d 592, 594-96 (1935) (holding that for-profit corporation may not engage in business of

4

1   providing medical services and stating that "professions are not open to commercial exploitation

2   as it is said to be against public policy to permit a 'middle-man' to intervene for a profit in

3   establishing a professional relationship between members of said professions and the members of

4   the public"); *Benjamin Franklin Life Assurance Co. v. Mitchell*, 14 Cal. App. 2d 654, 657 (1936)

5   (same); *Complete Service Bureau v. San Diego Medical Society*, 43 Cal. 2d 201, 211 (1954) (non-

6   profit corporations may secure low-cost medical services for their members only if they do not

7   interfere with the medical practice of the associated physician); *Blank v. Palo-Alto-Stanford*

8   *Hospital Center*, 234 Cal. App. 2d 377, 390 (1965) (non-profit hospital may employ radiologists

9   only if the hospital does not interfere with the radiologists' practice of medicine); *California*

10  *Association of Dispensing Opticians v. Pearle Vision Center, Inc.*, 143 Cal. App. 3d 419, 434

11  (1983) (CPOM prohibits technical agreements affecting the manner in which professionals

12  practice because it "requires the professional's undivided responsibility and freedom from

13  commercial exploitation"); *Conrad v. Medical Bd.*, 48 Cal. App. 4th 1038, 1041 (1996)

14  (recognizing CPOM guards against "the conflict between the professional standards and

15  obligations of the doctors and the profit motive of the corporation employer" and applying it

16  against quasi-public health care district hospitals); *California Physicians' Service v. Aoki*

17  *Diabetes Research Institute*, 163 Cal. App. 4th 1506, 1516 (2008) ("While the principal evils of

18  the corporate practice of medicine may arise from the stress the profit motive places on

19  physicians, the courts have also noted the danger of lay control").

20
    **B.      CPOM Has Evolved to Regulate Modern Arrangements and Structures that Create
21           Unacceptable Risks of Interference with the Practice of Medicine.**

22          As modern medicine advances and becomes more decentralized and commercialized, a

23  strain of CPOM is crystallizing to recognize that seeming "business decisions" in a medical

24  practice setting can result in undue influence over the practice of medicine. This strain focuses

25  not on whether there is open interference with the practice of medicine but on the conditions in

26  which physicians practice, such as the employment relationship, that create unacceptable risks of

27  interference. Early cases enforcing CPOM had laid the seed for such a more nuanced,

28
                                                    5

prophylactic approach in its modern enforcement. *See, e.g.*, *Pacific Health Corp.*, 12 Cal. 2d at 158 (CPOM cannot be "circumvented by technical distinctions in the manner in which the doctors are engaged, designated or compensated by the corporation"). Today, courts readily recognize that CPOM "restricts the <u>relationships</u> that [doctors] may have with corporations." *People v. Cole* (2006) 38 Cal. 4th 964, 970 (2006) (emphasis added).

In *Marik v. Superior Court*, 191 Cal. App. 3d 1136, 1140 (1987), the court recognized that it is difficult if not impossible to isolate "purely business" decisions from those affecting the quality of care. Notably, in holding that a provisional director of a medical corporation was required either to be a physician or other qualified licensed person, the *Marik* court recognized the interrelated nature of these concerns and observed:

> For example, the prospective purchase of a piece of radiological equipment could be implicated by business considerations (cost, gross billings to be generated, space and employee needs), medical considerations (type of equipment needed, scope of practice, skill levels required by operators of the equipment, medical ethics) or by an amalgam of factors emanating from both business and medical areas. The interfacing of these variables may also require medical training, experience, and judgment.

*Id.* at 1140 n.4. Along the same line, in *People v. Superior Court (Cardillo)*, 218 Cal. App. 4th 492 (2013), lay owners and operators of medical marijuana clinics were held to criminally violate CPOM where they controlled the operations of the clinics by employing licensed physicians to issue recommendations for medical marijuana, setting the physicians' hours, soliciting and scheduling patients, collecting fees from the patients, and paying the physicians a percentage of those fees. *Id.* at 498.

The Medical Board of California has issued formal guidance on the various ways that CPOM can be implicated. *See* Medical Board, Guidance on Corporate Practice of Medicine <https://www.mbc.ca.gov/Licensing/Physicians-and-Surgeons/Practice-Information/> (visited on 7/17/2025). The guidance shows that the Medical Board believes certain areas in the business of medicine are rife for CPOM abuse:

- Ownership is an indicator of control of a patient's medical records, including determining the contents thereof, and should be retained by a California-licensed physician;

- Selection, hiring/firing (as it relates to clinical competency or proficiency) of physicians, allied health staff and medical assistants;
- Setting the parameters under which the physician will enter into contractual relationships with third-party payors;
- Decisions regarding coding and billing procedures for patient care services; and
- Approving of the selection of medical equipment and medical supplies for the medical practice.

*Id.* The California Attorney General has echoed the Medical Board's more expansive view of CPOM's application. *See, e.g.*, 83 Ops. Cal. Atty. Gen. 170 (2000) ("The selection of a radiology site with appropriate equipment and operational personnel best suited for the performance of a diagnostic radiology study of a patient's particular physical disorder, as well as the selection of a qualified radiologist to view and interpret the films, would involve the exercise of professional judgment and evaluation as part of the practice of medicine.").

The California Attorney General confirms that CPOM prohibits not only lay entities engaging in or interfering with the practice of medicine but also hospitals and other lay entities from employing or contracting with physicians. *See* 11 Ops. Cal. Att. Gen. 236, 237 (1948). In so finding, the Attorney General observed that several courts have rejected the notion that a CPOM violation depends on actual interference with the practice of medicine. *See id.* at 238-39. Rather, CPOM categorically prohibits certain relationships and business structures joining physicians and lay entities where there is "a tendency to debase the profession," or where there is potential that a lay entity would be able to directly or indirectly influence or control physicians. *Id.* at 239.

The employment relationship is a prototypical example of a prohibited relationship whereby a lay entity gains undue influence over physicians. The Attorney General has issued opinions reaffirming this prophylactic approach to enforcement of CPOM and found numerous types of relationships to be prohibited based on the potential interference with the practice of medicine created by such relationships and the presence of a potential for the physician to have divided loyalties. *See* 54 Ops. Cal. Atty. Gen. 126 (1971) (nonprofit hospital may not employ physicians to provide professional services); 55 Ops. Cal. Atty. Gen. 103 (1972) (CPOM prohibits lay entities from having an economic interest in the net profits of a medical practice); 65

7

Ops. Cal. Atty. Gen. 223 (1982) (general business corporation may not lawfully engage licensed physicians to treat employees even though physicians act as independent contractors).

**C.      Lilly's Complaint Presents Serious Violations of CPOM That Potentially Could Interfere in the Practice of Medicine for Many Patients.**

Lilly's Complaint includes many allegations that, if proven, depict both classic and more nuanced violations of CPOM. In toto, the Complaint alleges a systematic scheme by Mochi Health and its non-licensed owners to direct, influence, or interfere with the medical care of patients in a closely-aligned if not "captured" medical group.

Lilly alleges that Mochi Health exerts influence or control over the hiring and recruitment of physicians to practice medicine at Mochi Medical and that Mochi Health controls the practice of medicine by Mochi Medical physicians by directing the medical intake process via scripted online forms and algorithmic sorting, implementing and amending diagnostic protocols and prescriptions. *See* Compl. ¶¶64-68, 71, 95-121. If ultimately proven, these allegations could demonstrate a business operation and model by Defendants that violate CPOM in its classic and modern forms.

CMA is concerned about the close family relationship that is alleged between Mochi Medical and the lay entity Mochi Health. California Business and Professions Code sections 2402 and 2406 permit medical practice by "medical corporations" operating under the Moscone-Knox Professional Corporation Act ("Moscone-Knox"). The Moscone-Knox Act establishes numerous strict requirements for the creation and operation of such medical professional corporations. Chief among these requirements is that the medical corporation's shareholders must be California licensed professionals. *See* Cal. Corp. Code §13406. Other requirements restrict who may own a medical corporation and prohibit physician owners from entering into voting trusts or proxies. *See id.* at §§13401.5, 13406(a). It is only by strict compliance with the Moscone-Knox Act that a medical professional corporation is permitted to "practice medicine" (i.e., hire doctors and arrange for medical care). *See* Cal. Bus. & Prof. Code §§2402 and 2406. Accordingly, any design or arrangement limiting the ownership rights of physician owners in medical corporations could

1    potentially enable a lay entity to do what is otherwise legally restricted to and reserved only for

2    licensed physicians. CMA believes CPOM requires <u>unfettered</u> medical corporation ownership.

3        Though there are no explicit allegations in the Complaint concerning ownership or

4    management of Mochi Medical, the overall picture of how the medical group fits into Mochi

5    Health's business model and operations should give pause to whether the arrangement complies

6    with CPOM. To be sure, as noted above, Lilly does allege that Mochi Health exercises control

7    over the clinical practice of Mochi Medical by dictating patient care policies, implementing

8    standardized treatment protocols without individualized physician judgment, and exerting

9    operational authority over licensed physicians through employment and administrative structures

10   not owned or managed by physicians. If true, such control by a lay entity might suggest a nominal

11   medical group owner, who in this case happens to be a close relative to the unlicensed owners of

12   Mochi Health. Lilly's allegations, if true, suggest a prototypical violation of California's

13   prohibition on the corporate practice of medicine through the use of a captive PC structure.

14       Based on Complaint alone, CMA cannot determine, and therefore takes no position,

15   whether Mochi Health has taken advantage of any artifices or arrangements with the licensed

16   physician owner(s) of Mochi Medical in violation of CPOM. However, the allegations do appear

17   to raise serious issues concerning alignments between Mochi Health and Mochi Medical's

18   owner(s) that may violate CPOM.

19
**D.    CPOM Has Always Been Advanced and Developed through Private and Public
20       Enforcement.**

21       As illustrated by the spectrum of cases over many decades that are cited and discussed

22   above, the scope and contours of CPOM enforcement have been developed and adapted to the

23   modern business of medicine through a combination of private and public enforcement. In this

24   light, Defendants' request that the Court dismiss the CPOM claims in deference to the primary or

25   exclusive jurisdiction of the Medical Board is wholly unsupported, if not fantastical. CMA is not

26   aware of, and Defendants do not cite, any instance in which the Medical Board has sought to

27   displace private enforcement of CPOM. Nor should the Medical Board ever do so, given over a

28

century of CPOM development in the courts and through regulatory guidance, not to mention the express provisions of the Medical Practice Act that recognize public and private enforcement.[2]

**1.  The Medical Practice Act Expressly Recognizes Private Enforcement of CPOM.**

CPOM springs out of the Medical Practice Act, and the Act is clear in allowing enforcement of its provisions by public and private litigants. The Legislature has explicitly authorized private parties, along with the Medical Board, to seek injunctive relief for violations of the Medical Practice Act, including CPOM violations. *See* Bus. & Prof. Code §§125.7, 125.8, 2311. What is more, the Medical Practice Act expressly reserves all other mechanisms and legal remedies for the enforcement of CPOM. Business and Professions Code section 2052 prohibits any person from practicing medicine without a valid license and imposes criminal penalties for both direct violations and for aiding or abetting such conduct. Critically, subdivision (c) of section 2052 provides: "The remedy provided in this section shall not preclude any other remedy provided by law."

Further support for private enforcement comes from California's Unfair Competition Law (UCL), which permits injunctive relief for "unlawful, unfair or fraudulent business act[s] or practice[s]." Bus. & Prof. Code § 17200. A violation of CPOM constitutes an "unlawful" business practice under this provision. In *American Academy of Emergency Medicine Physician Group, Inc. v. Envision Healthcare Corporation*, no. 22-cv-00421-CRB, 2022 WL 2037950, at *8 (N.D. Cal. May 27, 2022), Judge Breyer recognized that allegations of CPOM violations—specifically, the use of lay control over medical decision-making—could support a private UCL action. There, the court acknowledged the viability of claims seeking to enjoin unlawful corporate control over the practice of medicine, consistent with the purpose of CPOM to preserve physician independence and protect patient care.

---

[2] Defendants' reference to a Medical Board notice of investigation into their practices (dkt. 63) does not change the vitality and need for public and private enforcement. In CMA's experience, Lilly is correct to point out that public agencies regularly conduct investigatory and enforcement activities in tandem with private enforcement. Indeed, that typifies the history of CPOM enforcement, as demonstrated in the case law.

Indeed, private enforcement plays a vital role precisely because the Medical Board's authority is not comprehensive, nor is the Medical Board necessarily well-positioned to adjudicate the full range of harms caused by CPOM violations – particularly where those violations are systemic, commercial in nature, or linked to broader unfair competition. As illustrated above, CPOM has evolved to touch modern business structures, which is an area that the Medical Board does not possess exclusive expertise. As such, courts have long recognized that private actors, especially those with standing under the UCL or those directly injured by CPOM-related conduct, may and should act to enforce CPOM.

Private enforcement is not merely permissible, it is <u>essential</u> to safeguard against erosion of the physician-patient relationship. Many of the cases cited above involved private litigants advancing the jurisprudence around CPOM application to new and complex schemes that created new ways medical practice can be interfered with or controlled by lay entities. Litigation of Lilly's CPOM allegations fits within a tradition of private enforcement to break new ground in the evolution of CPOM. Moreover, Lilly's CPOM claim is directed to potential captive medical corporations as the mechanism through which lay control over the practice of medicine is accomplished. This is an area that CMA believes is the current frontier of CPOM enforcement.

**2. The Medical Board Has Openly Acknowledged Private CPOM Enforcement.**

Whereas Defendants cannot point to any instance of the Medical Board seeking to exert primary or exclusive jurisdiction over CPOM enforcement, the Medical Board has in fact encouraged or recognized the importance of broad enforcement of CPOM, which necessarily must include historical private enforcement. The Board has gone so far as to suggest that private enforcement actions play an integral role in the oversight of CPOM violations, and that its own authority is limited by statutory design and practical constraints.

In its 2020 Medical Practice Act Sunset Review report to the California Legislature, the Medical Board reaffirmed the importance of the CPOM prohibition as a patient protection measure. *See* Medical Bd. of Cal., Sunset Review Oversight Report (2020) <<https://www.mbc.ca.gov/Download/Reports/sunset-report-2020.pdf>> (visited July 17, 2025).  It

11

1    recognized a potential new field in which CPOM violations could arise: "as technology advanced

2    over the last few years, more complaints have been received regarding care provided via

3    telehealth, including complaints of unlicensed practice, inappropriate care, and the corporate

4    practice of medicine." *Id.* at 118. The Board further informed the Legislature in its sunset report

5    that "[t]he purpose of the ban on the corporate practice of medicine is to minimize the undue

6    influence or interference with physician's judgment and the physician-patient relationship." *Id.* at

7    166. It further emphasized that "[p]hysicians should not be forced to choose between the dictates

8    of the employer and the best interest of the patient." *Id.* The Board concluded that "removal of the

9    ban on the corporate practice of medicine would have a significant impact on consumer

10   protection" and maintained that "the ban provides a very important protection for patients and

11   physicians from inappropriate intrusions into the practice of medicine." *Id.*

12           This acknowledgment is not new. Ten years ago, the Board's legal staff made clear that

13   CPOM enforcement is a shared responsibility. In a presentation before the Education and

14   Wellness Committee, Board counsel explained that the ban on the corporate practice of medicine

15   exists to "protect California patients from unqualified persons or heads of entities making or

16   influencing medical decisions," and emphasized that CPOM violations often involve "divided

17   loyalties between physician and employer" that undermine the physician-patient relationship. *See*

18   Medical Board of California, Education and Wellness Committee Mtg. Minutes, Agenda Item #4

19   at p. 4 (Jan. 29, 2015) <https://mbc.ca.gov/About/Meetings/Minutes/29102/edu-Minutes-

20   20150129.pdf> (visited on 7/17/2025). A Board member queried whether CPOM is equipped to

21   address a variety of scenarios in which medical care can be improperly influenced or controlled

22   by lay entities. *Id.* The Board's chief counsel replied that "California courts have been firm in

23   supporting the ban on corporate practice in California and there are numerous cases." *Id.* In other

24   word, the Medical Board recognizes the value and importance of private enforcement through the

25   courts to develop and hone CPOM to address all the varying alignments between physicians and

26   lay entities in modern health care. Notably, there is no instance that CMA is aware of in which

27   the Medical Board expresses a desire or need for exclusive enforcement of CPOM.

28

Further, the Medical Board of California itself has recognized limitations in its enforcement authority that underscore the need for judicial oversight in matters implicating CPOM. In 2011, the Board highlighted the risk of regulatory evasion when licensees shift to retired or inactive status to escape disciplinary scrutiny. Board staff cautioned that "if the Board lacked jurisdiction to impose discipline, it may create a retired status loophole that would insulate any licensee from discipline by transferring his or her license to a retired or inactive status." Medical Board of California, "Legislative Proposals 2012," Agenda Item #20B, at 1-2 (Oct. 28, 2011) <https://www.mbc.ca.gov/About/Meetings/Material/29981/brd-AgendaItem20B-20111028.pdf> (visited on 7/17/2025). Accordingly, the Board proposed legislation to clarify that its disciplinary authority extends to all licensees, "regardless of the status of his or her license." *Id.* This acknowledgment demonstrates the inherent limitations of administrative enforcement and reinforces the critical role of courts in addressing unlawful arrangements—particularly where corporate entities and non-licensees exert control over medical practice in violation of CPOM.

Indeed, the Legislature itself has confirmed that private parties may bring actions to enforce the Medical Practice Act – including CPOM – under Business and Professions Code section 2052, which makes it unlawful for any unlicensed person to practice medicine, and section 2400, which deprives corporations of all "professional rights, privileges, or powers." These provisions form the statutory predicate for civil actions under the UCL, which permits injunctive relief and restitution for CPOM violations by unauthorized corporate actors. As the *Envision* order shows, courts have no issue finding that CPOM violations support private causes of action under the UCL.

At the national level, experts underscore the continuing need for a robust and flexible approach to CPOM enforcement. Researchers noted "[t]here is growing concern [] that corporations aren't simply providing ancillary business and operational support but are also increasingly assuming control over clinical operations, management and staffing decisions, billing and coding practices, and negotiations with insurers – which may exert pressure on physicians to change care delivery. Emerging empirical evidence suggests three primary risks that

13

corporatized medicine poses: increased health care prices and spending owing to market

consolidation and exploitation of payment loopholes, patient care concerns associated with

changes in practice patterns and pressures to reduce staffing, and moral injury and burnout among

physicians." Jane M. Zhu et al., "A Doctrine in Name Only — Strengthening Prohibitions against

the Corporate Practice of Medicine," 39 New Engl. J. Med. 11; 389:965-968 (Sep. 9, 2023)

<https://www.nejm.org/doi/full/10.1056/NEJMp2306904> (visited 7/17/2025). According to this

author, "[i]n the current wave of health care corporatization, the original need for the CPOM

doctrine has resurfaced. If sharpened, honed, and enforced, CPOM laws could be useful

guardrails to ensure that physicians' clinical decisions and professional autonomy aren't

superseded by corporate pressures." *Id.* Critical to this endeavor is "broader enforcement . . . if

CPOM restrictions are to have meaningful effect." *Id.*

Thus, the suggestion that CPOM enforcement is exclusively or even primarily the

province of the Medical Board is not only doctrinally flawed but also contradicts the Board's own

representations to the Legislature and the public. The Board and industry experts recognize that

private enforcement actions are necessary to preserve the integrity of California's health care

delivery system in an era of growing corporate influence over clinical decision-making.

### 3. Enforcement of CPOM in this Case Does Not Require the Medical Board's Unique Agency Expertise.

The doctrine of primary jurisdiction does not bar this Court's consideration of CPOM

violations alleged in this case. The enforcement of CPOM does not hinge on the Medical Board

specialized knowledge or expertise. On the contrary, California courts are well-equipped to

adjudicate these questions, as they have done for decades.

The allegations here concern whether Mochi Health has instituted corporate policies and

operational structures that improperly influence or control the professional judgment of licensed

physicians working under the name Mochi Medical. These are not arcane matters requiring

agency-led clinical assessment. They are legal and factual questions concerning how broad

business practices—such as compensation schemes, employment relationships, scheduling, and supervision—affect physician independence and, by extension, patient care.

As currently alleged, this case presents no need to probe into individual clinical judgments or evaluate the medical appropriateness of a diagnosis or treatment plan. The gravamen of the complaint is that lay control over medical practice—via administrative oversight and employment structure—violates CPOM. This Court does not need to answer the question, "Was the medical care appropriate?" Rather, it must answer, "Who had the legal right to make the medical decision?" That inquiry is firmly within the competence of the judiciary. Courts have long enforced CPOM without deferring to agency expertise. *In People ex rel. State Bd. of Medical Examiners v. Pacific Health Corp.*, *supra*, the California Supreme Court affirmed that the essence of a CPOM violation lies in whether a lay entity exercises control over medical decisions, not whether the decisions themselves were correct. Subsequent case law has confirmed that enforcement of CPOM turns on structural facts – contracts, corporate arrangements, and patterns of decision-making – not on clinical minutiae.

Moreover, the Medical Board itself relies on external physician experts to assess alleged violations of the Medical Practice Act, when needed. These experts are not state employees with special administrative insight, but rather licensed professionals whose knowledge is equally available to courts through expert testimony. As such, this Court is no less competent to assess whether lay control exists and whether it impermissibly intrudes on the physician-patient relationship. Just as the Medical Board uses independent experts to inform its determinations, this Court may rely on testimony and documentary evidence to determine whether Mochi Health's operational model crosses the line from lawful business support into unlawful lay control.

## CONCLUSION

For the foregoing reasons as well as the reasons stated in Lilly's opposition to the motion to dismiss, CMA respectfully urges the Court to decline Defendants' request that the Court abstain from adjudicating Lilly's CPOM claims in this action.

Dated:  July 18, 2025

Respectfully submitted,

ATHENE LAW, LLP
CALIFORNIA MEDICAL ASSOCIATION,
CENTER FOR LEGAL AFFAIRS

By:  _____*/s/ Long X. Do*_____
LONG X. DO
*Attorneys for Amicus Curiae CALIFORNIA MEDICAL
ASSOCIATION*

CMA AMICUS CURIAE BRIEF ISO PLTFF.'S OPPO. TO MTN. TO DISMISS          no. 3:25-CV-3534-JSC

**FRAP 29 DISCLOSURE**

Pursuant to Federal Rule of Appellate Procedure, rule 29(a)(4)(E), the undersigned counsel for the California Medical Association represents that no party or party's counsel (i) authored this amicus brief in whole or in part; (ii) contributed money that was intended to fund preparing or submitting this brief; or (iii) contributed money that was intended to fund preparing or submitting the brief, other than the amicus curiae, its members, or its counsel.

Dated:  July 18, 2025

                                            /s/ Long X. Do
                                    _____
                                            LONG X. DO
                                    Attorney for Amicus Curiae CALIFORNIA
                                    MEDICAL ASSOCIATION