UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELI LILLY AND COMPANY, Plaintiff, v. MOCHI HEALTH CORP., et al., Defendants. | Case No. 25-cv-03534-JSC **ORDER RE DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT** Re: Dkt. No. 102 |

Eli Lilly and Company ("Lilly") sues Mochi Health Corp., Mochi Medical CA, P.C., Mochi Medical P.A., and Aequita Pharmacy LLC alleging a scheme to mislead consumers into purchasing compounded versions of Lilly's FDA-approved medications MOUNJARO® and ZEPBOUND®. The Court previously granted Defendants' motion to dismiss the Complaint with leave to amend for failure to plausibly allege Article III standing. (*See* Dkt. No. 95 at 7.) Lilly timely filed the First Amended Complaint ("FAC") asserting three causes of action: 1) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq*., by Mochi Health; 2) violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), by Mochi Health; and 3) a civil conspiracy among all Defendants to commit these statutory violations. (Dkt. No. 99.) Defendants move to dismiss all claims under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Dkt. No. 102.)

Having considered the parties' submissions, and with the benefit of oral argument on April 9, 2026, the Court **GRANTS in part** and **DENIES in part** the motion to dismiss. Lilly plausibly alleges Article III standing as well as its claims under the UCL and Lanham Act; however, it has not plausibly alleged a civil conspiracy among the defendants.

**FACTUAL ALLEGATIONS**

The Court initially summarized Lilly's allegations in ruling on Defendants' first motion to dismiss. *See Eli Lilly & Co. v. Mochi Health Corp.*, No. 25-CV-03534-JSC, 2025 WL 2998166, at *1 (N.D. Cal. Oct. 24, 2025). Here, the Court briefly summarizes those allegations and incorporates Lilly's amendments. Eli Lilly is a pharmaceutical company responsible for the research and formulation of MOUNJARO® and ZEPBOUND®, two FDA-approved weight-loss medications containing the active pharmaceutical ingredient tirzepatide. (Dkt. No. 99 ¶¶ 1-2.[1]) Mochi Health is a telehealth company that connects consumers with physicians who can prescribe weight-loss medications, including compounded versions of tirzepatide. (*Id.* ¶¶ 3, 67.) Lilly brings this suit against Mochi Health based on alleged unfair competition and false advertising related to those compounded tirzepatide medications.

Lilly's First Cause of Action under the UCL arises out of Mochi Health's alleged corporate practice of medicine. (*See generally*, *id.* ¶¶ 104-148.) Prior to December 2024, Mochi Health prescribed its compounded tirzepatide medication in 2.5 mg, 5 mg, 7.5 mg, 10 mg, 12.5 mg, and 15 mg doses. (*Id.* ¶¶ 120-23.) Thereafter, Mochi Health allegedly changed the doses *en masse* without consulting patients or receiving a clinical indication from a physician. (*Id.* ¶¶ 124-25, 128.) In March 2025, Mochi Health allegedly changed the doses once again, reverting to the original doses prescribed prior to December 2024. (*Id.* ¶ 103.) Then, in September 2025, Mochi Health further altered the doses and formulation of its compounded medication based on a new partnership with Lexington Compounding Pharmacy. (*Id.* ¶ 127.)

Lilly avers Mochi Health instituted these changes based on its developing business relationships with various pharmacies. (*Id.* ¶¶ 131-33, 135-36.) Mochi Health customers allegedly received compounded medications that included niacinamide, glycine, and pyridoxine that differed depending on the pharmacy engaged by Mochi Health. (*Id.* ¶¶ 138, 143, 171.) Lilly asserts these additives were not meant to achieve a therapeutic effect, but rather reflected Mochi Health's financial considerations. (*Id.* ¶¶ 9, 145.) Per the FAC, Lilly contends these activities

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

violated California's prohibition on the corporate practice of medicine because Mochi Health made medical decisions for patients based on profit motives rather than clinical need. (*Id*. ¶ 145.) Moreover, Lilly claims Mochi Health "steer[s] its patients to compounded products over Lilly's FDA-approved tirzepatide medicines" through its hiring of Mochi physicians, its development of obesity treatment protocols, and training of Mochi medical staff. (*Id*. ¶¶ 88-90.) Through this alleged corporate practice of medicine, Lilly asserts it has suffered financial harm through diversion of sales. (*Id*. ¶¶ 186-87.)

As to the Second Cause of Action for violation of the Lanham Act, Lilly alleges Mochi Health made false or misleading statements to consumers. These include:

- Misrepresenting Mochi Health's compounded tirzepatide medications as safe and effective based on studies conducted of Lilly's products;
- Misrepresenting Mochi Health's products as FDA-approved;
- Claiming Mochi Health's compounded tirzepatide drug is "personalized."

(*See id*. ¶¶ 149-80.) In addition to lost sales, Lilly contends Mochi Health has caused the company reputational harm by comparing an inferior, compounded product to Lilly's FDA-approved medicine, (*id*. ¶193), which causes consumers to conflate the higher incidence of adverse events found in compounded medications with Lilly's drugs, (*id*. ¶¶ 196-201). As support, Lilly cites studies indicating a higher risk of adverse events from utilizing compounded versions of tirzepatide, such as "abdominal pain, diarrhea, nausea, suicidality, and cholecystitis." (*Id*. ¶ 199.)

Last, Lilly brings the Third Cause of Action for conspiracy to commit these statutory violations against all Defendants, including both Mochi Medical entities and Aequita Pharmacy. (*Id*. ¶¶ 220-24.) Lilly alleges the CEO of Mochi Health, Myra Ahmad, and her husband, Abraham Chaibi, control the various defendant companies and "acted in concert to unlawfully make, prescribe, and sell compounded tirzepatide drugs in violation of the California Unfair Competition Law and the Lanham Act." (*Id*. ¶¶ 221-22.)

**DISCUSSION**

Under Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss the complaint for lack of Article III standing, which divests the Court of subject-matter jurisdiction.

*Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011). "The party asserting federal subject matter jurisdiction bears the burden of proving its existence." *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010). A 12(b)(1) motion may advance a factual or facial challenge to jurisdiction. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). A factual challenge "disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction," while a facial challenge argues "the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Id*. at 1039. To resolve a factual challenge, the court "may review evidence beyond the complaint" and "need not presume the truthfulness of the plaintiff's allegations." *Id.* at 1038. The court "resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor . . . ." *3taps, Inc. v. LinkedIn Corp.*, No. 18-CV-00855-EMC, 2022 WL 16953623, at *4 (N.D. Cal. Nov. 15, 2022) (citing *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014)).

To survive a Rule 12(b)(6) motion, the plaintiff's "allegations must suggest that their claim has at least a plausible chance of success." *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1134-35 (9th Cir. 2014) (cleaned up). The district court assumes the plaintiff's allegations are true and draws all reasonable inferences in his favor. *Shields v. Credit One Bank, N.A.*, 32 F.4th 1218, 1220 (9th Cir. 2022). However, the court need not construe conclusory statements or unreasonable inferences as true. *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

Further, since Lilly's Lanham Act claim sounds in fraud, Federal Rule of Civil Procedure 9(b) requires the claim be pled with particularity. *See Genus Lifesciences Inc. v. Lannett Co., Inc.*, 378 F. Supp. 3d 823, 836 n.4 (N.D. Cal. 2019) (noting Rule 9(b)'s heightened pleading requirement applies to the Lanham Act and citing various cases in support). So, the Court considers whether Lilly properly alleges "the time, place, and specific content of [any] false representations as well as the identities of the parties to the misrepresentation." *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 558 (9th Cir. 2010).

The Court first addresses subject-matter jurisdiction before considering the parties' arguments as to whether the FAC plausibly states a claim.

4

## I. SUBJECT-MATTER JURISDICTION

Article III of the United States Constitution "confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Therefore, a plaintiff has standing to sue in federal court only when he can show "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id*. "[U]nder Article III, an injury in law is not an injury in fact. Only those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court." *Id*. at 427 (emphasis in original). Moreover, "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek . . . ." *Id*. at 431.

Defendants advance a factual attack on jurisdiction, arguing Lilly has failed to establish all three elements of standing. "In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." *Safe Air for Everyone*, 373 F.3d at 1039 (citation omitted). Accordingly, the Court need not assume the truth of the complaint's contested allegations. *Id*. "Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Id*. (citation omitted). As the basis for their factual attack, Defendants request judicial notice of various documents incorporated by reference in the FAC as well as certain publicly available filings related to the defendant entities.[2] (*See* Dkt. No. 104.)

The Court considers the extent to which these documents dispute the FAC's jurisdictional

---

[2] Pursuant to Federal Rule of Evidence 201, a "court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Courts often take judicial notice of "matters of public record" and court filings. *Reyn's Pasta Bella, LLC v. Visa USA, Inc*., 442 F.3d 741, 746 n.6 (9th Cir. 2006). To the extent Defendants request judicial notice of documents incorporated by reference in the FAC, the Court appropriately considers them incorporated. For the remaining public filings, the Court takes judicial notice of any undisputed material therein.

allegations, and where such a dispute exists, whether Lilly has presented sufficient evidence to establish subject-matter jurisdiction.

### A. Injury in Fact

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest'" that also satisfies Article III's concreteness and particularity requirements. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (citation omitted). Here, Defendants assert Lilly has failed to show economic or reputational injury resulting from the alleged conduct. The Court disagrees.

As to economic injury, Lilly alleges Mochi Health diverts potential customers—and concomitant sales—from Lilly's FDA-approved medications through its corporate practice of medicine as well as a series of misleading advertisements. For instance, the FAC alleges that Mochi Health steers customers away from products like MOUNJARO® and ZEPBOUND® and toward compounded tirzepatide through its improper control over the Mochi Medical entities and Aequita Pharmacy. (*See, e.g.*, Dkt. No. 99 ¶¶ 85-90, 123-25, 186-87.) Lilly alleges Mochi Health hires the physicians working at the Mochi Medical entities, advertises for them, provides "diagnostic protocols" related to obesity medicine, and trains medical providers. (*Id*. ¶¶ 85-89.) Coupled with Mochi Health's alleged unilateral ability to modify existing compounded medication doses for customers, (*id*. ¶¶ 120-25), Lilly asserts Mochi Health exercises control over the Mochi Medical practice to reduce patients' ability to choose MOUNJARO® or ZEPBOUND® over a compounded option, (*id*. ¶¶ 186-87). In this way, Mochi Health diverts potential sales from Lilly, causing economic injury. Similarly, Lilly alleges Mochi Health's misleading advertisements regarding the safety and personalization of compounded tirzepatide also steered consumers in the market for weight-loss medication away from Lilly's products. (*Id*. ¶ 188.)

Regarding reputational injury, Lilly plausibly alleges Mochi Health's conduct harms consumer perception of FDA-approved tirzepatide medications. To buttress this conclusion, Lilly first cites studies indicating a higher incidence of adverse side effects among users of compounded GLP-1 inhibitors compared to FDA-approved formulations. (*Id*. ¶ 199.) Then, Lilly connects this allegation to research findings from the National Consumers League that show consumer

United States District Court
Northern District of California

6

confusion about the difference between compounded medications and FDA-approved medications, and conflation of the two. (*Id*. ¶¶ 61-62.) Combined, these allegations permit a reasonable inference of harm to Lilly's reputation through public perception that FDA-approved tirzepatide medications have similar rates of adverse side effects compared to compounded medications. For both its UCL claim and its Lanham Act claim, Lilly has plausibly alleged an injury in fact.

Defendants counter that consumers of compounded tirzepatide are different from consumers of MOUNJARO® or ZEPBOUND®, rebutting any allegations of diverted sales. In support, they primarily rely on statements Lilly made in a separate case involving the FDA's determination that there was no longer a nation-wide "shortage" of tirzepatide-based drugs. *See Outsourcing Facilities Ass'n v. United States Food & Drug Admin.*, No. 4:24-CV-0953-P, 2025 WL 1397537, at \*8 (N.D. Tex. May 13, 2025). There, the district court granted the FDA's motion for summary judgment, upholding the FDA's decision to remove MOUNJARO® and ZEPBOUND® from the "shortage list." *Id*. at \*1. Defendants identify portions of Lilly's brief as an intervenor-defendant in the action, which state:

> And there were good reasons to think much of the market for compounded tirzepatide would not translate to future demand for Lilly's FDA-approved products. Compounded products are often promoted for uses different from the indications FDA has approved, including by affiliated telehealth providers, so patients may be less likely to get a prescription from a physician for FDA-approved medicine. There also might not be insurance coverage for those off-label uses, and some compounded products use a different formulation than Lilly's products.

(Dkt. No. 104-14 at 30-31.) Based on these statements, Defendants argue Lilly is judicially estopped from making allegations of diverted sales. The Court is not persuaded.

"Judicial estoppel, sometimes also known as the doctrine of preclusion of inconsistent positions, precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position." *Helfand v. Gerson*, 105 F.3d 530, 534 (9th Cir. 1997) (citation omitted). Three principal factors guide application of the doctrine:

> First, a party's later position must be clearly inconsistent with its earlier position. Second, the party must have succeeded in persuading a court to accept that party's earlier position. Third, the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Nada Pac. Corp. v. Power Eng'g & Mfg., Ltd.*, 73 F. Supp. 3d 1206, 1215 (N.D. Cal. 2014) (cleaned up). Ultimately, estoppel is "an equitable doctrine invoked by a court at its discretion." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001). Here, Defendants have not provided a sufficient basis to warrant the Court's exercise of discretion. In the *Outsourcing Facilities Ass'n* litigation, Lilly did not make any representations as to Mochi Health's marketing and customer base. Further, Lilly's prior statement that "much of the market for compounded tirzepatide" may not overlap is consistent with its allegations in this case of *some* consumers being diverted by virtue of Mochi Health's alleged corporate practice of medicine and false advertising. At the pleading stage, Lilly need not quantify the precise number of diverted customers, nor establish the market for compounded medication completely overlaps with the market for Lilly's products. It suffices that Lilly has shown a plausible basis for the diversion.

In response, Defendants further argue Mochi Health does not divert customers from Lilly because Mochi Health does not prescribe, manufacture, or sell the compounded tirzepatide medications. Since Mochi Health and Lilly operate in different strata of the market, the lost sales allegations are implausible. This argument misunderstands Lilly's injury theory. Lilly alleges Mochi Health's misleading advertisements about the safety and personalization of its medicines attracted customers in the market for weight-loss medication that may have otherwise purchased a Lilly medication. Additionally, Lilly asserts Mochi Health exercised improper control over the practices of the Mochi Medical entities such that Mochi patients were steered away from Lilly's products. It is not necessary that Mochi Health personally profited from the diverted sales; the relevant inquiry is whether Lilly has plausibly alleged it suffered an economic injury *caused by* Mochi Health's conduct. Accordingly, Lilly's and Mochi Health's relative positions in the market are not dispositive of the economic injury question here.

Last, Defendants assert Lilly's reputational harm allegations are implausible because: 1) the study on adverse effects was funded by Lilly and did not refer to Mochi Health's drugs, specifically; and 2) adverse event reports from consumers do not evince confusion in the market because Lilly solicited consumer complaints on compounded medications. These arguments improperly draw inferences in Defendants' favor. On a motion to dismiss, the Court must draw all

reasonable inferences in the non-movant's favor and accept the complaint's allegations as true. *See Shields*, 32 F.4th at 1218. Disputes regarding the specifics of the consumer studies and the adverse event reports lie outside the pleadings and require drawing inferences in Defendants' favor. To the extent Defendants assert these disputes are appropriate for a Rule 12(b)(1) factual attack on jurisdiction, a "[j]urisdictional finding of genuinely disputed facts is inappropriate when 'the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits' of an action." *Safe Air for Everyone*, 373 F.3d at 1039. The degree to which consumers are actually confused about the differences between compounded tirzepatide and FDA-approved medications, as well as the scale of adverse event reports, both go to the merits of Lilly's underlying claim under the Lanham Act. At this juncture, Lilly's allegations are sufficient to establish an injury in fact.

### B. Traceability

Article III standing next requires the plaintiff's alleged injury "was likely caused by the defendant." *TransUnion LLC*, 594 U.S. at 423. Courts have also interpreted this element to require the injury be "fairly traceable" to the defendant's conduct. *O'Handley v. Weber*, 62 F.4th 1145, 1161 (9th Cir. 2023). Notably, "the traceability requirement is less demanding than proximate causation, and thus the 'causation chain does not fail solely because there are several links' or because a single third party's actions intervened." *Id*. On this point, Defendants contend Lilly's alleged injury is not traceable to their conduct because an intervening cause disrupts the causal chain. The Court disagrees.

Defendants identify the intervening cause as the requirement that any consumer receive a valid prescription from a treating physician before purchasing compounded tirzepatide. Since consumers need the prescription, Defendants conclude their conduct could not have diverted a would-be Lilly customer. But as the Ninth Circuit noted, a single third-party's actions do not necessarily upend traceability given the requirement is "less demanding than proximate causation." *Id*. Additionally, Defendants fail to account for the FAC's full array of allegations. For example, Lilly alleges Mochi Health influences the prescription process. (Dkt. No. 99 ¶¶ 120-45.) On multiple occasions, Mochi Health allegedly changed the formulation of compounded

tirzepatide medications for all patients *en masse* without advanced notice or a clinical indication. (*Id*. ¶¶ 122-25.) Defendants' argument assumes away these allegations of Mochi Health's control over individual patient prescriptions. Given the allegations regarding Mochi Health's influence on prescribing practices, Lilly has plausibly alleged its injury is traceable to Defendants' conduct.

### C. Redressability

Turning to the final element of Article III standing, "[a] plaintiff's burden to demonstrate redressability is relatively modest . . . . She need not demonstrate that there is a guarantee that her injuries will be redressed by a favorable decision; rather, a plaintiff need only show a substantial likelihood that the relief sought would redress the injury." *M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018) (internal quotation marks omitted). "'[F]ull redress of the injury is not required, as the ability to effectuate a partial remedy satisfies the redressability requirement." *Idaho Conservation League v. Bonneville Power Admin*., 83 F.4th 1182, 1191 (9th Cir. 2023) (internal quotation marks omitted). Here, too, Defendants' arguments for dismissal fall short.

In sum, Defendants assert the requested injunctive relief would not redirect customers or sales to Lilly from Mochi Health. Indeed, Defendants argue compounded medication is prescribed based on medical necessity, and an injunction could not force the physicians—who are not parties to this case—to prescribe Lilly's products instead of a compounded drug. This argument lacks merit for two reasons. First, it ignores damages as an available remedy under the Lanham Act. Second, any equitable relief would address Mochi Health's alleged false advertising practices and corporate intervention in the practice of medicine. The Court need not compel medical providers to prescribe MOUNJARO® or ZEPBOUND®; instead, injunctive relief is substantially likely to curb unlawful practices and restore fair competition to the marketplace. Then, consumers could make a choice, with their healthcare provider, about the appropriate medication for their needs, free from the influence of unlawful advertising or corporate manipulation of medical practices. Such a remedy would redress Lilly's alleged injury.

\* \* \*

For these reasons, the Court **DENIES** Defendants' motion to dismiss the FAC for lack of Article III standing.

## II. UNFAIR COMPETITION LAW CLAIM

California's UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . . ." Cal. Bus. & Prof. Code § 17200. "Therefore, under the statute there are three varieties of unfair competition: practices which are unlawful, unfair or fraudulent." *In re Tobacco II Cases*, 46 Cal. 4th 298, 311 (2009) (internal quotation omitted). Lilly advances a UCL claim under the unlawful prong, relying on Mochi Health's alleged violation of California's Medical Practice Act ("CMPA") as the underlying offense.

Defendants move to dismiss the claim pursuant to Rule 12(b)(6), asserting Lilly has failed to plausibly allege statutory standing or a violation of the CMPA. In the alternative, Defendants argue the Court should abstain from resolving this claim because it is more appropriately within the "special competence" of the California Medical Board's police powers. (Dkt. No. 102 at 28 (citing *Farmers Ins. Exch. v. Superior Ct.*, 2 Cal. 4th 377 (1992)).)

### A. Statutory Standing

A plaintiff bringing a UCL claim must plausibly allege statutory standing, that is she must: "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury*, and (2) show that that economic injury was the result of, i.e., *caused by*, the unfair business practice or false advertising that is the gravamen of the claim." *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 322 (2011) (emphasis in original). As to the second element, California courts have not offered extensive interpretations of this reliance language in the context of competitor claims, but at minimum, the statutory language requires the plaintiff establish a causal relationship between the alleged violation and injury. *See KT Enters. LLC v. Comp360, LLC*, 751 F. Supp. 3d 999, 1003-04 (C.D. Cal. 2023) (observing the California Supreme Court has provided little guidance on the meaning of "as a result of" in the statute, and such cases have dealt with consumer, not competitor, claims); *see also L. Offs. of Mathew Higbee v. Expungement Assistance Servs.*, 214 Cal. App. 4th 544, 547 (2013) ("[W]e conclude that the lack of direct dealings between two business competitors is not necessarily fatal to UCL standing, provided the plaintiff competitor has suffered injury in fact and lost money or property as a result of the

defendant competitor's unfair competition.").

For the reasons discussed in the Court's analysis of Article III injury in fact, Lilly has plausibly alleged a loss of money or property caused by Defendants' conduct. In brief, Lilly's allegations permit a reasonable inference of reputational damage and diversion of sales from customers in the weight-loss medication market.

## B. Corporate Practice of Medicine

The statute underlying Lilly's UCL claim is California's prohibition on the corporate practice of medicine as codified in various provisions of the California Medical Practice Act. (Dkt. No. 99 ¶¶ 104-14.) "[A] violation of the [Medical Practice] Act occurs if a non-physician exercises 'control or discretion' over a medical practice." *People ex rel. Allstate Ins. Co. v. Discovery Radiology Physicians, P.C.*, 94 Cal. App. 5th 521, 535 (2023) (citation omitted). As noted by the California Court of Appeal, the Medical Board of California interprets the corporate practice of medicine to encompass the following activities:

> . . . a nonphysician may not "own[ ] or operat[e] a business that offers patient evaluation, diagnosis, care and/or treatment," and a management service organization may not "arrang[e] for, advertis[e], or provid[e] medical services rather than only provid[e] administrative staff and services for a physician's medical practice (non-physician exercising controls over a physician's medical practice, even where physicians own and operate the business).

*Id.* at 538 (citation omitted) (alterations in original). Lilly alleges Mochi Health violates this prohibition on the corporate practice of medicine by "engaging in and aiding and abetting the unlawful prescription of medicines, including modifying the formulation and dosage, without an appropriate prior examination by a physician and without the identification of a medical indication for the modification," among other activities. (Dkt. No. 99 ¶ 206.)

Specifically, the FAC alleges Mochi Health hires Mochi Medical physicians and advertises for them, all while providing "diagnostic protocols" and training medical staff. (*Id*. ¶¶ 85-89.) Additionally, Lilly alleges Mochi Health exercised control over prescribing practices, changing both the dose and formulation of customers' compounded tirzepatide medication—no fewer than three times—without a clinical indication for making the change. (*Id*. ¶¶ 120-27.) The alleged basis for these unilateral changes was Mochi Health's evolving business relationships with

United States District Court
Northern District of California

different pharmacies in different geographic regions, not medical necessity for the patient. (*Id*. ¶ 171.) In support of this conclusion, Lilly alleges Mochi Health told customers the changes to the product formulation were "not clinically significant." (*Id*. ¶¶ 139-41.) Together, these allegations permit a reasonable inference Mochi Health exercised "control or discretion over a medical practice," namely the Mochi Medical entities. *Discovery Radiology Physicians, P.C.*, 94 Cal. App. 5th at 535.

In response, Defendants raise two arguments: 1) a medical services organization may lawfully handle administrative tasks for a medical practice; and 2) there is an unreasonable inferential leap between the allegations regarding changes to customers' doses and Lilly's conclusion that Mochi Health controlled prescribing practices. Neither persuades the Court. As for the first argument, Defendants rely on *Epic Med. Mgmt., LLC v. Paquette*, 244 Cal. App. 4th 504 (2015), to support their position that Mochi Health's conduct was administrative, and therefore, does not constitute corporate practice of medicine. In *Epic Med. Mgmt., LLC*, a management services company agreed to supply the following for a physician: "lease office space to the doctor, lease to him all equipment he deemed reasonably necessary and appropriate, provide support services, provide non-physician personnel, establish and implement a marketing plan, conduct billing and collections, and perform accounting services." *Id*. at 508. Though the management company would provide nursing staff, the physician would train and supervise those individuals. *Id*. at 508 n.1. Upon reviewing the terms, the court concluded the agreement did not involve the corporate practice of medicine. *Id*. at 517-18. However, the facts in *Epic Med. Mgmt., LLC* differ critically from the instant allegations. The California Court of Appeal was not confronted with allegations that the outside commercial entity trained medical care providers—as Lilly claims here—nor that the outside entity changed the dose or formulation of prescribed medications for patients. Therefore, *Epic Med. Mgmt., LLC* is inapposite.

As for the second argument, Defendants suggest Mochi Health's publicized change to doses and formulations does not support an inference Mochi Health *compelled* those changes without a clinical justification. (Dkt. No. 102 at 40.) But this reading of the FAC improperly requires the Court to draw inferences in Defendants' favor. Lilly alleges a coherent set of facts to

support the inference of Mochi Health's control. Specifically, Lilly alleges Mochi Health stated the doses would be changing, (Dkt. No. 99 ¶ 122), customers received their compounded medication with unanticipated changes, (*id*. ¶¶ 137-43), and Mochi Health then stated the new additives in the medications were "not clinically significant," (*id*. ¶¶ 139-41). It is reasonable to infer Mochi Health's business relationship with pharmacies drove these changes rather than patient care, since a physician or pharmacist would not be expected to uniformly introduce an additive based on an individual patient's need if that additive were "not clinically significant." The Court need not—as Defendants assume—infer Mochi Health forced physicians to write certain prescriptions; indeed, the allegations do not support such an inference. Rather, it is enough to infer Mochi Health made decisions impacting patients' treatment, and the medications they received, when it is not licensed to provide medical care. Drawing such reasonable inferences in the plaintiff's favor, Lilly has plausibly alleged a violation of the California Medical Practice Act.

### C. Judicial Abstention

Separately, Defendants argue the Court should apply California abstention doctrine to dismiss the case because Lilly's allegations of corporate practice of medicine fall within the purview of the California Medical Board. The Court does not agree.

Defendants' argument presents an *Erie* question—namely, whether the Court must apply state or federal abstention doctrines. Though the Ninth Circuit has not squarely addressed the question in a published decision, it has indicated abstention may be a procedural issue, and therefore, a district court would apply federal law. *See MacRae by & through Watters v. HCR Manor Care Servs.*, LLC, 691 F. App'x 476, 478-79 (9th Cir. 2017) (Nguyen, J., concurring) ("Similarly, here, the California abstention doctrine appears to be procedural because it concerns not whether a right or obligation exists, but rather the proper venue for its enforcement."). Other district courts to confront the question have ruled similarly. *See, e.g.*, *Admiral Ins. Co. v. Fusion Pac., Inc.*, No. 5:22-CV-00109-SB-SHK, 2022 WL 3574172, at *6 (C.D. Cal. July 22, 2022). The Court finds these analyses persuasive and concludes abstention is a procedural issue governed by federal law.

Defendants do not specify which federal abstention theory applies, but the Court

determines *Burford* abstention is the only potentially relevant doctrine. "*Burford* abstention 'is concerned with protecting complex state administrative processes from undue federal interference.'" *Peridot Tree, Inc. v. City of Sacramento*, 94 F.4th 916, 929 (9th Cir. 2024) (quoting *New Orleans Pub. Serv., Inc. v. Council of New Orleans (NOPSI)*, 491 U.S. 350, 362 (1989)). The Ninth Circuit has held "*Burford* abstention 'is only appropriate' when:

> (1) [ ] the state has concentrated suits involving the local issue in a particular court; (2) the federal issues are not easily separable from complicated state law issues with which the state courts may have special competence; and (3) [ ] federal review might disrupt state efforts to establish a coherent policy."

*Id*. at 930 (citing *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 671 (9th Cir. 2004)) (alterations in original). These three conjunctive requirements are not present in the instant case as Defendants have not identified the "local issue" or "particular court" tasked with adjudicating corporate practice of medicine claims. So, the Court will not exercise its discretion to abstain from resolving Lilly's claim.

* * *

Based on this analysis, Defendants' motion to dismiss Lilly's UCL claim is **DENIED**. Further, the Court will not abstain from adjudicating the claim.

### III.  LANHAM ACT CLAIM

To advance a Lanham Act false-advertising claim, Lilly must plausibly allege:

> (1) the defendant made a false statement either about the plaintiff's or its own product;
> (2) the statement was made in a commercial advertisement or promotion;
> (3) the statement actually deceived or has the tendency to deceive a substantial segment of its audience;
> (4) the deception is material, in that it is likely to influence the purchasing decision;
> (5) the defendant caused its false statement to enter interstate commerce; and
> (6) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to the defendant, or by lessening of goodwill associated with the plaintiff's product."

*Jarrow Formulas, Inc. v. Nutrition Now, Inc*., 304 F.3d 829, 835 n.4 (9th Cir. 2002) (citation omitted). "To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show

15

that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997) (citation omitted).

Defendants challenge the sufficiency of the FAC's allegations, arguing Lilly has failed to plausibly allege statutory standing or the requisite elements to state a claim.

### A. Statutory Standing

"[T]he zone-of-interests test and the proximate-cause requirement supplies the relevant limits on who may sue" under the Lanham Act. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 (2014). For an injury to be "within the zone of interest in a § 1125(a) false-advertising suit, a plaintiff must allege an injury to a commercial interest in reputation or sales." *Id*. at 131-32. Additionally, "the proximate-cause requirement generally bars suits for alleged harm that is 'too remote' from the defendant's unlawful conduct." *Id*. at 133. "[A]ll commercial injuries from false advertising are derivative of those suffered by consumers who are deceived by the advertising; but since the Lanham Act authorizes suit only for commercial injuries, the intervening step of consumer deception is not fatal to the showing of proximate causation required by the statute." *Id*. Ultimately, a plaintiff "must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising." *Id*.

Both parties rely on *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 827 (9th Cir. 2011), for the proposition that there is a presumption of Lanham Act injury when the parties are direct competitors. In *TrafficSchool.com*, the Ninth Circuit held, "when plaintiff competes directly with defendant, a misrepresentation will give rise to a presumed commercial injury that is sufficient to establish standing." *Id*. However, three years later, in *Lexmark*, the Supreme Court clarified the proper test for determining statutory standing and ultimately chose not to adopt any of the lower courts' formulations of the test. *Lexmark*, 572 U.S. at 134-36. Even so, the relevant analysis on direct competitors in *TrafficSchool.com* is not necessarily contrary to *Lexmark*. Indeed, the Ninth Circuit has cited both cases together in unpublished decisions regarding Lanham Act statutory standing. *See, e.g., ThermoLife Int'l, LLC v. BPI Sports, LLC,* No. 21-15339, 2022

16

WL 612669, at *2 (9th Cir. Mar. 2, 2022); *ThermoLife Int'l, LLC v. Compound Sols., Inc.*, 848 F. App'x 706, 709 (9th Cir. 2021). The "presumption" of injury described in *TrafficSchool.com* was based on an understanding that "[c]ompetitors 'vie for the same dollars from the same consumer group,' and a misleading ad can upset their relative competitive positions." *TrafficSchool.com*, 653 F.3d at 827. Though *Lexmark* does not describe any "presumption" of injury, *TrafficSchool.com*'s reasoning still fits within the Supreme Court's articulation of the proximate causation test; namely, that a plaintiff "must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising." *Lexmark*, 572 U.S. at 133. Accordingly, the Court does not apply a "presumption" of statutory standing for direct competitors, but rather applies the test in *Lexmark*, supported by *TrafficSchool.com*'s analysis of competitive injury.

In *Lexmark*, the Supreme Court elaborated the application of the proximate cause standard. There, the defendant and counterclaimant, Static Control, brought a Lanham Act false-advertising claim against Lexmark. *Id*. at 137-38. The Court determined Static Control had statutory standing for at least two independent reasons. *Id*. "First, Static Control alleged that Lexmark disparaged its business and products by asserting that Static Control's business was illegal." *Id*. at 138. Standing exists for claims based on disparagement both "where a defendant denigrates a plaintiff's product by name . . . [and] where the defendant damages the product's reputation by, for example, equating it with an inferior product." *Id*. Second, Static Control alleged "something very close to a 1:1 relationship" between Lexmark's statements and a direct loss in the number of units Static Control sold. *Id*. at 139. Though Lexmark and Static Control operated in different segments of the market, Static Control's allegations of disparagement and concrete economic loss satisfied proximate causation at the motion to dismiss stage.

Applying *Lexmark* here, Lilly has plausibly alleged Lanham Act statutory standing. As the Court discussed in its analysis of subject-matter jurisdiction, Lilly describes two injuries resulting from Mochi Health's alleged false statements: 1) diversion of sales in the market for weight-loss medications, and 2) reputational damage through conflation between Lilly's products and compounded tirzepatide, which allegedly has a higher incidence of adverse side effects. *See*

Section I.A. Both Mochi Health and Lilly advertise tirzepatide-containing medications. (Dkt. No. 99 ¶¶ 1-3, 30-32, 67-73.) And as Mochi Health's website indicates, those medications can be sold side-by-side to the same consumer base. (Dkt. No. 99-1 at 17-18.) Indeed, Mochi Health allegedly deployed search-engine optimization to show Mochi Health's compounded tirzepatide medication advertisements to consumers searching for Lilly products. (Dkt. No. 99 ¶ 189.) Moreover, Mochi Health directly compares its own compounded medications to Lilly's products in social media advertising. (Dkt. No. 99 ¶ 169.) These allegations permit a reasonable inference that any alleged misrepresentations by Mochi Health put Lilly at a competitive disadvantage in the market—either by losing customers or suffering damage to its reputation. So, Lilly's allegations permit a reasonable inference that any misrepresentation by Mochi Health proximately caused its injuries. *See Eli Lilly & Co. v. Adonis Health, Inc.*, No. 25-CV-03536-JST, 2025 WL 2721684, at *4 (N.D. Cal. Sept. 24, 2025) (concluding nearly identical allegations were sufficient to establish Lanham Act standing).

As for Defendants' counterarguments, they first assert Mochi Health and Lilly are not direct competitors, and unlike the plaintiff in *Lexmark*, Lilly has not shown a "1:1 relationship" between Mochi Health's alleged misleading statements and lost sales. 572 U.S. at 139. To wit, Defendants claim Mochi Health does not manufacture or sell the compounded medications, and so it has not unfairly competed with Lilly. Even accepting Defendants' representations, Lilly has still plausibly alleged statutory standing. To start, reputational injury does not require the parties be direct competitors to meet the proximate causation requirement of Lanham Act standing. *See id*. at 138 ("But when a party claims reputational injury from disparagement, competition is not required for proximate cause; and that is true even if the defendant's aim was to harm its immediate competitors, and the plaintiff merely suffered collateral damage."). Therefore, Lilly has established standing even absent consideration of the diverted sales allegations.

Importantly, though, Lilly's diverted sales allegations also comport with the Supreme Court's reasoning in *Lexmark*. There, the plaintiff, Static Control, needed to show a 1:1 relationship between Lexmark's conduct and lost sales because Lexmark's anticompetitive actions primarily targeted remanufacturers, not Static Control. *Id*. at 122-23. That factual scenario differs

from the allegations here. Even if Mochi Health does not manufacture or sell compounded tirzepatide itself, Lilly alleges it effectively operates in the weight-loss market by advertising directly to those consumers. The relevant allegations here permit a plausible inference that any false or misleading statements issued by Mochi Health injured Lilly because they targeted the same segment of the market from which Lilly stood to profit.

Last, Defendants argue Lilly has failed to plausibly allege a chain of inferences connecting Mochi Health's advertising to a business harm. They contend tirzepatide medications require a prescription, which prevents consumers from relying on any alleged false advertising when purchasing Defendants' compounded medications instead of Lilly's products. (Dkt. No. 102 at 26.) That is to say: a physician's assessment and prescription serve as an intervening cause. The Court addressed this same argument in the context of Article III redressability, *see* Section I.C., and is unpersuaded here for the previously discussed reasons.[3]

Therefore, Lilly has plausibly alleged statutory standing under the Lanham Act.

## B.     False Advertising

The Court next considers the substance of Lilly's cause of action. Lilly identifies two misrepresentation categories as the basis for its false-advertising claims: (1) Mochi Health's statements about compounded tirzepatide safety, and (2) claims that the compounded medications are "personalized." (Dkt. No. 99 ¶¶ 149-82.) Defendants move to dismiss on various grounds, including failure to plausibly allege misrepresentation, puffery, and preclusion by the Federal Food, Drug, and Cosmetic Act ("FDCA").[4]

---

[3] In *Eli Lilly & Co. v. Willow Health Servs., Inc.*, No. 2:25-CV-03570-AB-MAR, 2025 WL 2631620, at *6 (C.D. Cal. Aug. 29, 2025), the district court considered this same argument and determined there was no proximate causation when the products at issue required a prescription. The Court does not find *Willow Health Servs.* persuasive on this point for two reasons. First, the *Willow Health Servs.* court was not confronted with allegations of direct interference with patient prescriptions, as is the case here. Second, drawing inferences in Lilly's favor, that a medication requires a prescription does not prevent a consumer from relying on advertising to request one product over another from their physician. Since both products at issue contain tirzepatide, it is a reasonable inference that a consumer would have some basis for asking her physician to prescribe a specific medication.

[4] Defendants also argue statements such as "Best Weight Loss Treatment of 2025" and "#1 GLP1" are inactionable puffery. (Dkt. No. 102 at 34 (citing Dkt. No. 99 ¶ 193).) Lilly responds that it is not advancing such statements as actionable misrepresentations but rather indications that Mochi

**1.      Mochi Health's Alleged Statements Regarding Safety**

Lilly asserts Mochi Health misleads reasonable consumers as to the safety and efficacy of compounded tirzepatide medications in two ways.  First, Mochi Health misleads consumers by citing to the SURMMOUNT and SURPASS clinical trials for Lilly's development of MOUNJARO® and ZEPBOUND®.  Second, Mochi Health's statement that "tirzepatide is a safe medication that has been approved by FDA" is false.  Ultimately, Lilly has plausibly alleged the statements could mislead a reasonable consumer.

Lilly points to a specific Mochi Health blog post as the site of the misleading SURMOUNT and SURPASS trials statement.  (*See* Dkt. No. 99 ¶ 175 n.75.)  In the blog post Mochi Health states:

> Tirzepatide is a safe medication that has been approved by the FDA. Both the SURMOUNT and The SURPASS clinical trials examined the effects of Tirzepatide in thousands of patients, demonstrating its safety and clinically significant benefits. The most commonly reported side effects are gastrointestinal issues. including nausea, vomiting, diarrhea, and stomach upset. While it's very uncommon, rare cases of pancreatitis. acute kidney injury, gallbladder disease, and hypersensitivity reactions have been reported. It's important to talk with your provider about whether Tirzepatide is right for you.

(*Id*. ¶ 176.)  Lilly contends the reference to "Tirzepatide" instead of MOUNJARO® and ZEPBOUND® is misleading because the studies only considered Lilly's specific tirzepatide formulations and did not investigate the effects of compounded tirzepatide medications.  Indeed, Lilly claims the FDA does not approve an active pharmaceutical ingredient for treatment of patients, but rather approves *specific* formulations of that ingredient that have been subjected to rigorous study.  (*Id*. ¶ 179.)  The Court agrees Lilly has plausibly alleged the blog post is misleading.

When determining whether an advertisement would mislead a reasonable consumer, the Court considers the entire advertisement, in context. *See Freeman v. Time, Inc*., 68 F.3d 285, 290 (9th Cir. 1995) (affirming dismissal of a false advertising claim and noting the statements should

---

Health and Lilly are direct competitors.  (Dkt. No. 107 at 36-37.)  Accordingly, the Court does not further address Defendants' puffery arguments as to those statements.

United States District Court
Northern District of California

be read "in context"); *Southland Sod Farms*, 108 F.3d at 1139 ("When evaluating whether an advertising claim is literally false [under the Lanham Act], the claim must always be analyzed in its full context."). The blog post's context supports a reasonable inference Mochi Health was using the SURMOUNT and SURPASS studies to advertise its own compounded product. For instance, the blog includes the following language:

> What Is The Most Affordable Way To Get Tirzepatide For Weight Loss? Compounding pharmacies can offer much more accessible alternatives to brand-name medications that are customized to the medical needs of the patient. Mochi Health partners with vetted compounding pharmacies to offer safe and effective compounded tirzepatide at an affordable monthly price.

(Dkt. No. 99-1 at 34.) Here, Mochi Health refers to "compounded tirzepatide," but earlier in the blog post, when discussing whether "tirzepatide" is safe, it makes no distinction between FDA-approved products and its own compounded medication. Rather, the blog uses the term "tirzepatide" without distinction when referring to the studies and the safety of the medication. Further, when Mochi Health addresses whether "tirzepatide" is the same medication as MOUNJARO®, it does not mention the difference between compounded and FDA-approved formulations, but instead suggests the medicines are interchangeable. (*See id*. at 33 ("Tirzepatide is the primary active ingredient in medications marketed under the brand names Mounjaro® and Zepbound®. While Mounjaro® is FDA-approved for type 2 diabetes and Zepbound® for obesity, these brand-name prescription medications both use tirzepatide.").) In sum, Mochi Health: 1) states "tirzepatide" is a safe medication because it has been researched in the SURMOUNT and SURPASS studies; 2) does not distinguish between its compounded tirzepatide medication and Lilly's FDA-approved tirzepatide formulation; and then 3) directs consumers to its own product as "safe," "effective," and "affordable." A reasonable consumer encountering these representations could plausibly be misled as to whether the SURMOUNT and SURPASS studies evaluated compounded medications or spoke to their safety.

Relying on other decisions from this district, Defendants argue Lilly's claim is based on an inactionable "lack of substantiation" theory. (*See* Dkt. No. 102 at 33.) In brief, Defendants read the FAC to allege Mochi Health merely failed to provide a scientific basis for its claims about the

21

safety of compounded tirzepatide medication. True, some district courts have dismissed similar claims on such grounds. *See, e.g.*, *Adonis Health, Inc.*, 2025 WL 2721684, at \*7 - \*8; *Eli Lilly & Co. v. Aios, Inc*, No. 25-CV-03535-HSG, 2026 WL 836624, at \*9 (N.D. Cal. Mar. 26, 2026). But the Court is not persuaded to apply their reasoning here. Though Defendants understand the FAC to assert Mochi Health failed to provide scientific studies on the safety of compounded tirzepatide, Lily's actual argument differs. Lilly alleges Mochi Health's statements misled consumers into believing the SURMOUNT and SURPASS studies actually considered compounded medication. The issue is not whether Mochi Health had a basis for its statements, but rather, whether Mochi Health misrepresented the *contents* of the studies. This latter theory of misrepresentation has been upheld by the Ninth Circuit as valid ground for a Lanham Act claim. *See Southland Sod Farms*, 108 F.3d at 1139 ("Moreover, if the plaintiff can show that the tests, even if reliable, do not establish the proposition asserted by the defendant, the plaintiff has obviously met its burden of demonstrating literal falsity."). Here, Lilly has plausibly alleged an actionable misrepresentation as to the contents of the SURMOUNT and SURPASS clinical studies.

Turning to the second alleged misrepresentation, Mochi Health's statements could be reasonably understood to indicate compounded tirzepatide medications are FDA-approved. Lilly refers to the same blog post discussed above, which states "Tirzepatide is a safe medication that has been approved by the FDA." (Dkt. No. 99 ¶ 176.) Based on the post, Lilly argues Mochi Health relies on the term "tirzepatide" to conflate the FDA approval given to Lilly's specifically formulated tirzepatide medicines with compounded tirzepatide, which has not received that same approval. As explained previously, the blog post claims Mochi Health's compounded medication is "safe," (Dkt. No. 99-1 at 34), but the only evidence cited to support that claim is the SURMOUNT and SURPASS studies as well as the FDA-approval given to Lilly's tirzepatide formulation, (*id*. at 33). A reasonable consumer reading this blog post could plausibly conclude Mochi Health's basis for its safety representations comes from the studies cited just a few paragraphs earlier in that same post, studies which resulted in FDA approval of Lilly's products, not Mochi Health's.

Consequently, Defendants' motion to dismiss the Lanham Act claim based on Mochi

Health's alleged statements regarding safety is **DENIED**.

### 2. Mochi Health's Alleged Statements Regarding "Personalized" Medicine

Lilly's second category of alleged false statements relate to Mochi Health's advertisements about the "personalized" medications it provides to customers. (Dkt. No. 99 ¶¶ 151-65.) As to this category, Lilly has plausibly alleged actionable false statements.

Per the FAC, Mochi Health's website includes the following statements about the compounded medications it offers:

> Compounding pharmacies can offer much more accessible alternatives to brand-name medications that are *customized to the medical needs of the patient*. Mochi Health partners with vetted compounding pharmacies to offer safe and effective compounded tirzepatide at an affordable monthly price. (*Id*. ¶ 161 (emphasis added).)
>
> Compounded medications are *custom-prepared to meet an individual patient's specific needs*. For example, they may include a specific dosage strength not available commercially or *additional active ingredients clinically indicated for the patient.* These medications are created by licensed pharmacies, based on a valid prescription from a licensed provider. While they are not FDA-approved (meaning they haven't gone through the FDA drug approval process), they are still regulated at the state and/or federal level, and must meet important safety and quality standards. (*Id*. ¶ 165 (emphasis added).)

Yet Lilly alleges Mochi Health does not actually customize its compounded medication to an individual patient's specific needs. Rather, Mochi Health changes the formulation and dosage of its compounded medication *en masse* based on its business relationships with pharmacies, not medical indication. (*See, e.g., id*. ¶¶ 120-27, 171.) These allegations directly contradict Mochi Health's claims of custom preparation in response to a patient's needs. Assuming the truth of Lilly's allegations, Lilly plausibly alleges facts sufficient to state a claim under the Lanham Act.

Defendants' insistence the advertisements are not literally false because they refer to "customized" or "personalized" care plans is meritless. Drawing reasonable inferences in Lilly's favor, the alleged advertisements clearly refer to "medications" and do not mention anything related to a treatment plan or combination of interventions.

Consequently, Defendants' motion to dismiss Lilly's Lanham Act claim based on Mochi

United States District Court
Northern District of California

Health's "personalized" medicine advertisements is **DENIED**.

### 3.    FDCA Preclusion

In the alternative, Defendants argue Lilly's Lanham Act claims are precluded because "only the FDA may bring actions to enforce or restrain alleged violations of the FDCA." (Dkt. No. 102 at 36.) In *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 121 (2014), the Supreme Court held Lanham Act suits and FDA enforcement of the FDCA "complement each other," and the FDCA does not broadly preclude false advertising claims because the FDA "does not have the same perspective or expertise in assessing market dynamics that day-to-day competitors possess." *Id*. at 115. Only when a Lanham Act suit "directly conflict[s] with [an] agency's policy choice" is the suit precluded. *Id*. at 120.

Defendants contend Lilly's misrepresentation theory based on "personalized" medication advertisements conflicts with the FDCA's regulatory scheme. In particular, they argue compounded medications are "personalized" by definition, and Lilly's theory contradicts a permissible practice of creating "batches of compounded medications for subsequent dispensing." (Dkt. No. 102 at 38 (citing 21 U.S.C. § 353a(a)(2)(A) - (B)(i)(ii)(I)-(II)).) However, Lilly's falsity theory is that Mochi Health advertised its medications as "personalized" but then did not tailor changes in dosage or formulation of the compounded drug to individual patients' medical needs. Whether Mochi Health or Aequita Pharmacy prepared the medication in "batches" is ultimately beside the point: the falsity derives from Lilly's allegations that Mochi Health changed the formulation of patients' medications based on business interests and evolving relationships with certain pharmacies rather than patient needs. Defendants have not identified any FDCA provision or FDA policy directly in conflict with this misrepresentation theory.

As for Mochi Health's alleged statements about the safety of compounded tirzepatide, Defendants argue Lilly's claim is precluded because it requires the Court to resolve policy questions better left to the FDA. In short, Defendants assume the Court would have to determine the scientific validity of citing the SURMOUNT and SURPASS studies to support safety claims about compounded medications. Not so. Lilly alleges Mochi Health misled consumers into believing the SURMOUNT and SURPASS studies tested the effects of compounded tirzepatide

24

medications. This misrepresentation theory presents a binary question of whether the studies considered *any* compounded tirzepatide formulation. Drawing inferences in Lilly's favor, resolution of Lilly's claim would not require adopting an interpretation of the FDCA at odds with FDA regulation. But even if it did, Defendants' concerns do not apply to Lilly's claim regarding Mochi Health's alleged statements about FDA approval. On that claim, Defendants present no argument that a fact-finder's determination would impinge on the FDA's policy choices.

With the benefit of discovery, Defendants may raise the issue of preclusion once again, should the Court be asked to break new ground on issues within the ambit of FDA's policy-making authority. At this early stage in the litigation, Defendants have not shown the FDCA precludes Lilly's Lanham Act claim.

## IV.    CIVIL CONSPIRACY

Under California civil law, "[c]onspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration. By participation in a civil conspiracy, a coconspirator effectively adopts as his or her own the torts of other coconspirators within the ambit of the conspiracy." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 510-11 (1994) (internal citations omitted). "The essence of the claim is that it is merely a mechanism for imposing vicarious liability; it is not itself a substantive basis for liability. Each member of the conspiracy becomes liable for all acts done by others pursuant to the conspiracy, and for all damages caused thereby." *Favila v. Katten Muchin Rosenman LLP*, 188 Cal. App. 4th 189, 206 (2010) (citation omitted). To plausibly allege a civil conspiracy, the plaintiff must show "the formation of a group of two or more persons who have agreed to a common plan or design to commit a tortious act. The conspiring defendants must also have actual knowledge that a tort is planned and concur in the tortious scheme with knowledge of its unlawful purpose. However, actual knowledge of the planned tort, without more, is insufficient to serve as the basis for a conspiracy claim. Knowledge of the planned tort must be combined with intent to aid in its commission." *Id*. (cleaned up). In the instant case, Lilly has failed to plausibly allege a civil conspiracy to commit the UCL violation or the Lanham Act violation.

United States District Court
Northern District of California

25

First, the FAC does not include allegations supporting a plausible inference of an agreement to a common plan among Mochi Health, the Mochi Medical Defendants, and Aequita Pharmacy. Though the FAC alleges the actions of each entity in their normal business operations, it fails to provide any allegations regarding Defendants' individual knowledge of a scheme to commit a tort. Further, the FAC does not specify each Defendant's actions to aid in the alleged scheme. For example, the FAC does not include allegations supporting a plausible inference Mochi Medical knew of Mochi Health's alleged *en masse* changes to compounded tirzepatide formulations or of the alleged misrepresentations made on Mochi Health's website. Nor does the FAC plausibly allege Mochi Medical's role in the creation or dissemination of those allegedly false statements. "Mere association does not make a conspiracy." *Kidron v. Movie Acquisition Corp.*, 40 Cal. App. 4th 1571, 1582 (1995). Currently, the FAC only establishes a plausible association among Defendants, but lacks factual support for the conclusion that they possessed knowledge of a shared scheme to commit the alleged UCL and Lanham Act violations, as well as the intent to aid in achieving the violations.

Therefore, the Court **GRANTS** Defendants' motion to dismiss the conspiracy claim.

**CONCLUSION**

For the reasons stated above, Defendants' motion to dismiss for lack of subject-matter jurisdiction is **DENIED**. Similarly, Defendants' motion to dismiss the UCL claim and Lanham Act claim is **DENIED**. Last, Defendants' motion to dismiss the civil conspiracy claim is **GRANTED**, **with leave to amend**. Should Lilly choose to file a Second Amended Complaint, it must do so by May 8, 2026. Lilly may only amend its allegations regarding the conspiracy claim. No additional defendants or claims may be added absent stipulation or further leave of Court.

The Court schedules an initial case management conference for May 20, 2026, at 2:00 p.m. via Zoom videoconference. An updated joint case management conference statement is due one week in advance. Discovery is open.

This Order disposes of Docket No. 102.

**IT IS SO ORDERED.**

Dated: April 20, 2026

Jacqueline Scott Corley

JACQUELINE SCOTT CORLEY
United States District Judge

United States District Court
Northern District of California