# Exhibit B

~~I~~James F. Hurst (pro hac vice)
~~Diana M. Watral~~James R.P. Hileman (pro hac vice)
~~Ryan Moorman~~Diana M. Watral (pro hac vice)
~~Robin McCue~~Nicholas M. Ruge (pro hac vice)
~~James R.P. Hileman (pro hac vice)~~
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
james.hurst@kirkland.com
~~diana.watral@kirkland.com~~
~~ryan.moorman@kirkland.com~~
~~robin.mccue@kirkland.com~~
jhileman@kirkland.com
~~tasha~~diana.~~gerasimow~~watral@kirkland.com
nicholas.ruge@kirkland.com

David I. Horowitz (S.B.N. 248414)
Yungmoon Chang (S.B.N. 311673)
KIRKLAND & ELLIS LLP
2049 Century Park East
Suite 3700
Los Angeles, CA 90067
Telephone: (310) 552-4200
dhorowitz@kirkland.com
yungmoon.chang@kirkland.com

Attorneys for Plaintiff
ELI LILLY AND COMPANY

*Additional Counsel On Signature Page*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

ELI LILLY AND COMPANY,

      Plaintiff,

v.

MOCHI HEALTH CORP.~~.,~~; MOCHI MEDICAL CA, P.C.~~.,~~; MOCHI MEDICAL, P.A.~~.,~~; AEQUITA PHARMACY~~,~~ LLC.~~,~~; AND AEQUITA CORPORATION,

      Defendants.

Case No.: 3:25-cv-03534-JSC

~~FIRST~~SECOND AMENDED COMPLAINT

Judge Jacqueline Scott Corley

1.      For nearly 150 years, Lilly has developed and delivered trusted medicines that save and improve patients' lives. Lilly's proprietary and innovative MOUNJARO® and ZEPBOUND® are two first-of-their-kind medicines indicated for serious conditions afflicting millions of Americans. Approximately one in ten Americans has type 2 diabetes, and four in ten Americans are obese. To advance the treatment of these chronic conditions, Lilly used its extensive experience and years of research to develop a new class of medicines that target patients' GLP-1 (glucagon-like peptide-1) and GIP (glucose-dependent insulinotropic polypeptide) receptors. These medicines activate both receptors to improve blood sugar control and reduce appetite and food intake. The Food & Drug Administration ("FDA") has approved these medicines for specific, indicated conditions and populations: MOUNJARO® for adults with type 2 diabetes, and ZEPBOUND® to treat chronic weight management and obstructive sleep apnea in certain adults.

2.      Both MOUNJARO® and ZEPBOUND® contain the active pharmaceutical ingredient tirzepatide. They are the only FDA-approved medications that contain tirzepatide. Before and after obtaining FDA approval for MOUNJARO® and ZEPBOUND®, Lilly undertook years of randomized controlled clinical trials evaluating the safety and effectiveness of its tirzepatide medicines administered by subcutaneous injection on thousands of patients.

3.      Defendant Mochi Health Corp. ("Mochi Health") is at the heart of a conspiracy to sell knockoff compounded tirzepatide drugs through false and misleading advertising and in violation of California's corporate practice of medicine doctrine. While Mochi Health's compounded tirzepatide offerings have varied over time, Mochi's current offerings (Mochi Health's "Tirzepatide Mix") consist of injections containing compounded tirzepatide with the additives glycine, niacinamide, and pyridoxine. Compounded drugs are not approved by regulators, have not been clinically studied, and are riskier than FDA-approved medicines. Moreover, combining multiple active ingredients in a single injection introduces new risks and uncertainties that are not present with each ingredient alone, and Mochi has not conducted any testing, clinical or otherwise, to establish that its combinations are safe or

FIRST SECOND AMENDED COMPLAINT                                        CASE NO.: 3:25-CV-03534-JSC

effective. Mochi Health's sale of untested, unproven tirzepatide compounded with numerous additives is divorced from good medicine and patient health.

4. Myra Ahmad, Mochi Health's founder and CEO, serves as the face of Mochi Health, claiming that her motivation for founding the company was grounded in her experience "as a doctor" and touting her business as "developed by doctors." These statements unequivocally encourage consumers to purchase products and healthcare services from Mochi because of Ms. Ahmad's purported medical supervision and experience. In reality, Ms. Ahmad is not—and has never been—a licensed physician in any state. The same is true for Mochi Health's other owner, Abraham Chaibi—a non-physician who is Ms. Ahmad's husband.

5. Both Ms. Ahmad and Mr. Chaibi are entangled in and exercise control over multiple entities that touch Mochi Health's Tirzepatide Mix—from importing drugs from China to prescribing and dispensing them to Mochi Health's patients:

- Ms. Ahmad is the CEO and co-founder of Mochi Health—the telehealth platform that attracts patients—and she and Mr. Chaibi own it.

- Mochi Health refers patients to Mochi Medical, P.A. and Mochi Medical CA, P.C. (collectively, "Mochi Medical"). Ms. Ahmad has identified herself as CEO of Mochi Medical, P.A., and Rana Ahmad (who, upon information and belief, is Ms. Ahmad's father), is the appointed director of Mochi Medical CA, P.C.

- For periods of time other than when the Washington Board of Health shut it down, Aequita Pharmacy, LLC has supplied Mochi Health's patients with compounded tirzepatide. Mr. Chaibi owns Aequita Corporation, which in turn owns Aequita Pharmacy, LLC. Aequita Corporation shares an address with Aequita Pharmacy, LLC, and previously listed as its address the same location identified for Ms. Ahmad's "Active" National Provider Identifier.

- Upon information and belief, USA Distribution LLC imports weight loss drugs to Aequita Pharmacy from China. Ms. Ahmad is the Governor of USA Distribution LLC.

3

6.      Through its conduct related to compounded tirzepatide, Mochi Health violates California state law and the Lanham Act in multiple ways, together in a conspiracy with Mochi Medical CA, P.C., Mochi Medical, P.A., Aequita Pharmacy, LLC, and Aequita Corporation.

7.      ***First***, California law requires that medical decisions be made by doctors and, as a result, restricts unlicensed individuals and corporations from engaging in the practice of medicine, including through exercising undue control over physicians' medical practices. Despite this, Mochi Health and its unlicensed owners exercise undue influence and control over, among other things, the prescribing decisions of its physicians—and, as a result, engage in, and aid and abet, the unlawful corporate practice of medicine.

8.      Over the span of just thirteen months, Mochi Health switched dosages and prescriptions for patients en masse at least six times—with corporate interests, rather than doctor decision-making, driving the changes.

- In August 2024, Mochi Health changed prescriptions for its customers from tirzepatide mixed with an additive called niacinamide to tirzepatide mixed with an additive called pyridoxine.

- Just three months later, in November 2024, Mochi Health announced it was unilaterally moving its customers' prescriptions to its captive compounding pharmacy—Aequita Pharmacy.

- The move to Aequita Pharmacy came with two changes to the drugs sold to Mochi Health's customers: customers were switched back to tirzepatide mixed with niacinamide, and Mochi also unilaterally changed its customers' prescribed doses away from the dosing approved by FDA for Lilly's medicines to slightly different, contrived doses (e.g., 8.8 mg instead of 10 mg).

- Months later—when the Washington Pharmacy Quality Assurance Commission ("WPQAC") issued a Limited Stop Service to Aequita Pharmacy in March 2025—Mochi Health made another global change, switching its customers back to FDA-approved doses of tirzepatide (like those sold by Lilly).

FIRST~~~~SECOND AMENDED COMPLAINT                                    CASE NO.: 3:25-CV-03534-JSC

- A month later, in April 2025, Mochi Health again changed drugs for patients, this time swapping patients' prescriptions to tirzepatide mixed with additives of glycine, niacinamide, or pyridoxine.

- More recently, in September 2025, Mochi Health switched patients to Lexington Compounding Pharmacy.

9.     There was no patient-specific or medical reason to make these unilateral prescription changes en masse—at least six times in just thirteen months. Rather, Mochi Health's reason for the change was its business's bottom line and the mistaken belief that its alterations would allow it to continue selling—and making money from—knockoff tirzepatide.

10.     Underscoring that these prescription changes are not patient-driven medical decisions, but rather were unduly influenced by corporate interests, Mochi Health repeatedly assured customers leading up to the switch to the tirzepatide/niacinamide combination in November 2024 that its addition of niacinamide was "not clinically significant."[1]

11.     The dangers of these business practices were recently highlighted by shocking revelations from a whistleblower complaint demonstrating Mochi Health's complete disregard for the law. The whistleblower alleges that Mochi Health sources its tirzepatide from Chinese manufacturers and relabels it to disguise its foreign origins.[2] The complaint also alleges that Mochi Health pushed for assistants to compound batches of its Tirzepatide Mix without a technician or pharmacy oversight. Furthermore, the complaint alleges that Mochi Health has employed day laborers acquired from hardware store parking lots to address staffing shortages, allowing them to fill prescriptions and access patients' private health information.

12.     **Second**, Mochi Health falsely advertises its Tirzepatide Mix as a "customizable treatment plan" that is "built around [a patient's] needs"[3] and claims that its Tirzepatide Mix is "***custom-prepared***

---

[1]    JoinMochi-Info, *Tirzepatide + Niacinamide (Mochi)*, REDDIT (Oct. 7, 2024), https://www.reddit.com/r/tirzepatidecompound/comments/1fyncks/tirzepatide_niacinamide_mochi/.

[2]    Dep't of Health, Health Systems Quality Assurance, *Confidential Investigation Report Prepared for The Pharmacy Quality Assurance Commission* (Aug. 13, 2025), https://www.glpwinner.com/api/media/file/Aequita%20Pharmacy%20WA%20Investigation.pdf.

[3]    https://web.archive.org/web/20250921020922/https://joinmochi.com/ (captured on Sept. 21, 2025).

5

FIRST SECOND AMENDED COMPLAINT                    CASE NO.: 3:25-CV-03534-JSC

to meet an individual patient's specific needs."[4] Not content to end its deception there, Mochi Health further tells the unsuspecting public that its "custom-prepared" Tirzepatide Mix has been proven safe and effective for weight loss. Even worse, Mochi Health tells patients that the supposedly tailored nature of its Tirzepatide Mix makes it the "[b]est weight loss treatment of 2025" and "#1 in GLP-1s."[5] In reality, Mochi Health buys its Tirzepatide Mix well before filling an individual patient's prescription, and every consumer gets the exact same drug regardless of any individualized need. And Mochi Health's drugs have never been clinically proven to result in weight loss of any kind and certainly have not been reviewed or approved by FDA.

13. Notably, FDA has taken issue with the very types of claims that Mochi Health is making—i.e., claims regarding the allegedly personalized nature of these drugs. On September 16, 2025, FDA publicly posted dozens of warning letters sent to retailers of compounded drugs; these letters repeatedly identify as "false and misleading" numerous advertisements containing mirror-image statements to Mochi Health's claims. The advertisements referenced in these warning letters included statements promoting compounded drugs as being "recognized for effective weight loss"; "customized"; "personalized"; or "custom" products. Mochi Health's false and misleading claims—for example, that its compounded tirzepatide drugs are "custom-prepared"—are indistinguishable.

14. All of this harms Lilly. Mochi Health's violations of the corporate practice of medicine are unfair competition that results in lost sales to Lilly. If Mochi Health did not switch prescriptions for its patients en masse, or steer its prescribers towards compounded products, and instead let prescribers make individual determinations, some of those prescribers could have and would have prescribed Lilly's FDA-approved medicine instead. So too with Mochi Health's false advertisements. Mochi Health and Lilly are direct competitors in the marketplace. Mochi Health's false statements—which emphasize its purported comparative superiority, claimed personalized nature, and effectiveness, all key attributes of prescription drugs any consumer would consider—lure patients away from Lilly's FDA-approved medicines towards Mochi Health's compounded drugs. That has resulted in lost sales for Lilly. And

---

[4]    https://joinmochi.com/medications.

[5]    *See infra* ¶¶ 167–168.

6

Mochi Health's unlawful conduct—both its corporate practice of medicine and its unlawful advertisements—causes harm to Lilly's reputation and goodwill too.

15. Lilly brings this action under California state law and the Lanham Act to stop Mochi Health's improper corporate practice of medicine, unfair competition, deception, and false advertising, and the conspiracy with Defendants Mochi Medical CA, P.C., Mochi Medical, P.A., Aequita Pharmacy, LLC, and Aequita Corporation, all of which endanger patient safety and harms Lilly as set out below.

## THE PARTIES

16. Plaintiff Eli Lilly and Company is a corporation organized and existing under the laws of Indiana and has its principal place of business in Indiana.

17. Defendant Mochi Health Corp. is a Delaware corporation with a principal place of business at 161 Natoma St., San Francisco, CA 94105. Myra Ahmad, Mochi's CEO, and her husband Abraham Chaibi both own Mochi Health Corp.[6]

18. Defendant Mochi Medical CA, P.C. is a California professional corporation with its principal place of business at 161 Natoma St., San Francisco, CA 94105, the same address as Mochi Health.

19. Defendant Mochi Medical, P.A. is a Florida professional corporation with its principal place of business at 161 Natoma St., San Francisco, CA 94105, the same address as Mochi Health.

20. Defendant Aequita Pharmacy LLC is a limited liability company organized under the laws of Washington with its principal place of business at 12825 NE 126th Pl, Kirkland, WA 98034. Aequita Pharmacy has registered as an Out-of-State Limited Liability Company with the California Secretary of State.

21. Defendant Aequita Corporation is a Delaware corporation with a principal address of 439 US Route 1, STE A, York, ME 03909.[7] Aequita Corporation has also identified its address as 12825 NE

---

[6] Washington State Dep't of Revenue, *Business Lookup*, https://secure.dor.wa.gov/gteunauth/_/ (click "Business Lookup," then enter "605-418-033" in the UBI/Account ID # field) (last visited Nov. 14, 2025).

[7] North Dakota Sec'y of State, *Business Search*, https://firststop.sos.nd.gov/search/business (enter "0006854716" in the search field) (last visited Apr. 14, 2025).

7

126th Pl, Kirkland, WA, 98034, the same address as Aequita Pharmacy LLC. Abraham Chaibi is an owner and the president of Aequita Corporation. Aequita Corporation's other owner,[8] Aequita Semiworks, lists Mr. Chaibi as its CEO, and shares an address with Ms. Ahmad's National Provider Identifier address.[9]

## JURISDICTION AND VENUE

22.     The Court has subject matter jurisdiction over the Lanham Act cause of action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1331. The Court has supplemental jurisdiction over the state law cause of action pleaded herein pursuant to 28 U.S.C. § 1367(a), as it is part of the same case or controversy as the federal claim. Additionally, and in the alternative, this Court has subject matter jurisdiction on diversity grounds pursuant to 28 U.S.C. § 1332, as the parties are citizens of different states and the matter in controversy exceeds $75,000.

23.     Mochi Health and Mochi Medical are subject to personal jurisdiction in California because each has a principal place of business located in the State of California where each recruits and employs California residents,[10] and because they have purposefully availed themselves of the privilege of conducting business in California, including by operating and conducting business in California. Mochi Medical CA, P.C. is also subject to personal jurisdiction in California because it is incorporated in the State of California.

24.     Aequita Corporation is subject to personal jurisdiction in this District because it has purposefully availed itself of the privilege of conducting business in California, including by operating and conducting business in California.

25.     Aequita Pharmacy LLC is subject to personal jurisdiction in this District because it has purposefully availed itself of the privilege of conducting business in California, including by operating

---

8   Washington State Dep't of Revenue, *Business Lookup*, https://secure.dor.wa.gov/gteunauth/_/ (click "Business Lookup," then enter "605-221-989" in the UBI/Account ID # field, then click the KIRKLAND option) (last accessed on Nov. 14, 2025).

9   *Annual Franchise Tax Report of Aequita Semiworks, Inc.*, Del. Div. of Corps. (2024).

10   *See Mochi Health*, LINKEDIN, https://www.linkedin.com/company/mochihealth/posts (last visited Nov. 14, 2025); *Physician – Obesity Medicine*, SIMPLYHIRED, https://www.simplyhired.com/job/9kDg-_Lyuv_HtGLoQBpSWu8g4JVJRp7HztH_EBL73HSqkPM 85IDTRw (last visited Nov. 14, 2025).

FIRSTSECOND AMENDED COMPLAINT                                    CASE NO.: 3:25-CV-03534-JSC

and conducting business in California and registering as an Out-of-State Limited Liability Company with the California Secretary of State. In addition, Aequita Corporation and Aequita Pharmacy share the same office address and office space at 12825 NE 126th Pl, Kirkland, WA 98034, and function as a single enterprise.

26.     Aequita Pharmacy is also subject to personal jurisdiction in California because it has purposefully availed itself of the privilege of conducting business in California, recruiting California residents for employment with Aequita Pharmacy via listings on Mochi Health's job board.[11] Further, in its website's terms and conditions, Aequita Pharmacy anticipates that California residents would use its services.[12] Aequita Pharmacy has also conspired with the remaining Defendants to commit the misconduct detailed herein.

27.     Aequita Corporation's purposeful availment of the privileges of conducting business in California, thus invoking the benefits and protections California's laws—including by operating from its principal address and headquarters in California—subjects it and Aequita Pharmacy to specific jurisdiction in this Court. This Court's exercise of jurisdiction comports with due process under the Fourteenth Amendment and California's long-arm statute (Cal. Civ. Proc. Code § 410.10).

28.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (d) because a substantial part of the events or omissions giving rise to the claim occurred in this District and because Defendants' contacts would be sufficient to subject them to personal jurisdiction in this District if the District were a separate State.

### DIVISIONAL ASSIGNMENT

29.     Pursuant to Civil L.R. 3-2(c), this case arises in the County of San Francisco, as a substantial part of the events or omissions giving rise to the claims occurred in the County of San Francisco. For example, Mochi Health and Mochi Medical lists principal places of business in the

---

[11]  *See*  Mochi  Health,  *Current  openings  at  Mochi  Health*, https://web.archive.org/web/20250119041834/https://job-boards.greenhouse.io/mochihealth?error=true (captured on Jan. 19, 2025).

[12]  *See* Aequita Pharmacy, *Terms & Conditions*, https://www.aequitapharmacy.com/terms-conditions (last visited Nov. 14, 2025).

FIRST SECOND AMENDED COMPLAINT                                                    CASE NO.: 3:25-CV-03534-JSC

County of San Francisco, through which they prescribe and sell untested, unapproved drugs from the Aequita Defendants, which also list principal places of business in the County of San Francisco.

**FACT ALLEGATIONS**

## I.  LILLY'S TIRZEPATIDE INJECTABLE MEDICINES

### A.  Lilly's Long History of Developing and Manufacturing Safe and Effective Medicines

30.    Lilly is an international medicine company and pharmaceutical manufacturer. Throughout its nearly 150-year existence, Lilly has pioneered countless life-changing discoveries. Today, Lilly's medicines help tens of millions of patients across the globe.

31.    Lilly manufactures its medicines under strict controls in state-of-the-art facilities, which employ thousands of highly specialized personnel to ensure that Lilly's medicines meet its rigorous quality and safety standards. Transforming active pharmaceutical ingredients, or API, into medicine is a complex, methodical, and science-based process. Lilly follows Current Good Manufacturing Practices ("cGMP") across the design, monitoring, and control of manufacturing processes and facilities—from establishing robust quality management systems to obtaining quality raw materials and detecting and investigating product quality deviations. Each step—from chemical synthesis of the API to formulation, device assembly, and packaging—requires extensive testing and controls and specialized equipment.

32.    Lilly develops, tests, and manufactures its medicines in compliance with FDA oversight, the international gold standard for pharmaceuticals. It includes rigorous pre-approval testing for safety and effectiveness under specific conditions for use, routine FDA inspections of manufacturing facilities, adverse event reporting obligations, and post-market surveillance and studies. Additionally, Lilly's medicines must be, and always are, accompanied by important labels, instructions, and warnings, which themselves are approved by FDA.

### B.  The Clinical Trial Process Necessary to Safely Bring Medicines to Market

33.    Before a new prescription medication can be brought to market, it must be clinically tested through a rigorous series of studies designed to determine whether the medication is safe and effective for people to use and to receive FDA approval.

10

34.    FDA approval is famously hard to earn. More than 90% of drug candidates ultimately fail.[13] It is also an enormously costly and time-intensive process. "On average, it takes 10-15 years and costs $2.6 billion to develop one new medicine."[14]

35.    To begin, drug sponsors first subject the drug candidate to preclinical testing to determine if the product is reasonably safe for initial use in humans and if the drug candidate exhibits pharmacological activity that justifies commercial development. Based on the data derived from preclinical testing, the drug sponsor must apply for an "Investigational New Drug" (IND) designation from FDA before the drug candidate can move into the clinical trial stage, in which it is tested in human subjects through a series of increasingly complex phases of studies, typically culminating in double-blind, multi-center, placebo-controlled clinical trials. The IND application requires disclosure of information pertaining to "the composition, manufacturer, stability, and controls used for manufacturing" the API contained in the drug candidate.[15] Once FDA grants the IND application, the clinical trial stage can begin using the same API disclosed in the IND application.

36.    Phase I clinical trials typically evaluate the drug candidate's safety and generate data that will inform a range of doses that are safe for use in further clinical testing. This determination typically culls a large portion of drug candidates—for example, averaging across diseases, only 52% of drug candidates that make it through Phase I testing will progress to Phase II.[16]

37.    Phase II trials are typically designed to preliminarily establish the effectiveness in addition to further confirming safety of the drug for a particular indication over a range of doses and to develop additional data on its safety. Another swath of drug candidates is eliminated in Phase II; drug candidates for various diseases that make it through Phase II only progress to Phase III at rates between

---

[13]    Biotechnology Innovation Organization, *Clinical Development Success Rates and Contributing Factors 2011-2020* at 3 (Feb. 2021), https://go.bio.org/rs/490-EHZ-999/images/ClinicalDevelopmentSuccessRates2011_2020.pdf (hereinafter "BIO 2021").

[14]    PHRMA, *Research and Development Policy Framework* (Sept. 2024), https://tinyurl.com/5eecdtm9.

[15]    FDA, *Investigational New Drug (IND) Application (Sept. 16, 2025),* https://www.fda.gov/drugs/types-applications/investigational-new-drug-ind-application.

[16]    BIO 2021 at 7.

11

15% and 48.1% depending on disease type.[17] Phase III trials are designed to confirm the safety and effectiveness of a dose identified in Phase II trials in a much larger patient population as well as to monitor side effects.

38.    Based on the data assembled during development in Phase I, Phase II, and Phase III clinical trials, a sponsor company can then submit a marketing application to FDA called a New Drug Application (NDA), where the sponsor requests that FDA approve the drug candidate for sale and marketing in the United States. As part of this application, the sponsor must provide a "composition statement" detailing the "full list of the articles used as components of such drug" and a "full statement of the composition of such drug."[18]

39.    There is a scientific reason for the specificity of the information FDA requires in approval of a medicine. Drugs purporting to contain the same active ingredient can have different effects based on differences in API formulation or production, method of administration, dosage form, and manufacturing specifications. Moreover, because the ingredients in a drug can interact with one another, drugs with even the same API, but different additives or ingredients, may differ significantly in their safety and effectiveness profile. For this reason, the FDCA requires that generic drug applications show both (1) that it uses the same API as a previously approved product but independently (2) that there is sufficient evidence to conclude the generic is "bioequivalent" to the listed drug. *See* 21 U.S.C. § 355(j)(2)(A)(ii), (iv). An applicant therefore has to show via valid evidence that their generic drug will function the same in the human body as the listed drug; they cannot rely solely on the fact that it uses the same API as a previously approved product.

40.    For example, "tirzepatide" refers to the macromolecule that forms the basis of the API in Lilly's medicines—but Lilly's tirzepatide API has a specific profile that involves a strict manufacturing and purification process to produce a consistent substance, which is then tested to determine if its specifications fall within metrics reviewed and approved by FDA. A non-Lilly substance that purports to

---

[17]    *Id.*

[18]    FDA, *Content and Format of Composition Statement and Corresponding Statement of Ingredients in Labeling in NDAs and ANDAs* (Apr. 2024), https://www.fda.gov/media/178099/download

FIRSTSECOND AMENDED COMPLAINT                                    CASE NO.: 3:25-CV-03534-JSC

be "tirzepatide API" may (or may not) actually contain tirzepatide molecules, but even if it does, it could have different specifications in terms of potency (the percentage of the API that is pharmacologically active), purity (the presence or absence of other chemical substances), or other factors that affect how the drug substance will perform in the human body, in terms of either safety or effectiveness. Thus, data collected from clinical studies of Lilly's tirzepatide API says nothing about how another manufacturer's purported "tirzepatide API"—which could be sub- or super-potent, contain impurities not found in Lilly's API, or be contaminated with an endotoxin or bacteria—will affect a patient who takes it. Yet this distinction requires specialized knowledge to understand and is not commonly known among the average consumer, who likely assumes anything referred to by the same name will have the same predictable effects and safety profile.

41.     To ensure that the drug candidate being sold to the public contains the same specifications as the drug that was clinically tested, FDA conducts inspections to monitor compliance with cGMP and reviews the drug's labeling to ensure appropriate disclosure of side effects, warnings, and contraindications even after granting the NDA. FDA also requires manufacturers to track and trace each finished product, to promptly report all adverse events, and to conduct further post-approval studies. All of this is to ensure that—in FDA's words—"American consumers benefit from having access to the safest and most advanced pharmaceutical system in the world."[19]

### C.     MOUNJARO® and ZEPBOUND®

42.     FDA approved MOUNJARO® and ZEPBOUND® pursuant to Lilly's marketing application, which was the culmination of the lengthy and expensive clinical trial process described above that is designed to develop, study, and bring safe medicines to patients.

43.     MOUNJARO® and ZEPBOUND® were approved after nearly a decade of development and have undergone testing in 37 completed clinical trials, with more ongoing. They are groundbreaking medicines containing a macromolecule Lilly discovered called tirzepatide. As formulated by Lilly, these tirzepatide medicines target patients' GLP-1 (glucagon-like peptide-1) and GIP (glucose-dependent

---

[19]  FDA, *Development & Approval Process* (Aug. 8, 2022), https://www.fda.gov/drugs/development-approval-process-drugs.

FIRSTSECOND AMENDED COMPLAINT                    CASE NO.: 3:25-CV-03534-JSC

insulinotropic polypeptide) receptors. These medicines activate both receptors to improve blood sugar control and reduce appetite and food intake.

44. Both medicines meet critical patient needs. MOUNJARO® is FDA-approved to treat type-2 diabetes, and ZEPBOUND® is approved to treat chronic weight management and obstructive sleep apnea in certain adults. Today, Lilly manufactures, markets, and sells MOUNJARO® and ZEPBOUND® throughout the United States, among other places.

45. Lilly is the only lawful source of mass-produced tirzepatide in the United States. Because tirzepatide is a new active ingredient not previously approved by FDA, Lilly earned new chemical exclusivity for tirzepatide. As a result, through at least May 13, 2027, FDA cannot accept an application from any other person for any other tirzepatide product.

46. MOUNJARO® and ZEPBOUND® are the only FDA-approved medicines containing tirzepatide in the United States. Lilly's tirzepatide medicines are injectables; they are administered via under-the-skin injections. Customers can purchase Lilly's tirzepatide medicines from several pharmacy options, include their local pharmacy. FDA has not approved, and Lilly does not sell, any tirzepatide product with additives like glycine, niacinamide, or pyridoxine.

## II.    DRUG COMPOUNDING

### A.    Compounded Drugs Are Neither Clinically Tested nor FDA Approved

47. Compounded drugs live at the other end of the regulatory spectrum: they are not FDA approved, do not undergo clinical trials, are not made pursuant to cGMP, and are not subject to pharmacovigilance requirements like adverse event reporting. Indeed, FDA generally does not even know what compounded drugs are produced or sold in the United States, where they are made, or by whom.[20]

48. Drug compounding is a "practice in which a licensed pharmacist, a licensed physician or, in the case of an outsourcing facility, a person under the supervision of a licensed pharmacist, combines,

---

[20] *See, e.g.*, Congressional Research Service, *Drug Compounding: FDA Authority and Possible Issues for Congress* (Jan. 5, 2018) ("[T]he majority of compounding facilities in the United States do not register with FDA …. This means that FDA often is unaware of potential problems with the drug products or facility conditions unless the agency receives a complaint."), https://www.congress.gov/crs_external_products/R/PDF/R45069/R45069.3.pdf.

FIRSTSECOND AMENDED COMPLAINT                                    CASE NO.: 3:25-CV-03534-JSC

mixes or alters ingredients of a drug to create a medication tailored to the needs of an individual patient."[21] For example, if an individual patient is allergic to an ingredient in an FDA-approved medicine, a compounding pharmacy could produce a version of that medication that does not contain the allergen for that individual patient.

49.     As FDA has made clear, "[c]ompounded drugs are not FDA-approved."[22] FDA does not review compounded drugs to evaluate their safety, effectiveness, or quality before they reach patients.

50.     Unlike FDA-approved medications, compounded drugs are also not tested in preclinical studies or in clinical trials. Further, compounding pharmacies are not subject to cGMP, their facilities are not subject to inspections by regulatory authorities, and they have no reporting requirements for adverse events.

51.     For these and other reasons, FDA has warned that "[c]ompounded drugs . . . do not have the same safety, quality, and effectiveness assurances as approved drugs. Unnecessary use of compounded drugs . . . exposes patients to potentially serious health risks."[23] FDA further advises that compounded drugs "should only be used to meet a patient's needs if the patient's medical needs cannot be met by an available FDA-approved drug."[24]

52.     The risks FDA has identified with compounded drugs generally are heightened in the context of compound tirzepatide-based drugs because, on information and belief, tirzepatide used in compounded drugs is produced by foreign manufacturers—generally in China.[25] Indeed, a whistleblower

---

[21]   FDA, *Human Drug Compounding* (May 15, 2025), https://www.fda.gov/drugs/guidance-compliance-regulatory-information/human-drug-compounding.

[22]   FDA, *Compounding and the FDA: Questions and Answers* (Sept. 16, 2025), https://www.fda.gov/drugs/human-drug-compounding/compounding-and-fda-questions-and-answers.

[23]   FDA, *Compounding and the FDA: Questions and Answers*, https://web.archive.org/web/20220702213650/https://www.fda.gov/drugs/human-drug-compounding/compounding-and-fda-questions-and-answers (capture of web page on Jul. 02, 2022).

[24]   FDA, *FDA Alerts Health Care Providers, Compounders and Patients of Dosing Errors Associated with Compounded Injectable Semaglutide Products* (July 26, 2024), https://www.fda.gov/drugs/human-drug-compounding/fda-alerts-health-care-providers-compounders-and-patients-dosing-errors-associated-compounded.

[25]   FDA, *National Drug Code Directory*, https://www.accessdata.fda.gov/scripts/cder/ndc/dsp_searchresult.cfm (current through Nov. 12, 2025).

15

has alleged that Mochi Health's Tirzepatide Mix contains tirzepatide sourced from Genohope, a Chinese manufacturer, which Mochi Health relabels as being sourced from Darmerica, an American company.[26] These foreign manufacturers are not subject to the same quality controls as Lilly and, as a result, produce tirzepatide with little to no oversight. Thus, the tirzepatide used in compounded drugs like Mochi Health's can differ significantly from the tirzepatide used by Lilly in its medicines, which is produced in compliance with all applicable federal and state requirements.

53. Indeed, FDA has identified a "concerning trend about non-compliance with CGMP" from "API suppliers for compounding sites."[27] "Over the past five years, 72% of API manufacturing sites subject to FDA regulatory actions (e.g., warning letters, import alerts, and regulatory meetings) were sites that exclusively supply compounding pharmacies."[28] This is notable because such sites "represent only 18% of API manufacturers."[29] On September 5, 2025, FDA went further and expressed "serious concerns with compounded versions of semaglutide and tirzepatide, including dosing errors, use of unapproved salt forms and adverse events—some requiring hospitalization."[30] According to FDA, these concerns were due in substantial part to the use of "illegal GLP-1 active ingredients imported from overseas" by compounders formulating weight-loss drugs in the United States.[31]

**B.    Compounded Drugs Often Contain Unstudied Additives**

54. The only active ingredient in MOUNJARO® or ZEPBOUND® is tirzepatide. By contrast, many compounded tirzepatide drugs mix tirzepatide together with other purportedly active ingredients that have never been tested with tirzepatide. For instance, Mochi presently claims to sell

---

[26] Dep't of Health, Health Systems Quality Assurance, *Confidential Investigation Report Prepared for The Pharmacy Quality Assurance Commission* (Aug. 13, 2025) https://www.glpwinner.com/api/media/file/Aequita%20Pharmacy%20WA%20Investigation.pdf.

[27] FDA, Report on the State of Pharmaceutical Quality, FY 2024, available at https://www.fda.gov/media/188236/download.

[28] *Id.*

[29] *Id.*

[30] FDA, *FDA Launches Green List to Protect Americans from Illegal Imported GLP-1 Drug Ingredients* (Sept. 5, 2025), https://www.fda.gov/news-events/press-announcements/fda-launches-green-list-protect-americans-illegal-imported-glp-1-drug-ingredients.

[31] *Id.*

FIRSTSECOND AMENDED COMPLAINT                                      CASE NO.: 3:25-CV-03534-JSC

tirzepatide mixed with glycine, niacinamide, and/or pyridoxine. For several reasons, there is no plausible justification for creating an injection that combines tirzepatide with these ingredients.

55.    ***First***, tirzepatide has not been studied in combination with any other active ingredient, including glycine, niacinamide, or pyridoxine. When multiple active ingredients are combined in a single solution, the ingredients can interact in unexpected ways. Those interactions can harm one or both of the ingredients by causing them to degrade through chemical reactions like oxidation or hydrolysis. Alternatively, a chemical reaction can occur that combines the ingredients to produce a new molecule with unknown toxicity, safety, or efficacy. In other words, mixing multiple drugs together for patients is not a simple 1+1=2 equation. The possibility that drug ingredients might be incompatible for physical, chemical, or therapeutic reasons is one of the many reasons why FDA requires rigorous testing of drug combinations before they are used in humans.

56.    ***Second***, there are very good reasons to be concerned about the untested combinations that Mochi is selling to patients. Tirzepatide is a very large (4813 g/mol) and very complex protein-based macromolecule[32]:



It is well-known that protein-based macromolecules interact with even simple excipients (i.e., *inactive* ingredients).[33] Yet the additives used by Mochi are biologically active ingredients, some of which are

---

[32]    National Library of Medicine, PubChem CID 16328597, Compound Summary, 2D Image (accessed Oct. 2, 2025), https://pubchem.ncbi.nlm.nih.gov/compound/163285897.

[33] Science Direct, *Progress in peptide and protein therapeutics: Challenges and strategies (Oct. 25, 2025),* https://www.sciencedirect.com/science/article/pii/S221138352500704X ("The instability of peptides and proteins can result from multiple degradation pathways, including oxidation,

~~FIRST~~SECOND AMENDED COMPLAINT                                  CASE NO.: 3:25-CV-03534-JSC

themselves complex molecules. By selling tirzepatide mixed with multiple active ingredients in a single solution without any form of testing, Mochi is engaged in a large-scale, uncontrolled, and unconsented human experiment.

57.    **Third**, combining active ingredients is only appropriate when both contribute to the intended therapeutic effect of the end product. None of the additives used by Mochi are effective as a treatment for diabetes, treatment for sleep apnea, or as a weight loss drug. And there is no evidence whatsoever that Mochi's additives either increase the effectiveness of tirzepatide or reduce any side effects associated with tirzepatide. To the contrary, Lilly is aware of patients who have experienced severe adverse events after taking a tirzepatide product compounded with cobalamin, including at least one from a pharmacy that has supplied Mochi Health.

58.    **Fourth**, even if there were a clinical need for a patient to take one of Mochi's additives, they could take the other ingredient separately, *without* combining it in solution with tirzepatide. Cobalamin, niacinamide, pyridoxine are all readily available vitamins that can be found in any drug store. Glycine is a common dietary supplement. Mochi's reckless experimenting is not just a pretext, it is also completely unnecessary.

59.    **Finally**, as discussed below, Mochi has conceded to its customers that its additives are not clinically significant. *See infra* Section IV.B.

C.    **Consumers Are Being and Have Been Deceived About Compounded Tirzepatide**

60.    The false and misleading promotion of compounded tirzepatide-based medicines has been prolific, and as a result consumers have been overwhelming deceived as to the safety and effectiveness of these untested, unapproved compounded drugs.

61.    For example, in 2025, the National Consumers League (NCL) conducted a survey of 1,498 women and found widespread confusion as to the nature of compounded GLP-1s. For example, of the nearly fifteen hundred women surveyed, "71 percent hold the view that compounded GLP-1s must

___

deamidation, conformational unfolding, aggregation, and denaturation at interfaces. … Even subtle perturbations to their native structures can lead to a loss of bioactivity, complicating their therapeutic potential.").

FIRSTSECOND AMENDED COMPLAINT                                    CASE NO.: 3:25-CV-03534-JSC

be tested and proven safe to be on the market," and over half believed that compounded GLP-1s are FDA-approved.[34] The survey also found that 49% of women—and 54% of women with obesity—believe that compounded GLP-1s "have the same ingredients as the branded GLP-1 drugs," despite the fact that compounded GLP-1s are often formulated with untested and unapproved additives like glycine and that the API used in compounded GLP-1s may have very different potency or purity profiles from approved medicines and therefore affect patients very differently.

62.    As NCL noted, these views on compounded GLP-1s are false. NCL observed that "compounded versions [of medications] can be made with different ingredients or at different concentrations, potentially leading to ineffective treatment or adverse events."[35] In explaining the nature of the deceit, NCL noted "[t]he truth is that compounded GLP-1s are held to lower safety standards than FDA-approved drugs and do not undergo premarket FDA review, a requirement for branded drugs to be on the market."

63.    A similar conclusion was reached by a study of compounded GLP-1 advertising conducted by the JAMA Health Forum, which found that most websites advertising such drugs "provided limited safety information and unauthorized efficacy claims."[36] Based on these findings, the study recommended that FDA "require websites to explicitly disclose and define compounding, including lack of FDA approval; institute unique naming conventions for compounded medications; and be given greater authority to act against misleading compounded medication advertising."

64.    Recently, FDA agreed and called out prolific false and misleading advertising of compounded drugs like those Mochi Health sells. For instance, on September 16, 2025, FDA publicly posted warning letters sent to various compounders and telehealth companies selling compounded weight-loss drugs, explaining that advertising statements mirroring those made in Mochi Health's

---

[34]  Nat'l Consumers League, *The Influence of Disinformation on Attitudes and Beliefs About Compounded GLP-1 Drugs: A Dose of Reality* at 6 (May 2025), https://nclnet.org/wp-content/uploads/2025/05/The-Influence-of-Disinformation-on-Attitudes-and-Beliefs-About-Compounded-GLP-1-Drugs-Survey-Results.pdf.

[35]  *Id.*

[36]  Ashwin K. Chetty, et al., *Online Advertising of Compounded Glucagon-Like Peptide-1 Receptor Agonists,* JAMA NETWORK (Jan. 17, 2025), https://jamanetwork.com/journals/jama-health-forum/fullarticle/2829225.

19

advertising are "false or misleading" statements. The letters repeatedly faulted compounded drug sellers for stating or implying that their products were "the same as an FDA-approved product when they are not."[37]

65.     For example, FDA warned that advertisements promoting compounded weight loss drugs as being "clinically proven ingredients"[38]; being "clinically proven"[39] or "clinically shown";[40]

---

[37] FDA, *Warning Letter to Lovely Meds, Inc. dba Lovely Meds* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/lovely-meds-inc-dba-lovely-meds-09092025.

[38] FDA, *Warning Letter to Hims & Hers, Inc. dba Hims* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/hims-hers-health-inc-dba-hims-09092025.

[39] FDA, *Warning Letter to TRYM Health, Inc. dba TRYM Health* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/trym-health-inc-dba-trym-health-09092025; FDA, *Warning Letter to Healthy Male* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/healthy-male-09092025; FDA, *Warning Letter to EvoLife Wellness* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/evolife-wellness-715507-09092025; FDA, *Warning Letter to Curex* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/curex-09092025; FDA, *Warning Letter to Healthon Inc. dba Healthon* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/healthon-inc-dba-healthon-09092025; FDA, *Warning Letter to Slendid* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/slendid-09092025; FDA, *Warning Letter to The HCG Institute* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/hcg-institute-09092025; FDA, *Warning Letter to Lyfe Rx* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/lyfe-rx-09092025.

[40] FDA, *Warning Letter to Healthy Male* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/healthy-male-09092025.

FIRSTSECOND AMENDED COMPLAINT                                    CASE NO.: 3:25-CV-03534-JSC

"customized";[41] "personalized";[42] or "custom" products;[43] were false and misleading because they imply that the compounded drug products "are the same as an FDA-approved product when they are not."[44]

66.    The categories of claims that FDA has found are false and misleading are the very same types of claims that Mochi Health has put into the market. Indeed, there is no material difference between Mochi Health's claims and the statements that FDA determined was false and misleading. Mochi Health's claims that its medicine is "custom-prepared to meet an individual patient's specific needs,"[45] is nearly identical to statements flagged by FDA as false and misleading.

## III.    DEFENDANTS' PRODUCTION AND SALE OF KNOCKOFF TIRZEPATIDE

### A.    Myra Ahmad and Abraham Chaibi, Neither of Whom Is a Licensed Physician, Own or Are Entangled with All Defendants and Related Entities

67.    Mochi Health is a telehealth corporation that claims it matches patients with physicians at a variety of "affiliated medical services providers," who then prescribe weight loss medications advertised on Mochi Health's website, including untested and unapproved compounded tirzepatide.[46]

68.    Myra Ahmad is Mochi Health's Co-Founder and CEO. Upon information and belief, Ms. Ahmad is married to Abraham Chaibi.[47] Mr. Chaibi is also an owner of Mochi Health.

---

[41]    FDA, *Warning Letter to Fancy Meds, LLC dba Fancy Meds* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/fancy-meds-llc-dba-fancy-meds-09092025; FDA, *Warning Letter to directmeds.com, Inc. dba DirectMeds* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/directmedscom-inc-dba-directmeds-09092025.

[42]    FDA, *Warning Letter to Elevate Your Wellness LLC, dba Elevated* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/elevate-your-wellness-llc-dba-elevated-09092025.

[43]    FDA, *MedClub by Dr. Jenn* (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/medclub-dr-jenn-09092025.

[44]    *Supra* notes 37–43.

[45]    https://joinmochi.com/medications.

[46]    Mochi Health, *Mochi - Terms of Use*, (Sep. 17, 2025), https://joinmochi.com/termsandconditions

[47]    Khaos Entertainment, *Myra Ahmad & Abrahim Chaibi Married December 21, 2019 at The Banff Springs Hotel. A magical multicultural wedding after a massive snowfall!!*, FACEBOOK (Dec. 22, 2019) https://www.facebook.com/watch/?v=668895403645110.

FIRSTSECOND AMENDED COMPLAINT                                    CASE NO.: 3:25-CV-03534-JSC

69.     Ms. Ahmad states that her motivation for founding Mochi Health was grounded in her experience "as a doctor" and touts her business as "[d]eveloped by doctors."[48] She also touts her experience treating patients, claiming "As a doctor, I saw firsthand the endless challenges patients face…":



## Developed by *doctors.*

"I founded Mochi Health to revolutionize access to obesity medicine with evidence-based practices. Traditionally, healthcare has centered on treatment, not prevention.

As a doctor, I saw firsthand the endless challenges patients face in obtaining affordable, sustainable weight care without the burden of stigma. Driven by a desire to transform the industry, Mochi Health delivers solutions targeting the root causes of weight-related health issues.

We've empowered thousands of patients nationwide, shifting the narrative from generic treatments to personalized, holistic care."

*Myra Ahmad*

**Dr. Myra Ahmad, MD**
Co-Founder & CEO

70.     Ms. Ahmad further refers to her background "as a physician"[49] in interviews, including a webcast with over 13,000 subscribers, and provided no correction to interviewer statements that "Dr. Myra is a doctor," instead nodding affirmatively.[50]

---

[48]   Mochi Health, *Mochi - About*, https://web.archive.org/web/20250425015015/https://joinmochi.com/about (captured on Apr. 25, 2025).

[49]   DOWNSIZED, *Exclusive Interview Dr Myra – The CEO & Founder of Mochi Health Speaks Out!*, YOUTUBE (Feb. 28, 2025) https://youtu.be/XknghozB0mc?si=42iJvkHo8bRAu09Z&t=56.

[50]   *Id.*

~~FIRST~~SECOND AMENDED COMPLAINT                                    CASE NO.: 3:25-CV-03534-JSC

71.     In reality, Ms. Ahmad is not licensed to practice medicine in any state, including California. Holding herself out as a doctor violates Cal. Bus. & Prof. Code §§ 2052 and 2054.[51] Her husband, Mr. Chaibi, likewise is not licensed to practice medicine in any state.

72.     Nevertheless, Ms. Ahmad and Mr. Chaibi, through Mochi Health and related entities, directly and indirectly control and exert undue influence over prescribing decisions for Mochi Health patients.

73.     In fact, through Mochi Health, Ms. Ahmad and Mr. Chaibi exert undue control or influence over each of the Defendants and affiliated entities, with at least one of a trio of family members—Ms. Ahmad, Mr. Chaibi, and Rana Ahmad—listed in past or present corporate filings of each and every Defendant and other additional affiliated entities as well.

74.     ***Mochi Health***: Mochi Health's Washington registration lists Ms. Ahmad and Mr. Chaibi as "governors" and Rana Ahmad as its registered agent.[52] Mochi Health is funded by Dexterity Capital.[53] Abraham Chaibi is a co-founder of Dexterity Capital.[54]

---

[51]   Cal. Bus. & Prof. Code §§ 2052 and 2054 ("any person who practices or attempts to practice, or who advertises or holds himself or herself out as practicing, any system or mode of treating the sick or afflicted in this state, or who diagnoses, treats, operates for, or prescribes for any ailment, blemish, deformity, disease, disfigurement, disorder, injury, or other physical or mental condition of any person, without having at the time of so doing a valid, unrevoked, or unsuspended certificate as provided in this chapter or without being authorized to perform the act pursuant to a certificate obtained in accordance with some other provision of law is guilty of a public offense"); ("Any person who uses in any sign, business card, or letterhead, or, in an advertisement, the words 'doctor' or 'physician,' the letters or prefix 'Dr.,' the initials 'M.D. or 'D.O.',' or any other terms or letters indicating or implying that he or she is a physician and surgeon, physician, surgeon, or practitioner under the terms of this or any other law, or that he or she is entitled to practice hereunder, or who represents or holds himself or herself out as a physician and surgeon, physician, surgeon, or practitioner under the terms of this or any other law, without having at the time of so doing a valid, unrevoked, and unsuspended certificate as a physician and surgeon under this chapter, is guilty of a misdemeanor."). Upon information and belief, Ms. Ahmad does not fall within any applicable exceptions to this section.

[52]   Washington Sec'y of State, *Annual Report of Mochi Health Corp.* (2025).

[53]   The Founder Story, *Myrah Ahmad, Co-Founder of Mochi Health Talks About Building A Telehealth Company,* SPOTIFY (Jul. 27, 2022), https://open.spotify.com/episode/3q3PlAAApJPmHTL8IOHQfk6 at 2:55.

[54]   Decential, *'Kind of free money' in the 2017 Crypto Mayhem Set Dexterity Capital on Path to High-Speed Trading* (Mar. 8, 2022), https://www.decential.io/articles/kind-of-free-money-in-the-2017-crypto-mayhem-set-dexterity-capital-on-path-to-high-speed-trading.

75.    *Mochi Medical*: Ms. Ahmad's father, Rana Ahmad, is the director of Mochi Medical which comprises Mochi Health's "affiliated medical services providers."[55] Mochi Medical, P.A.'s corporate filings have previously identified Ms. Ahmad as Director and CEO of Mochi Medical, P.A., under penalty of perjury.[56] Mochi Health,[57] Mochi Medical, P.A.,[58] and Mochi Medical CA, P.C.[59] share an address at 161 Natoma Street, San Francisco, CA 94105. Rana Ahmad has registered Mochi Medical, P.A. with his Mochi Health email address.[60]

76.    *Aequita Defendants*: Mr. Chaibi is the CEO, Director, President, Secretary, and Treasurer of Aequita Corporation, which holds an ownership interest in Aequita Pharmacy.[61] Until earlier this year, Aequita Pharmacy fulfilled prescriptions from Mochi Medical. Aequita Pharmacy is owned by and shares an address with Aequita Corporation at 12825 NE 126th Pl, Kirkland, WA, 98034. Additionally, one of Defendants' office buildings at 12531 131st Ct NE, Kirkland, WA 98034, in the same Totem Valley Business Center as the Aequita Defendants' primary address, is labeled "Mochi."[62]

---

[55]    Mochi Health, *Mochi - Terms of Use*, (Sep. 17, 2025), https://joinmochi.com/termsandconditions.

[56]    Florida Sec'y of State, *Florida Profit Corporation Annual Report* (2023), https://search.sunbiz.org/Inquiry/CorporationSearch/GetDocument?aggregateId=domp-p220000446 05-2bfd1531-811d-42e0-b969-46b697f7426f&transactionId=p22000044605-7cedff0c-106d-4291-99 46-53689adfd671&formatType=PDF.

[57]    Washington Sec'y of State, *Annual Report of Mochi Health Corp.* (2025).

[58]    Florida Sec'y of State, *Florida Profit Corporation Annual Report* (2024), https://search.sunbiz.org/Inquiry/CorporationSearch/GetDocument?aggregateId=domp-p220000446 05-2bfd1531-811d-42e0-b969-46b697f7426f&transactionId=p22000044605-77e201fc-e0ba-4717-8 2b4-76960a0f22d8&formatType=PDF.

[59]    California Sec'y of State, *Statement of Information for Mochi Medical CA, P.C.* (Filed Mar. 22, 2024).

[60]    Vermont Sec'y of State, *Annual Report of Mochi Medical, P.A.* (2025).

[61]    Washington State Dep't of Health, *Facility Search*, Aequita Pharmacy, https://fortress.wa.gov/doh/facilitysearch/ (License Number 61640636) (last visited Apr. 14, 2025).

[62]    *12531 131st Ct NE*, GOOGLE MAPS, https://www.google.com/maps/@47.7133373,-122.1659703,3a,61.8y,252.74h,78.56t/data=!3m7!1e1 !3m5!1sPvp7rq4-Q5Mh2AY4Xqz7ow!2e0!6shttps:%2F%2Fstreetviewpixels-pa.googleapis.com%2 Fv1%2Fthumbnail%3Fcb_client%3Dmaps_sv.tactile%26w%3D900%26h%3D600%26pitch%3D11. 436519857575519%26panoid%3DPvp7rq4-Q5Mh2AY4Xqz7ow%26yaw%3D252.74327535699902! 7i16384!8i8192?entry=ttu&g_ep=EgoyMDI1MDQwNi4wIKXMDSoASAFQAw%3D%3D    (Last visited Nov. 14, 2025); Alaska Dep't of Commerce, *Aequita Corporation Certificate of Authority* (filed Oct. 28, 2024).

24

77.    Aequita Corporation has two owners: Mr. Chaibi[63] and Aequita Semiworks.[64] Aequita Semiworks lists Mr. Chaibi as its CEO and shares an address with Ms. Ahmad's "Active" National Provider Identifier (NPI).[65]

78.    Aequita Corporation previously listed its principal address at 2131 S. Crestline St, Spokane, WA 99203—the same address listed for Ms. Ahmad's NPI.[66] Rana Ahmad lists his own address as 2131 S Crestline St, Spokane, WA, 99203 in Mochi Health's Washington Annual Report.[67] Aequita Corporation's principal address of 1 Bluxome St., San Francisco, CA 94107 is the same address that Mochi Health listed as its business address in its initial California filing.[68] Furthermore, Aequita Corporation's other owner,[69] Aequita Semiworks, lists Mr. Chaibi as its CEO, and shares an address with Ms. Ahmad's NPI address.[70]

79.    Mr. Chaibi uses an email address from one of his other entities, Aequita Bioworks, on corporate filings for Aequita Corporation. For instance, Mr. Chaibi submitted a Certificate of Authority to the Vermont Secretary of State in November 2024 for Aequita Corporation that identified its

---

[63]    Alaska Dep't of Commerce, *Aequita Corporation Certificate of Authority* (filed Oct. 28, 2024).

[64]    Washington State Dep't of Revenue, Business Lookup, https://secure.dor.wa.gov/gteunauth/_/ (click "Business Lookup," then enter "605-221-989" in the UBI/Account ID # field) (last visited Nov. 14, 2025).

[65]    Delaware Div. of Corps., *Annual Franchise Tax Report of Aequita Semiworks Inc.* (2024).

[66]    NPPES NPI Registry, *Provider Information for 1780382622*, https://npiregistry.cms.hhs.gov/provider-view/1780382622 (last visited Nov. 14, 2025).

[67]    Washington Sec'y of State, *Annual Report of Mochi Health Corp.* (2025).

[68]    California Sec'y of State, *Signed Statement and Designation by Foreign Corporation* (Filed Feb. 16, 2022), https://bizfileonline.sos.ca.gov/api/report/GetImageByNum/091114108112159128024249094106092080213141026017.

[69]    Washington State Dep't of Revenue, *Business Lookup*, https://secure.dor.wa.gov/gteunauth/_/ (click "Business Lookup," then enter "605-221-989" in the UBI/Account ID # field) (last visited Apr. 11, 2025).

[70]    *Annual Franchise Tax Report of Aequita Semiworks, Inc.*, Del. Div. of Corps. (2024).

25

"Business Email' as kate@aequitabioworks.com,[71] and Aequita Corporation's filings in Montana use the same email address.[72]

80.    ***USA Distribution LLC***: Myra Ahmad is registered as governor of USA Distribution LLC, a Washington corporation with an address of 12912 NE 125th Way # A228, Kirkland, WA 98034, the same Totem Valley Business Center where Aequita is based.[73] As elaborated below, upon information and belief, USA Distribution LLC imports active pharmaceutical ingredients for Aequita Pharmacy, shipped from China to Aequita's address at 12825 NE 126th Pl, Kirkland, WA, 98034.

81.    Collectively, Defendants work to attract patients who are interested in being prescribed Lilly's FDA-approved medicines by advertising these drugs on Mochi Health's website and then overwhelmingly steer patients to unapproved, compounded knockoffs, including those imported by Ms. Ahmad's USA Distribution LLC, prescribed by Mochi and Mochi Medical, and dispensed by the Aequita Defendants, enriching Defendants and their related entities in the process.

82.    Upon information and belief, Mochi Health and its principals also target patients interested in other popular medications for hormone replacement and fertility through other affiliated businesses, Miso (hormone replacement therapy)[74] and Taro (fertility),[75] with similar arrangements.

**B.    Mochi Health Sells Risky, Unapproved Compounded Drugs Through Its Affiliated Medical Group**

**1.    *Mochi Health exerts undue control or influence over its medical providers***

83.    Mochi Health recognizes Mochi Medical as its own. On its website, Mochi Health tells patients it will match them with one of "Our Mochi doctors."[76] Mochi Health also stated "our"—*i.e.*,

---

[71]   Vermont Sec'y of State, *Certificate of Authority to Aequita Corporation* (filed Nov. 12, 2024).

[72]   State of Montana Sec'y of State, *Foreign Registration Statement for Foreign Profit Corporation* (filed Oct. 22, 2024).

[73]    Washington Sec'y of State, *Initial Report* (filed Jul. 12, 2024).

[74]   Miso, *About,* https://web.archive.org/web/20250423100927/https://www.joinmisohealth.com/about (captured on Sept. 23, 2025).

[75]   Taro, *About,* https://web.archive.org/web/20250423100514/https://www.tarofertility.com/about (captured on Sept. 23, 2025)..

[76]   Mochi Health, *Medications*, https://joinmochi.com/medications (last visited Apr. 14, 2025).

26

FIRSTSECOND AMENDED COMPLAINT                                                CASE NO.: 3:25-CV-03534-JSC

Mochi Health's—network is made up of "board-certified obesity medicine providers and registered dietitians."[77]



84.     Patients are referred to a "Mochi doctor" through a web portal operated by Mochi Health. Mochi Health's website is the exclusive conduit through which Mochi Medical receives referrals of new patients.

85.     Mochi Health exerts undue control or influence over the hiring and employment of both medical and business personnel at Mochi Medical. As of March 17, 2025, Mochi Health advertised forty-four job postings on its "Careers" page,[78] including physicians, nurses, and pharmacists—that is, the medical providers who are supposed to work at Mochi Medical and be free from Mochi Health's undue influence.

---

[77]    Mochi Health, https://joinmochi.com/ (last visited Apr. 14, 2025).

[78]    Mochi Health Job Postings, *Current openings at Mochi Health,* https://web.archive.org/web/20250316045611/https://job-boards.greenhouse.io/mochihealth (captured on Mar. 16, 2025).

27

FIRSTSECOND AMENDED COMPLAINT                                    CASE NO.: 3:25-CV-03534-JSC

86.    Job openings for medical providers are listed as "Current openings at Mochi Health," not at Mochi Medical. And nowhere on its "Careers" page or job listings does Mochi Health distinguish between positions at Mochi Health or Mochi Medical.

87.    Similarly, Mochi Health's "Careers" page and Mochi Health's job listings on LinkedIn and Glassdoor all indicated physicians are hired by Mochi Health, not Mochi Medical.[79]

88.    Upon information and belief, Mochi Health provides diagnostic protocols to providers at Mochi Medical and trains them to use these protocols. Mochi Health also owns and controls patient

---

[79]    Mochi Health LinkedIn Job Posting, https://www.linkedin.com/jobs/search/?currentJobId=4159098434 (last visited Apr. 14, 2025); Mochi Health Glassdoor Job Posting, https://www.glassdoor.com/job-listing/physician-obesity-medicine-mochi-JV_KO0,26_KE27,32.htm?jl=1009689444492 (last visited Apr 14, 2025).

28

records through a "custom-built"[80] electronic medical record ("EMR") system, which, upon information and belief, dictates what records must be retained in the system.

89. For example, a recent job posting by Mochi Health for a "Physician" in "Obesity Medicine" stated: "By joining our team, you will: . . . Utilize advanced tools like our"—*i.e.*, Mochi Health's—"custom-built [Electronic Medical Record system] and obesity-specific protocols."[81] In another recent job posting for a "Nurse Practitioner" in "Obesity Management," Mochi Health emphasized that "we provide . . . structured training based on our protocols" and a "custom-built [Electronic Medical Record system]."[82]

90. Upon information and belief, Mochi Health uses these protocols, trainings, and other corporate tools to influence and steer prescribers towards Mochi Health's compounded tirzepatide products over FDA-approved medicines for non-clinical reasons.

91. Mochi Health also improperly advertises and arranges for medical services, activities the Board reserves for licensed physicians only. For example, Ms. Ahmad holds herself out as a "physician" when advertising for Mochi Health's medical services. On social media, Ms. Ahmad—who is not licensed to practice medicine in any state—advertises Mochi Health's medical services and encourages individuals to sign up using sale referral codes. By trading on consumers' trust in medical professionals and medical supervision of their healthcare, Mochi Health masks its corporate and business interests in prescribing its customers compounded tirzepatide products, deceives consumers, and diverts some who would otherwise have been prescribed FDA-approved medicine.

**C.   The Aequita Defendants Made and Sold Compounded Drugs Under Mochi Health's Control**

---

[80] Mochi Health Job Posting, *Physician – Obesity Medicine*, h https://web.archive.org/web/20250417195852/ttps://job-boards.greenhouse.io/mochihealth/jobs/4535832008 ttps://job-boards.greenhouse.io/mochihealth/jobs/4535832008 (captured on Apr. 17, 2025).

[81] *Id.*

[82] Mochi Health Job Posting, *Nurse Practitioner - Obesity Management*, https://web.archive.org/web/20250423095305/https://job-boards.greenhouse.io/mochihealth/jobs/4535885008 (captured on Jan 21, 2025).

29

FIRSTSECOND AMENDED COMPLAINT                                    CASE NO.: 3:25-CV-03534-JSC

92.    Aequita Pharmacy holds itself out as "an independent mail-order pharmacy" engaging "in customizing medications."[83] But as described further below, this is false. The Aequita Defendants are intimately linked with Mochi Health.

93.    Mochi Health and Aequita Pharmacy announced a "partnership" in November 2024, in which Aequita Pharmacy would provide compounded drugs to Mochi Health customers.[84]



## We're Partnering With Aequita Pharmacy: Here's What To Expect

We're joining forces with Aequita Pharmacy to launch a medication program, making safe and effective medications more widely accessible to Mochi Health patients.

Sydney Wexler, RDN

This partnership unlocks greater transparency in testing, travel-safe packaging, and access to a consistent supply of medications. Here's what Mochi Health patients can expect:

### Rigorously-tested pharmaceuticals you can trust.

We are setting a new standard of transparency and accountability across all the medications we offer. Aequita Pharmacy provides us with special visibility into the most current and thorough testing data on their custom-made formulations, something that's not typically available in the standard pharmaceutical supply model. They're also a member of Professional Compounding Centers of America (PCAA), the industry-leading resource organization for compounding pharmacies. As a result, Mochi Health will be able to uphold the highest standard of quality on everything we prescribe and deliver to our patients.

94.    Mochi Health and Aequita Pharmacy claimed this partnership would ensure that Mochi Health could "uphold the highest standard of quality on everything we prescribe and deliver."[85]

95.    When queried as to whether Mochi Health would eventually transition all of its patients to Aequita Pharmacy, Ms. Ahmad asserted that she "think[s] that's the goal" and that Mochi Health aimed to fully "transition over the course of the next couple of months."[86]

---

[83]    Aequita Pharmacy, *About Aequita,* https://web.archive.org/web/20250121175901/https://www.aequitapharmacy.com/about (captured on Jan. 21, 2025)

[84]    Sydney Wexler, RDN, *We're Partnering with Aequita Pharmacy: Here's What To Expect,* (Nov. 4, 2024), https://web.archive.org/web/20250821001317/https://joinmochi.com/blogs/aequita-pharmacy-partnership (captured on Aug. 21 2025).

[85]    *Id.*

[86]    DOWNSIZED, *Exclusive Interview Dr. Myra – The CEO & Founder of Mochi Health Speaks Out!*, YOUTUBE (Feb. 28, 2025), https://youtu.be/XknghozB0mc?si=2GoKOlYdL43zHSz0&t=635.

FIRST SECOND AMENDED COMPLAINT                                    CASE NO.: 3:25-CV-03534-JSC

96.    Mochi Health listed jobs on its website and third-party job boards under headings for Mochi and Mochi Health that are actually jobs for Aequita Pharmacy in the pharmacy's Kirkland, Washington facility. These listings included positions for pharmacy staff and legal counsel. These job postings further eroded any distinction between Mochi Health and Aequita Pharmacy.[87]

mochi  **Mochi Health**

# Overnight Pharmacist

Kirkland, WA · 1 week ago · **8 people clicked apply**

Life at Aequita

- Flexible Health Coverage with Take Command (ICHRA) – We believe in giving you control over your healthcare. With Take Command and our Individual Coverage HRA (ICHRA), you choose the health insurance plan that works best for you, and we reimburse you—giving you flexibility, freedom, and financial support for the coverage you actually want.

97.    Similarly, when patients contact Aequita Pharmacy, Mochi Health is the entity that responds. One patient reported that they "contacted Aequita pharmacy through their contact form on their website to ask if they ship to my state."[88] This patient received "an email from Mochi with the answers" and "sent a return email stating I had never contacted them (Mochi) and why were they responding to the email that I sent to Aequita?"[89]

98.    Despite this, Mochi Health has denied all allegations that Ms. Ahmad[90] and/or Mochi Health[91] owned Aequita. Ms. Ahmad, too, has been steadfast in her denial of ownership of Aequita, going as far as explicitly denying ownership herself in a February 2025 interview:[92]

---

[87]   Mochi Health LinkedIn Posting, https://www.linkedin.com/jobs/view/overnight-pharmacist-at-mochi-health-4164198535 (captured on Apr. 14, 2025).

[88]   *Mochi Aequita Pharmacy – Famished,* REDDIT (June 19, 2024), https://www.reddit.com/r/tirzepatidecompound/comments/1divrbj/comment/l99ff9p/.

[89]   *Id.*

[90]   JoinMochi-Info, *More Mochi nonsense.,* REDDIT (July 25, 2024), https://www.reddit.com/r/SemaglutideFreeSpeech/comments/1e8zt56/comment/lefg89t/.

[91]   *Id.*

[92]   DOWNSIZED, *Exclusive Interview Dr Myra – The CEO & Founder of Mochi Health Speaks Out!,* YOUTUBE (Feb. 28, 2025) https://youtu.be/XknghozB0mc?si=42iJvkHo8bRAu09Z&t=56.

~~FIRST~~SECOND AMENDED COMPLAINT                                        CASE NO.: 3:25-CV-03534-JSC

Q: "So you guys are partners, I guess, you don't own that pharmacy, you're more partners with them? [Aequita]"

A: "Yeah, so we have our staff that are there for operations purposes, but, like, we don't own the pharmacy."

99.     And when questioned about the overlapping ownership between Defendants, Mochi Health falsely and fraudulently denied all allegations that Mochi Health owns Aequita.[93]

100.    Upon information and belief, the Aequita Defendants also import, or attempt to import, knockoff tirzepatide and semaglutide (the active ingredient in another chronic weight management medication), from China through Ms. Ahmad's company USA DISTRIBUTION LLC.

101.    According to an individual on Reddit who claimed to be a former employee, Aequita's Chinese-sourced weight loss drops are "[r]esearch grade and NOT approved in the US."[94]

 **Valuable-Piano-7216** • 17d ago

Fun fact.....Aequita has been using peptides from China anyway. Research grade and NOT approved in the US. They've been disguising under and LLC but it ships and is stored at the "warehouse" by the pharmacy......just one piece of evidence.



⊖    ⇧ 2 ⇩    ◯ Reply    ↪ Share    ⋯

102.    Aequita Pharmacy has been subject to discipline in multiple states. On March 13, 2025, the WPQAC issued a Limited Stop Service to Aequita Pharmacy due to "deficient practices," including

---

[93]   JoinMochi-Info, *More Mochi nonsense.*, REDDIT (July 22, 2024), https://www.reddit.com/r/SemaglutideFreeSpeech/comments/1e8zt56/comment/lefdz6a/.

[94]   Valuable-Piano-7216, *Who are we all switching to from Mochi???,* REDDIT (Mar. 18, 2025), https://www.reddit.com/r/JoinMochiHealth/comments/1jcr4xu/comment/mijrb5r/ (captured Apr. 2025).

~~FIRST~~SECOND AMENDED COMPLAINT                              CASE NO.: 3:25-CV-03534-JSC

"allowing untrained and unqualified staff to perform sterile compounding, not properly supervising staff, and not adhering to sterile compounding procedures designed to ensure product integrity and patient safety."[95]

103.    Aequita Pharmacy then reached an Interim Consent Agreement for Interim Suspension of Permit with the Arizona Board of Pharmacy, suspending Aequita Pharmacy's ability to practice in Arizona based on the deficient practices found in the Limited Stop Service Order.[96] As of the time of this filing, Aequita Pharmacy is still not permitted to practice in Arizona and has also voluntarily surrendered its permit to operate in North Carolina for cause.[97] Aequita's National Association of Boards of Pharmacy credential was similarly revoked.[98]

## IV.    MOCHI HEALTH'S UNLAWFUL CORPORATE PRACTICE OF MEDICINE

104.    Through an extensive statutory and regulatory regime, California protects patients by seeking to ensure that corporations run by non-physicians do not influence or control the practice of medicine. "The central tenet of CPOM is to protect physician autonomy . . . This is especially important when the fiduciary obligation of a corporation to its shareholders does not align with the physician's obligation to patients."[99] Many states share these types of rules that prohibit the corporate practice of

---

[95]  Washington State Dep't of Health, *Pharmacy Quality Assurance Commission issues Limited Stop Service on license of pharmacy,* (Mar. 13, 2025) https://doh.wa.gov/newsroom/pharmacy-quality-assurance-commission-issues-limited-stop-service-license-pharmacy.

[96]  Arizona Bd. of Pharmacy, *Interim Consent Agreement for Interim Suspension of Permit,* (Mar. 17, 2025), https://azbop.igovsolution.net/cZcSUdCt/AZBOPDOCS//2025/3/dd65b31997c34fc3a4e17eb1e13491a0.pdf.

[97]  N. Carolina Bd. of Pharmacy, *Voluntary Surrender of Permit for Cause*, (Mar. 17, 2025) https://portal.ncbop.org/File/fileDisplay.aspx?FileID=gBcrIqXhO8c%3d&ENF=TRUE.

[98]  RallyeReadHead, *AEQUITA NABP ACCREDITATION REVOKED,* REDDIT (March 20, 2025), https://www.reddit.com/r/SemaglutideCompound/comments/1jfzh2n/aequita_nabp_accreditation_revoked/; RallyeReadHead, *AEQUITA had their NABP accreditation REVOKED,* REDDIT (March 20, 2025), https://www.reddit.com/r/tirzepatidecompound/comments/1jfz3xy/aequita_had_their_nabp_accreditation_revoked/?rdt=46295.

[99]  Jordan M. Warchol, *Corporate Practice of [Emergency] Medicine*, in Emergency Medicine Advocacy Handbook (5th ed. 2019), EMRA, https://www.emra.org/books/advocacy-handbook-2019/corporate-practice.

FIRSTSECOND AMENDED COMPLAINT                                    CASE NO.: 3:25-CV-03534-JSC

medicine. For example, Texas, Ohio, Colorado, Iowa, Illinois, New York, and New Jersey all have laws restricting the corporate practice of medicine.

105.     In California, like in other states, unlicensed persons—both individuals and corporations—cannot own medical practices, or directly or indirectly employ physicians, or engage in the practice of medicine, Cal. Bus. & Prof. Code §§ 2400 *et seq.*, § 2052, and a corporation cannot hold a medical license, Cal. Bus. & Prof. Code § 2400. As the Medical Board of California ("the Board") recently made clear: "This section of the law is intended to prevent unlicensed persons from interfering with, or influencing, the physician's professional judgment."[100]

106.     The Board has explained that certain decisions "should be made by a physician licensed in the State of California and would constitute the unlicensed practice of medicine if performed by an unlicensed person."[101] In particular, a licensed physician must have "[r]esponsibility for the ultimate overall care of the patient, including treatment options available to the patient."[102]

107.     The Board has also made clear that the following decisions "should be made by a physician licensed in the State of California and would constitute the unlicensed practice of medicine if performed by an unlicensed person":

- Determining what diagnostic tests are appropriate for a particular condition;
- Determining the need for referrals to, or consultation with, another physician/specialist; and
- Responsibility for the ultimate overall care of the patient, including treatment options available to the patient. [103]

108.     The Board also states that "the following 'business' or 'management' decisions and activities, resulting in control over the physician's practice of medicine, should be made by a licensed California physician and not by an unlicensed person or entity":

---

[100]   Med. Bd. of California, Physicians and Surgeons: Information Pertaining to the Practice of Medicine – Corporate Practice of Medicine, https://www.mbc.ca.gov/Licensing/Physicians-and-Surgeons/Practice-Information/.

[101]   *Id.*

[102]   *Id.*

[103]   *Id.*

34

- Control of a patient's medical records, including determining the contents thereof; and

- Selection, hiring/firing of physicians, health staff, and medical assistants. [104]

109.    The California Business and Professions Code also prohibits the offer, delivery, receipt, or acceptance of consideration to induce the referral of patients, Cal. Bus. & Prof. Code § 650, and prohibits the use of unfair, unlawful, and/or fraudulent business acts or practices, *id.* §§ 17200 *et seq.* It also prohibits the making of untrue or misleading statements concerning professional or other services. *Id.* §§ 17500 *et seq.*

110.    In addition to these prohibitions, California law also makes clear that the decision to alter the formulation, dosage, or titration schedule of a prescription drug cannot be made at a corporate level. Such decisions must be made by a physician pursuant to a good faith examination of the patient and upon identification of a clinical need for the prescription. California Business & Professions Code § 2242 states that "[p]rescribing, dispensing, or furnishing dangerous drugs as defined in Section 4022 [*i.e.*, a prescription drug] without an appropriate prior examination and a medical indication, constitutes unprofessional conduct." In addition, the healthcare professional is required to comply with "the appropriate standard of care."[105] That standard of care requires a "prior examination" *and* the identification of "a medical indication" showing that the prescription is warranted.

111.    California's Business & Professions Code also imposes consent requirements on telehealth providers like Mochi Health. California Business & Professions Code § 2290.5 states that "[b]efore the delivery of health care via telehealth, the health care provider initiating the use of telehealth shall inform the patient about the use of telehealth and obtain verbal or written consent from the patient for the use of telehealth as an acceptable mode of delivering health care services and public health. The consent shall be documented."

112.    The Board further specifies that a physician is not permitted to operate a medical practice as a limited liability company, a limited liability partnership, or a general corporation.[106]

---

[104]  *Id.*

[105]  *Id.*

[106]  *Id.*

35

113.    Many other states prohibit corporations controlled by non-physicians from making medical decisions and all prohibit unlicensed individuals from practicing medicine.

114.    Despite California and other states' prohibition on the corporate practice of medicine, Mochi Health unlawfully influences the practice of medicine and otherwise engages in unfair and unlawful practices by violating California law regarding the practice of medicine by unlicensed individuals and corporations.

115.    Highlighting Mochi's disregard for the law and applicable licensing restrictions, a whistleblower complaint recently revealed that Mochi Health compounds its Tirzepatide Mix with tirzepatide obtained from China.[107] The whistleblower alleges that Aequita not only obtained its compounded tirzepatide from China, but it also removed the labels to imply that Mochi's Tirzepatide Mix was made in the USA.[108]

116.    More worrisome, on information and belief, Mochi Health's Tirzepatide Mix has, at times, been filled by unlicensed day laborers. Information obtained from the Washington Department of Health's investigation of Aequita Pharmacy suggests that it hired "individuals off the street" from "the Home Depot and Lowes parking lots" to "fill in gaps of staffing," including "out of the sister company's 'warehouse' (Mochi Health)." [109] These workers are not licensed pharmacists or otherwise permitted to fill medications.

117.    The allegations contained in this whistleblower complaint are evidence of a pattern and practice by Mochi Health and its affiliates to engage in the unlawful corporate practice of medicine. The Washington State Department of Health has identified fourteen additional whistleblower complaints against Aequita Pharmacy and its affiliates.[110]

---

[107]  Dep't of Health, Health Systems Quality Assurance, *Confidential Investigation Report Prepared for The Pharmacy Quality Assurance Commission* (Aug. 13, 2025)*,* https://www.glpwinner.com/api/media/file/Aequita%20Pharmacy%20WA%20Investigation.pdf.

[108]  *Id.*

[109]  *Id.*

[110]  *Id.*

36

118.    Even worse, Mochi Health has tried to silence whistleblowers of this kind. For instance, Mochi Health is being sued by its former Director of Human Resources in San Francisco for whistleblower retaliation and wrongful termination.[111] The first amended complaint alleges that the whistleblower informed Ms. Ahmad that she could not hire Mochi Health warehouse workers as independent contractors.[112] In response, Ms. Ahmad purportedly stated that she did "not give a single f*ck" about the law.[113] These allegations align with Mochi Health's pattern and practice of unlawful conduct.

119.    In short, Mochi Health engages in the unlawful corporate practice of medicine. It does so by altering dosages and prescriptions for purely business purposes. Though Mochi Health purports to offer its customers Lilly medicines in addition to compounded tirzepatide products, each time it makes a forced switch, it only ever switches patients to compounded products, repeatedly demonstrating that Mochi Health is engaged in steering its patients to compounded products over Lilly's FDA-approved tirzepatide medicines and therefore diverting potential patients.

A.    Altering Dosage for Business Purposes

120.    Before December 2024, Mochi Health prescribed tirzepatide to patients with doses similar to those of Lilly's MOUNJARO® and ZEPBOUND®: 2.5 mg, 5 mg, 7.5 mg, 10 mg, 12.5 mg, and 15 mg.

121.    In December 2024, after announcing its partnership with Aequita Pharmacy—but not revealing the common ownership and control—Mochi Health announced publicly, including on social media platforms, that it was unilaterally changing the compounded tirzepatide doses of Mochi Health patients to non-standard doses.

122.    These changes were automatic and across the board—for instance, patients who were previously prescribed a 10 mg dose of compounded tirzepatide were automatically transitioned to an 8.8

---

[111]  First Amended Complaint, *Kelley v. Mochi Health Corp. et. al,* CGC-25-624283 (Cal. Super. Ct. Oct. 21, 2025).

[112]  *Id.* ¶ 22.

[113]  *Id.* (alteration not in original).

FIRSTSECOND AMENDED COMPLAINT                                CASE NO.: 3:25-CV-03534-JSC

mg dose, patients whose provider prescribed a 12.5 mg dose were automatically switched to an 11 mg dose, and so on. The standard doses patients previously were prescribed were no longer available.[114]



Compounded medication doses are changing with Mochi!

What Do I need to do?

There are *no extra steps* needed to stay on your treatment plan! We'll automatically readjust your refill to the closest appropriate dose, as in the image below.

What if I need more help?

The fastest way to get a response is to call our 24/7 support line at +1 (619) 648-1247 for assistance. This applies to u/everyone who receives medication from Aequita Pharmacy. Compounded medication doses are changing with Mochi!

| Semaglutide | | Tirzepatide | |
| --- | --- | --- | --- |
| Previous Dose | New Dose | Previous Dose | New Dose |
| 0.25 mg | 0.22 mg | 2.5 mg | 2.2 mg |
| 0.5 mg | 0.44 mg | 5 mg | 4.4 mg |
| 1 mg | 0.88 mg | 7.5 mg | 6.6 mg |
| 1.7 mg | 1.50 mg | 10 mg | 8.8 mg |
| 2 mg | 1.50 mg | 12.5 mg | 11 mg |
| 2.4 mg | 2.21 mg | 15 mg | 13.2 mg |
| | 2.67 mg | | 16.6 mg |

123.    Mochi Health made this unilateral change without providing advance notice to patients, and without attempting to provide a clinical justification. Mochi Health's public announcement made clear the dose change "applies to u/everyone who receives medication from Aequita Pharmacy" (which at the time was Mochi Health's primary pharmacy) and that "*no extra steps*" were needed from Mochi Health customers.[115]

124.    Without undue control or influence by the unlicensed individuals controlling Mochi Health, one would not see such wholesale changes across large groups of patients.

125.    In fact, as further evidence that Mochi Health orchestrated a unilateral shift to Aequita Pharmacy—in which its owners have a financial interest—Mochi Health told patients, "[e]ven if you

---

[114]  JoinMochi-Info, *Compounded medication doses are changing with Mochi!*, REDDIT (Dec. 17, 2024), https://www.reddit.com/user/JoinMochi-Info/comments/1hgqy40/compounded_medication_doses_are_changing_with/.

[115]  *Id.*

FIRSTSECOND AMENDED COMPLAINT                                    CASE NO.: 3:25-CV-03534-JSC

want to choose a different pharmacy, the option is not there."[116] In this way, Mochi Health centralized control over Mochi Medical and Aequita Pharmacy within Mochi Health itself.

126.    Several months later, in March 2025, Mochi Health changed the doses of its patients' prescriptions en masse ***back*** to their original doses.[117] This change came about as a result of the WPQAC Limited Stop Service Order issued to Aequita Pharmacy, after which patients were switched from Aequita Pharmacy to other compounding pharmacies such as Red Rock Pharmacy.

127.    More recently, in September 2025, Mochi Health once again changed the doses of its patients' medications en masse.[118] This change came about as a result of Mochi Health's new partnership with Lexington Compounding Pharmacy.

128.    Upon information and belief, Mochi Health made this unilateral, global, en masse change to what it called "standard dosing" for Mochi Health patients without providing advance notice to patients (or their providers) and without attempting to provide a clinical justification.[119]

129.    Alterations to patients' dosage schedules involve risks that healthcare providers should discuss with their patients instead of permitting doses to be altered by corporate fiat for business purposes and without prior notice. Such alterations made by unlicensed individuals at a corporate entity for business purposes and without any medical indication violate state prohibitions on the practice of medicine by unlicensed individuals and corporations and other state physician-practice laws.

### B.    Altering Prescriptions for Business Purposes

130.    Beyond dose changes, Mochi Health has also changed its patients' compounded tirzepatide formulation to manipulated formulations including various additives, which are not FDA approved and have not been studied in clinical trials, again without notice or medical indication.

---

[116] JoinMochi-Info, *Compounded medication doses are changing with Mochi!,* REDDIT (Dec. 18, 2024), https://www.reddit.com/user/JoinMochi-Info/comments/1hgqy40/comment/m2pndhl/.

[117] EyeBeginning5281,    *New    dosing?,*    REDDIT    (Mar.    14,    2025), https://www.reddit.com/r/JoinMochiHealth/comments/1jb1ac9/new_dosing/.

[118] SRMochi_MOD,    *Lexington    Vials,*    REDDIT    (Sept.    22,    2025), https://www.reddit.com/r/JoinMochiHealth/comments/1nnze6b/lexington_vials/.

[119] JoinMochiHealth,    *No    more    3    to    6    month    refills,*    REDDIT    (Mar.    14,    2025), https://www.reddit.com/r/JoinMochiHealth/comments/1jb3j0d/no_more_3_to_6_month_refills/.

FIRSTSECOND AMENDED COMPLAINT                                    CASE NO.: 3:25-CV-03534-JSC

131.   For example, in August 2024 Mochi Health wholesale switched its patients from compounded tirzepatide products supplied by compounding pharmacy Empower to those supplied by compounding pharmacy Southend.[120]

132.   This change was not for patient-specific reasons, but it was significant for patients and for competition. Upon information and belief, Empower was supplying tirzepatide with niacinamide, while Southend exclusively compounds tirzepatide with pyridoxine—neither of which has ever been clinically tested with tirzepatide. This means that Mochi Health patients whose tirzepatide previously was compounded by Empower with niacinamide would have experienced a change in the formulation of their prescription—en masse and improperly influenced by Mochi Health's business motives.

133.   Months later, in November 2024, Mochi Health finalized its unilateral move of patients to a different compounding pharmacy—this time, to Aequita Pharmacy. Patients were switched from compounded tirzepatide manipulated with pyridoxine, provided by Southend Pharmacy, back to tirzepatide compounded with niacinamide, this time provided by Aequita Pharmacy.

134.   Patients learned of these changes not through their doctor but instead when ordering a refill in Mochi Health's automated platform.[121]



r/tirzepatidecompound · 5 mo. ago
SummerVibes1111

**Tirzepatide + Niacinamide (Mochi)**

Went to order a refill of compounded tirzepatide, and noticed that it now contains naicinamide. Anyone have any experience with this new formula? I'm nervous about additives. Thanks.

⬆ 5 ⬇      💬 14      ⊘      ↗ Share



135.   This change was not based on patient need or any medical indication—nor could there be any medical need to prescribe tirzepatide compounded with untested, unapproved additives. There, of course, is no medical reason to change patients from tirzepatide with niacinamide, to tirzepatide mixed

---

[120] meech-meech-, *Wtf is Southend pharmacy?*, REDDIT (Aug. 11, 2024), https://www.reddit.com/r/JoinMochiHealth/comments/1epzmf0/wtf_is_southend_pharmacy/.

[121] SummerVibes1111, *Tirzepatide + Niacinamide (Mochi)*, REDDIT (Oct. 7, 2024), https://www.reddit.com/r/tirzepatidecompound/comments/1fyncks/tirzepatide_niacinamide_mochi/.

FIRST SECOND AMENDED COMPLAINT                                CASE NO.: 3:25-CV-03534-JSC

with pyridoxine, to tirzepatide mixed with niacinamide, then followed by the December 2024 dose change discussed above—all in a matter of months.

136.    This change instead was driven by Mochi Health's and its owners' financial interests and their influence on prescribing decisions and as a way to unfairly compete. And with their overlapping ownership and control, both Mochi Health and Aequita Pharmacy served to profit from Aequita Pharmacy supplying Mochi Health's patients.

137.    This is confirmed by patient complaints with the Better Business Bureau. One patient reported that Mochi Health switched the patient's drug to tirzepatide with niacinamide, but the patient "reached out via chat" and explained they "had never taken" that additive before and "didn't feel comfortable with adding that to [their] medication and that [they] would prefer to continue receiving [their] medication (just tirzepatide) from the same pharmacy" used previously.[122] But "[w]hen the order came, it was from Mochi's new pharmacy, came with Mochi themed water bottles and branding, and the medication was tirzepatide with" niacinamide.[123] Not only did this drug not work for this patient, but their "skin started breaking out in little bumps" which were determined by a dermatologist to be a reaction from the additive in the injection. Another patient complained that their medication arrived "hot" and not with proper safety protocols in place.[124] Another patient reported that Mochi Health switched her prescription to a "random non accredited compounding pharmacy" without warning.[125] Worse still, that compounding pharmacy appeared to be reselling compounded product purchased from another pharmacy.[126]

---

[122] Mochi Health, *Mochi Health Reviews*, BBB, https://www.bbb.org/us/ca/san-francisco/profile/health-care/mochi-health-1116-955238/customer-reviews?page=8.

[123] *Id.*

[124] https://www.bbb.org/us/ca/san-francisco/profile/health-care/mochi-health-1116-955238/complaints?page=6.

[125] Mochi Health, *Mochi Health Reviews*, BBB, https://www.bbb.org/us/ca/san-francisco/profile/health-care/mochi-health-1116-955238/customer-reviews?page=2.

[126] *Id.*

FIRST SECOND AMENDED COMPLAINT                                    CASE NO.: 3:25-CV-03534-JSC

138.    When other patients expressed concern about the sudden change in the formulation of their prescription—from tirzepatide *without* niacinamide to tirzepatide *with* niacinamide—Mochi Health made clear this change was not for any benefit to the patient, despite California's ban on the practice of medicine by unlicensed individuals and corporations, and even though California law expressly prohibits the prescription, dispensing, and furnishing of prescription drugs where there is no "medical indication" for doing so. Cal. Bus. & Prof. Code § 2242.

139.    Mochi Health specifically announced to patients, "Rest assured, the amount that is included is small and not clinically significant!"[127] Mochi Health has also repeatedly told patients publicly that it makes "non-significant alterations" to medications and that patients will "feel[] the exact same."[128]

JoinMochi-Info · 5mo ago

Hi there, totally a valid concern when you see an additive. Rest assured, the amount that is included is small and not clinically significant!

The intention of compounding GLP-1 medications is to produce near-exact replicas of these medications by making non-significant alterations: for example, changing the dosing by 0.02mg such that the patient feels the exact same, but can get access to medication much more affordably.

140.    The reason for the change is simple: Mochi Health mistakenly believes that by making these "not clinically-significant alterations" it can skirt the law.[129] Far from basing formulation changes on a medical indication, Mochi Health repeatedly told patients that what "your medication will have [in] it depends on if your state is supplied by this particular pharmacy."[130] It also emphasized again that adding niacinamide was "not clinically significant."[131]

---

[127]    JoinMochi-Info, *Tirzepatide + Niacinamide (Mochi)*, REDDIT (Oct. 7, 2024), https://www.reddit.com/r/tirzepatidecompound/comments/1fyncks/tirzepatide_niacinamide_mochi/.

[128]    JoinMochi-Info, *Tirzepatide + Niacinamide (Mochi)*, REDDIT (Oct. 8, 2024), https://www.reddit.com/r/tirzepatidecompound/comments/1fyncks/tirzepatide_niacinamide_mochi/lr1dq0a/.

[129]    *Id.*; *see also* paradisehuss727, *Feeling a bit more at ease*, REDDIT (Mar. 7, 2025), https://web.archive.org/web/20250309165946/https://www.reddit.com/r/JoinMochiHealth/comments/1j68lq4/feeling_a_bit_more_at_ease.

[130]    JoinMochi-Info, *Do all mochi meds contain b12?*, REDDIT (Aug. 30, 2024), https://www.reddit.com/r/JoinMochiHealth/comments/1f44iup/do_all_mochi_meds_contain_b12/.

[131]    *Id.*

FIRSTSECOND AMENDED COMPLAINT                                          CASE NO.: 3:25-CV-03534-JSC

141.    Despite Mochi Health's public assurances to customers that the changes were "not clinically significant," Mochi Health's own "Content Developer," Eva Shelton, stated in an online essay that B-vitamins (niacinamide and pyridoxine are both B-vitamins) can actually have negative effects. She explained that "there is no solid evidence that vitamin B12 injections is [*sic*] effective in weight loss, and the potentially serious risks may outweigh the benefits."[132] These risks include "allergic reaction, heart problems, fluid build up in the lungs, electrolyte disturbances, diarrhea, swelling" and "increased risk of cancer."[133] These are risks that healthcare providers ought to discuss with their patients before changes to medicinal formulations are made.

142.    Mochi Health continues to change patient prescriptions en masse and without advance notice. In April 2025, Mochi Health patients reported receiving tirzepatide compounded with a variety of untested, unapproved additives: glycine, niacinamide, and pyridoxine.

143.    On April 5, 2025, a Mochi Health patient receiving compounded tirzepatide from Red Rock Pharmacy reported that their tirzepatide prescription had been changed to include glycine.[134]

---

[132] Eva Shelton, *Do weight loss shots and pills really work?*, MEDIUM (Apr. 9, 2022), https://medium.com/@sheltoneva79/do-weight-loss-shots-and-pills-really-work-430e6563e418.

[133] *Id.*

[134] apprehensive-look-02, *Anyone else get this change? Added glycine*, REDDIT (Apr. 5, 2025), https://www.reddit.com/r/JoinMochiHealth/comments/1jsj8qv/anyone_else_get_this_change_added _glycine/.

FIRSTSECOND AMENDED COMPLAINT                                  CASE NO.: 3:25-CV-03534-JSC

Again, this patient learned of this change through notification on Mochi Health's automated platform rather than through discussion with a doctor regarding a medical indication for the change.



144.     At the same time, other Mochi Health patients have reported receiving tirzepatide compounded with niacinamide from compounding pharmacy Empower Pharmacy[135] and tirzepatide compounded with pyridoxine from Southend Pharmacy.[136]



---

[135] Professional_Let5100, *What dose did they send me*, REDDIT (Apr. 4, 2025), https://www.reddit.com/r/JoinMochiHealth/comments/1jrf93g/what_dose_did_they_send_me/.

[136] Nikki_Dee_Dallas, *Southend is Shipping Meds*, REDDIT (Apr. 9, 2025), https://www.reddit.com/r/JoinMochiHealth/comments/1jv9umr/southend_is_shipping_meds/#lightbox.

FIRSTSECOND AMENDED COMPLAINT                                      CASE NO.: 3:25-CV-03534-JSC

145.    The fact that Mochi Health patients receive differing formulations depending on the compounding pharmacy filling their prescriptions and continue to be subject to unannounced prescription changes illustrates that these prescribing decisions are not based on any medical indication, but rather Mochi Health's financial interest in continuing to sell compounded tirzepatide, driven by the availability of compounded tirzepatide from various compounding pharmacies at a given time. By driving prescription decisions based on financial considerations instead of medical indication, Mochi Health unfairly competes in the marketplace and harms Lilly by unilaterally diverting potential Lilly patients into Mochi Health's competing compounded products based solely on business justifications. Despite the numerous complaints about the additives they were switched to, Mochi Health's patients were never even given the option of selecting Lilly's FDA-approved medicines, which Mochi Health purports to offer, demonstrating again that Mochi Health intentionally diverts sales away from Lilly.

C.    **Mochi Health's Lack of a Good Faith Examination**

146.    Mochi Health's undue control and influence over prescription changes violate not only California's and other states' prohibition on the practice of medicine by unlicensed individuals and corporations, but also California Business & Professions Code § 2242, which makes clear that "[p]rescribing, dispensing, or furnishing dangerous drugs as defined in Section 4022 [*i.e.*, a prescription drug] without an appropriate prior examination and a medical indication, constitutes unprofessional conduct ." Cal. Bus. & Prof. Code § 2242. The healthcare professional is required to comply with "the

45

appropriate standard of care ." *Id.* That standard of care requires a "prior examination and a medical indication" that the prescription is warranted. *Id.*

147. This standard cannot be met where, as here, decisions to prescribe a compounded product and then change the formulation, dosage, and titration schedule are ***unilaterally*** influenced at the corporate level for business purposes and not through a patient-specific assessment by a licensed healthcare professional. Given the utter lack of a medical indication for Mochi Health's compounded products, but for Mochi Health's corporate control and influence over prescribing decisions, at least some patients would have purchased Lilly's FDA-approved medicines instead of a compounded product for which they had no medical need.

*         *         *

148. At bottom, Mochi Health's business-driven medical decisions steer patients away from Lilly's FDA-approved, clinically tested medicines and to Mochi Health's untested and unapproved drugs, like its Tirzepatide Mix. This diversion of sales proximately causes economic injury to Lilly. Each customer that was prescribed Mochi Health's compounded drugs based on business-driven considerations could have otherwise been prescribed Lilly's FDA-approved medicine.

## V.    MOCHI HEALTH'S FALSE AND MISLEADING ADVERTISING CLAIMS

149. Mochi Health also promotes its Tirzepatide Mix through false advertising. Specifically, in promoting its Tirzepatide Mix, Mochi Health has made and continues to make numerous false statements throughout its advertising pertaining to the inherent nature and quality of its Tirzepatide Mix. These include falsely telling consumers that (A) the drug prescribed as Mochi Health's Tirzepatide Mix is clinically tailored and compounded specifically for each individual patient, and (B) Mochi Health's Tirzepatide Mix is safe and effective for weight loss. None of this is true.

150. A compilation of representative examples of Mochi Health's false advertising is discussed below and attached hereto as Exhibit A.

### A.    Mochi Health's False Claims Regarding the "Personalized" Nature of its Tirzepatide Mix

46

151.    Mochi Health's entire marketing campaign for its Tirzepatide Mix is based on the false premise that it offers "customized obesity medication" telling consumers that the benefit of such "personalized" medicine is that it offers "weight care designed *for you*."[137]

**Weight care designed *for you*.**

152.    Indeed, for months, Mochi Health's website, located at https://www.joinmochi.com/, has explicitly promoted the purported personalized nature of its Tirzepatide Mix. For example, Mochi Health told patients "[y]our body is *unique*. Your healthcare should be, too."[138]



**Your body is *unique*.**
Your healthcare should be, too.

153.    Doubling down the alleged personalized nature of its medications, Mochi Health's website expressly told consumers that its patients receive a "[c]ustomizable treatment plan," that is "built around your needs" and developed by experts.[139]

---

[137]   https://web.archive.org/web/20250921020922/https://joinmochi.com/ (captured on Sept. 21, 2025)

[138]   *Id.* (emphasis in original).

[139]   *Id.* (emphasis in original).

FIRST SECOND AMENDED COMPLAINT                                CASE No.: 3:25-cv-03534-JSC

# Customizable treatment plan

You deserve care that's as unique as you are. Our expert team will develop a custom weight loss plan built around your needs.

154. In particular, Mochi Health's invites consumers to explore its medications page, where it offers its alleged customized obesity medications, including specifically its Tirzepatide Mix.



**Compounded Medication**

Compounded medications are custom-prepared to meet an individual patient's specific needs. For example, they may include a specific dosage strength not available commercially or additional active ingredients clinically indicated for the patient. These medications are created by licensed pharmacies, based on a valid prescription from a licensed provider. While they are not FDA-approved (meaning they haven't gone through the FDA drug approval process), they are still regulated at the state and/or federal level, and must meet important safety and quality standards.
see less

A Mochi provider may prescribe a compounded medication if they determine that such medication is an appropriate part of your course of treatment.

Side Effects                                                                                    +

Avoid when                                                                                      +

### 1. *Mochi Health's false personalization advertisements*

155. Mochi Health has made, and continues to make, numerous claims that its Tirzepatide Mix is a personalized medicine compounded specifically and individually for each customer when that is simply not true.

156. Compounders are not permitted to mass produce compounded drugs. Rather, each drug should be made specifically for the identified patient based on an identified medical need that renders the commercially available FDA-approved medicine inappropriate specifically for them. There is, however, a narrow exception to this rule that allows certain compounders to mass produce copies of FDA-approved drugs when the branded medication appears on FDA's drug shortage list at the time of compounding, distribution, and dispensing. 21 U.S.C. § 353(b).

157. Lilly's tirzepatide medicines appeared on the FDA's drug shortage list for a time, but no longer. On October 2, 2024, FDA determined that the shortage for tirzepatide injection products,

FIRSTSECOND AMENDED COMPLAINT                                                CASE NO.: 3:25-CV-03534-JSC

including for Lilly's medicines, had ended.[140] After a group of compounders sued FDA seeking to enjoin its removal of tirzepatide from the shortage list, FDA reconsidered its decision.[141] FDA then conducted a thorough reevaluation of the tirzepatide supply in the United States and determined on December 19, 2024 that the shortage of tirzepatide injection products had been resolved.[142] Thus, compounders cannot mass produce copies of Lilly's medicine, as a federal court confirmed earlier this year.[143]

158.    Aware of this limitation, Mochi Health falsely claims its products are "personalized," even though they are mass produced. But Mochi Health's personalization marketing campaign has nothing to do with the formulation of its compounded tirzepatide. Instead, it is merely a marketing tactic to appear in compliance with the law while still selling mass-produced compounded tirzepatide now that the shortage is over.

159.    To be clear, this lawsuit does not challenge Mochi Health's compliance (or lack thereof) with the FDCA. The point is that Mochi Health has intentionally chosen its advertising to look like it is engaged in lawful practices while in fact mass producing and selling a product that does not match its advertising claims. In calling its tirzepatide drug "personalized," Mochi Health's advertising conveys the undeniable message to consumers that the *drug* inside each vial of its compounded tirzepatide contains a unique blend of ingredients that is compounded specifically to each patient. It does not.

160.    As noted above, Mochi Health's deception started on the homepage of its website where it expressly and falsely claimed that the medicine it sells is "customized obesity medication."

---

[140]  FDA, *Resolution of Tirzepatide Injection Product Shortage and Supply Status* (Dec. 19, 2024), https://www.fda.gov/media/185577/download at 1.

[141]  *Id.*

[142]  *Id.*

[143]  *Outsourcing Facilities Assoc., et al. v. United States Food and Drug Admin.*, 2025 WL 746028, at *7 (N.D. Tex. Mar. 5, 2025) ("The immediate consequences of the Lilly Drugs being removed from the shortage list are, inter alia, that Lilly regains its statutory exclusivity over tirzepatide products, and that 503A and 503B Compounders, like Plaintiffs, must cease production of their versions of the drugs.")

FIRSTSECOND AMENDED COMPLAINT                                    CASE No.: 3:25-CV-03534-JSC

**Work with your hormones,**
*not against them.*

Customized obesity medicine with doctors who care.

161.    The website goes on to claim that Mochi's compounding pharmacy partners can offer "more accessible alternatives" that "are customized to the medical needs of the patient."[144]

## What Is The Most Affordable Way To Get Tirzepatide For Weight Loss?

Compounding pharmacies can offer much more accessible alternatives to brand-name medications that are customized to the medical needs of the patient. Mochi Health partners with vetted compounding pharmacies to offer safe and effective compounded tirzepatide at an affordable monthly price.

162.    In other words, Mochi Health expressly told consumers that the drugs they provide are specifically compounded for a particular patient after they receive an individual, specific prescription for that particular patient. For its mass-compounded tirzepatide, that is literally false and entirely misstates how the drugs they provide are actually manufactured, which, as discussed below, are mass produced.

163.    Mochi Health's social media similarly communicates that its Tirzepatide Mix is "custom" or "tailored" specifically for patients. In one advertisement, for example, Mochi Health claims its tirzepatide is a "medication" "designed just for you ." And in another advertisement, Mochi Health claims it offers "[t]ailored weight loss just for YOU."[145]

---

[144]  Mochi Health, *Tirzepatide for Weight Loss: Dosage, Pricing & More*, (Updated March 18, 2025) https://www.blogs.joinmochi.com/blogs/tirzepatide-for-weight-loss#is-tirzepatide-safe-for-weight-loss-5 (last visited Nov. 14, 2025).

[145]  Facebook advertisement (Apr. 7, 2025).

FIRSTSECOND AMENDED COMPLAINT                                    CASE NO.: 3:25-CV-03534-JSC



164.    Although Mochi Health changed its website on October 30, 2025, similar claims remain. For example, its Medications page markets its Tirzepatide Mix as "compounded medications" that are "custom-prepared to meet an individual patient's specific needs."[146]

## Compounded Medication

Compounded medications are custom-prepared to meet an individual patient's specific needs. For example, they may include a specific dosage strength not available commercially or additional active ingredients clinically indicated for the patient. These medications are created by licensed pharmacies, based on a valid prescription from a licensed provider. While they are not FDA-approved (meaning they haven't gone through the FDA drug approval process), they are still regulated at the state and/or federal level, and must meet important safety and quality standards.

see less

165.    These personalization claims convey the literally false message that the drug contained within each vial of Mochi Health's compounded tirzepatide drug is specially compounded after an assessment of each patient's particularized needs to contain a unique blend of ingredients. Indeed, according to Mochi Health's advertising, patient needs are assessed and then specialized drugs are compounded containing a customized formulation of ingredients specifically tailored to meet those

---

[146]    *Medications*, MOCHI HEALTH, https://joinmochi.com/medications (last visited Nov. 14, 2025).

51

needs. These advertisements clearly communicate that the drug—and not the prescription process needed to obtain the medicine—is specifically formulated for each patient. *See, e.g., Eli Lilly & Co. v. Adonis Health, Inc.*, No. 25-CV-03536-JST, 2025 WL 2721684, at *8 (N.D. Cal. Sept. 24, 2025) (finding advertising statements promoting compounded drug as a "patient-specific" "tailored" or "individualized treatment" would be "understood by any linguistically competent person" to mean that advertiser "specifically creates individualized medication plans for each patient") (quotations omitted). They also leave the false impression that Lilly's FDA-approved medicines, which come in 18 different administrations, are one-size-fits-all medicines that do not effectively address their medical needs.

166.    Even worse, Mochi Health's advertising explicitly and implicitly claims that its "personalized" Tirzepatide Mix is *better* for the patient than standardized medicines like Lilly's MOUNJARO® and ZEPBOUND®, driving consumers to choose Mochi Health's compounded drugs instead of Lilly's FDA-approved medicines.

167.    For example, in April 2025, Mochi Health launched an entire social media advertising campaign claiming that its compounded products are the "[b]est weight loss treatment of 2025."[147]



---

[147]    Facebook advertisement (Apr. 7, 2025).

FIRSTSECOND AMENDED COMPLAINT                    CASE NO.: 3:25-CV-03534-JSC

168.    Likewise, Mochi Health advertises on Google that it is "#1 in GLP-1s," in direct conjunction with claims that its "personalized weekly injections" provide "safe, effective weight loss care."



169.    More recently, Mochi Health has promoted the purported superiority of its Tirzepatide Mix through Instagram advertisements. In one such advertisement, a Mochi patient points to an old video where she was struggling to lose weight on Lilly's MOUNJARO® and only "hit her goal weight" of 160 pounds after switching to Mochi Health's Tirzepatide Mix.[148] These claims are intended to convey that Mochi Health's compounded drugs are superior to Lilly's FDA-approved medicines, leading consumers to choose the compounded drugs and costing Lilly sales.

---

[148] *Join Mochi*, INSTAGRAM, https://www.instagram.com/reel/DQc1wV5DFZw/ (last visited Nov. 14, 2025).

FIRSTSECOND AMENDED COMPLAINT                                    CASE NO.: 3:25-CV-03534-JSC



### 2. *Mochi Health's compounded Tirzepatide Mix is mass produced, not personalized*

170.    In reality, there is nothing personalized about Mochi Health's medications. On information and belief, Mochi Health's customers receive the exact same drug (i.e., tirzepatide blended with glycine, niacinamide, and pyridoxin), based solely on which pharmacy Mochi Health is currently using to mass produce and distribute its Tirzepatide Mix. In other words, everyone gets the same drug chosen by Mochi Health's business model, not an assessment of the patient's individual needs or goals. Neither Mochi Health nor its partner compounding pharmacies compound each dose—or any dose—with a customer's "specific needs in mind"; the doses are prepared at scale in large batches well before they are ever sold to a particular consumer. Mochi Health does not sell this compounded tirzepatide in any personalized way—instead it offers its compounded tirzepatide to customers in a single formulation and standardized doses.

171.    Mochi Health has repeatedly switched patients en masse to different variations of its Tirzepatide Mix. For example, Mochi Health switched patients from a version of its Tirzepatide Mix

FIRST SECOND AMENDED COMPLAINT                                    CASE NO.: 3:25-CV-03534-JSC

that did not contain niacinamide to a version that contained niacinamide.[149] When questioned about this change, Mochi Health did not respond on a patient-by-patient basis. Instead, Mochi Health repeatedly told patients that what "your medication will have [in] it depends on if your state is supplied by this particular pharmacy."[150] In other words, medications are customized by *geography* and not by addressing any individual patient need.

172.    Most recently, on information and belief, Mochi Health has engaged in a mass switch to Lexington Compounding Pharmacy.[151] This medication has reportedly been delivered warm,[152] and with new dosing amounts.[153] When Mochi Health was questioned about this change, its admin stated, "We are constantly testing out new pharmacies to expand our marketplace and offer new options for our patients."[154] Through Mochi Health's own admission, the decision to switch patients was not based on an individual patient's need for a particular unique blend of ingredients, but instead to *test out* new pharmacies, treating patients like experiments to grow Mochi Health's business operations.

173.    More concerning, these changes happen without any input or awareness from the patient. Instead, on information and belief, patients are switched from a version of Mochi Health's Tirzepatide Mix containing one additive to a new version of Mochi Health's Tirzepatide Mix containing a different additive without their knowledge or consent. This is the exact opposite of a personalized process, but rather is an unfair way to compete.

---

[149] paradisehuss727, *Feeling a bit more at ease*, REDDIT (Mar. 7, 2025), https://web.archive.org/web/20250309165946/https://www.reddit.com/r/JoinMochiHealth/comments/1j68lq4/feeling_a_bit_more_at_ease/

[150] JoinMochi-Info, *Do all mochi meds contain b12?*, REDDIT (Aug. 30, 2024), https://www.reddit.com/r/JoinMochiHealth/comments/1f44iup/do_all_mochi_meds_contain_b12/.

[151] SRMochi_MOD, *Lexington Vials,* REDDIT (Sept. 22, 2025), https://www.reddit.com/r/JoinMochiHealth/comments/1nnze6b/lexington_vials/.

[152] Much-Appointment-137, *Shipment not cold,* REDDIT (Sept. 30, 2025), https://www.reddit.com/r/JoinMochiHealth/comments/1nuqjxm/shipment_not_cold/.

[153] SRMochi_MOD, *Lexington Vials,* REDDIT (Sept. 22, 2025), https://www.reddit.com/r/JoinMochiHealth/comments/1nnze6b/lexington_vials/.

[154] Nhalia, *New pharmacy again?*, REDDIT (Aug. 29, 2025), https://www.reddit.com/r/JoinMochiHealth/comments/1n3fgmd/new_pharmacy_again/.

FIRSTSECOND AMENDED COMPLAINT                                    CASE NO.: 3:25-CV-03534-JSC

174.    Rather than making "custom" products tailored specifically to individual patient needs and patient-specific prescriptions where changes result in a clinical difference for that patient, Mochi Health is mass producing its Tirzepatide Mix in exactly the manner it claims it's not.

### 3.    *Mochi Health's False Safety and Efficacy Advertisements*

175.    Mochi Health misleads consumers into believing that its compounded products have been proved to be safe and effective. Mochi Health's website communicates to consumers that patients taking "tirzepatide" can expect to lose "over 20% of body weight" and claims that "[m]any patients lose 5 to 6% of their weight in their first few weeks" on "tirzepatide," without distinguishing between compounded or FDA-approved tirzepatide products. [155]

## Does Tirzepatide Work For Weight Loss?

One major trial in adults with obesity demonstrated that over half of the participants lost over 20% of body weight was achieved while on the highest dose (15mg weekly) of tirzepatide (2). Compared to only 3% weight loss among participants in the placebo group, tirzepatide has made waves in the medical community for its effectiveness.

## How Long Does It Take To See Weight Loss On Tirzepatide?

Many patients lose 5 to 6% of their weight in their first few weeks on Tirzepatide. Some patients notice up to 20% of their weight loss on medication over the first 12 weeks. To manage side effects, patients must start on a low dose and slowly increase the dose over time. It's important to have follow-up appointments with your provider to adjust your dose appropriately.

176.    And Mochi Health's website includes an FAQ section stating that its Tirzepatide Mix "is a safe medication that has been approved by the FDA."

---

[155] Mochi Health, *Tirzepatide for Weight Loss: Dosage, Pricing & More*, (Updated March 18, 2025) https://www.blogs.joinmochi.com/blogs/tirzepatide-for-weight-loss#is-tirzepatide-safe-for-weight-loss-5 (last visited Nov. 14, 2025).

FIRSTSECOND AMENDED COMPLAINT                                    CASE NO.: 3:25-CV-03534-JSC

## Is Tirzepatide Safe For Weight Loss?

Tirzepatide is a safe medication that has been approved by the FDA (1). Both the SURMOUNT and The SURPASS clinical trials examined the effects of Tirzepatide in thousands of patients, demonstrating its safety and clinically significant benefits (2, 4). The most commonly reported side effects are gastrointestinal issues, including nausea, vomiting, diarrhea, and stomach upset. While it's very uncommon, rare cases of pancreatitis, acute kidney injury, gallbladder disease, and hypersensitivity reactions have been reported. It's important to talk with your provider about whether Tirzepatide is right for you.

177.    These claims are false and misleading in multiple respects.

178.    ***First***, Mochi Health cites the testing results from Lilly's SURMOUNT-1 and SURPASS clinical trials, which studied ***Lilly's*** MOUNJARO® and ZEPBOUND®, as the results of "tirzepatide." This is literally false and implicitly communicates more false messages to consumers. As discussed previously, these clinical trials collect data derived from medicines made with Lilly's tirzepatide API, which has a specific profile including potency and purity. The data produced therefore is not, and could not be, extrapolated to all medicines purporting to contain the macromolecule tirzepatide, because a tirzepatide API with different specifications of potency or purity, or manufactured with lower sterility standard and quality consistency requirements, could produce significantly different results in a human patient. Yet Mochi Health intentionally describes the data as the effects of "tirzepatide," falsely communicating to consumers that those results are those of its *compounded* tirzepatide products too—and those products may or may not have similar specifications to Lilly's FDA-approved API and may even vary from batch to batch, because compounding pharmacies are not required to have standard processes that can produce consistent drug products. Mochi therefore makes literally false and false by necessary implication claims because "tirzepatide" as a category of drug product does not produce these same results and Mochi's non-Lilly tirzepatide medicines do not have the same safety and efficacy clinical data as Lilly's medicines do.

179.    ***Second***, Mochi Health claims that "tirzepatide is a safe medication that has been approved by FDA." That is both literally false and implicitly communicates more false messages to consumers. FDA does not approve *any* API as a "safe medication," period. Instead, FDA approves a *specific drug product*—with a specific label, drug substance specifications, manufacturing process, and instructions—as being safe and effective "under the conditions prescribed, recommended, or suggested

57

in the proposed labeling thereof." 21 U.S.C. § 355(d). "Tirzepatide" is not an approved medication; Lilly's MOUNJARO® and ZEPBOUND® are. Yet Mochi Health falsely and deceptively abstracts the FDA approval to "tirzepatide" in order to deceive consumers that its compounded tirzepatide products have also been approved or deemed to be safe and effective from clinical data. Indeed, Mochi Health's claim that its compounded tirzepatide is "safe and effective" communicates to consumers that its Tirzepatide Mix has been clinically studied and proven to be safe for weight loss. But that is not true. Mochi Health's compounded tirzepatide has never been clinically studied or proven to be safe and effective for weight loss.

180.    In fact, FDA has recently warned that advertisements promoting compounded weight loss drugs as being "recognized for effective weight loss"[156]; "delivers the same active ingredient found in the leading GLP-1 weight loss medications – without the need for injections,"[157] and "backed by extensive clinical research"[158] were all false and misleading because they imply that the compounded drug products "are the same as an FDA-approved product when they are not."[159]

\* \* \*

181.    In short, Mochi Health's claims are literally false. As a result, consumers who view Mochi Health's advertising will be deceived into believing that Mochi Health's Tirzepatide Mix is unique to them, as safe as FDA-approved products, and superior to other tirzepatide-based medicines, like Lilly's medicines, when it is none of those things. *Mut. Pharm. Co. v. Ivax Pharms., Inc.*, 459 F. Supp. 2d 925, 933 (C.D. Cal. 2006) ("Where the advertisement is literally false, a violation may be established without evidence of consumer deception") (quotations omitted). This deception is material

---

[156] FDA, Warning Letter to Bioverse, Inc. dba Bioverse (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminalinvestigations/warning-letters/bioverse-inc-dba-bioverse-09092025.

[157] FDA, Warning Letter to Elevate Your Wellness LLC, dba Elevated (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminalinvestigations/warning-letters/elevate-your-wellness-llc-dba-elevated-09092025.

[158] FDA, Warning Letter to Sprout Health Partners LLC dba Sprout Health (Sept. 9, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminalinvestigations/warning-letters/sprout-health-partners-llc-dba-sprout-health-09092025.

[159] *Supra* Notes 156–158.

FIRSTSECOND AMENDED COMPLAINT                              CASE NO.: 3:25-CV-03534-JSC

in that it is "likely to influence the purchasing decision of consumers" because it falsely describes inherent qualities or characteristics of drug products—namely, their safety and effectiveness. *E.g.*, *Clorox Co. v. Reckitt Benckiser Grp. PLC*, 398 F. Supp. 3d 623, 644 (N.D. Cal. 2019).

182.   Finally, as discussed in more detail below, Mochi Health's advertising claims have proximately caused injury to Lilly. Mochi Health and Lilly are direct competitors in the market for tirzepatide drug products. Mochi Health's advertising communicates the clear and false message that Mochi Health's Tirzepatide Mix is superior to Lilly's FDA-approved and clinically tested medicine because it offers an individualized option tailored to each individual patient's needs. By falsely claiming that its products are personalized, comparing its Tirzepatide Mix to Lilly's FDA-approved and clinically tested medicines, claiming that its compounded products are safe and effective, and communicating that Tirzepatide Mix provides superior results, Mochi Health's false advertising has caused a diversion of sales and lost profits from Lilly on those sales. It has also caused, and continues to cause, harm to Lilly's goodwill, reputation, and standing with the consuming public because consumers will associate the negative aspects of Mochi Health's medicine with all tirzepatide. Finally, while not necessary to establish Lilly's standing to pursue claims here, this conduct exposes the public to the unnecessary risks associated with untested and unproven drugs.

## VI.    MOCHI HEALTH'S UNLAWFUL CONDUCT HAS OR IS LIKELY TO CAUSE HARM AND COMMERCIAL INJURY TO LILLY

183.   Mochi Health's unlawful competition and false advertising causes both economic and reputational harm to Lilly. To begin with, Mochi Health and Lilly are direct competitors in the marketplace. For instance, websites that purport to compare prices for GLP-1 treatments compare Lilly's MOUNJARO® and ZEPBOUND® with Mochi Health's Tirzepatide Mix. Mochi Health not only directly competes with Lilly for customers interested in GLP-1 treatment, but Mochi Health's treatment also purports to contain the same active ingredient as Lilly's MOUNJARO® and ZEPBOUND®. This alone gives Lilly standing to challenge Mochi Health's advertising. *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 827 (9th Cir. 2011) ("[W]hen plaintiff competes directly with defendant, a misrepresentation will give rise to a presumed commercial injury that is sufficient to establish standing."); *Eli Lilly & Co.*, 2025 WL 2721684, at *3 ("Lilly and Henry are direct competitors in the

59

market for tirzepatide products because both Henry and Lilly market and sell tirzepatide-containing drugs . . . to the same potential customers, i.e., they 'vie for the same dollars from the same consumer group.'"). And, because Mochi Health's unfair competition through the corporate practice of medicine is expressly designed—and used—to prescribe its competing Tirzepatide Mix instead of Lilly's medicines to patients, Lilly has standing to challenge those practices too. In short, every Mochi customer that receives Mochi's compounded tirzepatide drug is a patient who could have received Lilly's genuine medicine instead.

184.    Mochi Health's conduct causes concrete and particularized harm to Lilly. *First*, Mochi Health's unlawful conduct is the proximate cause of lost sales of its MOUNJARO® and ZEPBOUND®. *Second,* Mochi Health's unlawful conduct, including comparing its compounded tirzepatide with Lilly's FDA-approved medicines, creates an association in the minds of consumers between its drugs and Lilly's MOUNJARO® and ZEPBOUND®—either a false equivalency or, in some cases, inferiority on Lilly's part—that continues to harm Lilly's goodwill and reputation.

### A.    Mochi Health's Unlawful Conduct Proximately Caused Lilly's Harm Through Lost Sales

185.    Mochi Health's unlawful conduct—namely, its corporate practice of medicine and its false advertising—proximately cause commercial injury to Lilly through the diversion of sales.

186.    *First*, Mochi Health's unlawful corporate practice of medicine diverts patients away from FDA-approved MOUNJARO® and ZEPBOUND®—with a patient who otherwise would purchase FDA-approved MOUNJARO® and ZEPBOUND® instead purchasing unapproved compounded tirzepatide. For instance, a patient might ask their doctor to send their prescription to be filled with FDA-approved vials of ZEPBOUND® or might fill a prescription for MOUNJARO® and ZEPBOUND® auto-injectors. Mochi Health's unlawful corporate practice of medicine eliminates that choice for its customers. Mochi Health customers are not asked and do not decide where to send their prescriptions and are steered away from genuine MOUNJARO® and ZEPBOUND® towards compounded tirzepatide. The healthcare providers that work for Mochi Health also do not make that decision. Instead, as described above, Mochi Health controls where its customers' prescriptions are sent based solely on its corporate business interests and to unfairly compete with Lilly.

FIRSTSECOND AMENDED COMPLAINT                    CASE NO.: 3:25-CV-03534-JSC

187.    If Mochi's customers had been informed and given the opportunity to choose where their prescriptions are sent and how they are filled, at least some would have chosen to have their prescriptions filled with genuine, FDA-approved MOUNJARO® or ZEPBOUND®. In other words, Mochi's unlawful corporate practice of medicine proximately caused harm and continues to proximately cause harm to Lilly by blocking Mochi Health's customers from accessing FDA-approved MOUNJARO® or ZEPBOUND®, thereby diverting sales from Lilly.

188.    **Second,** Mochi Health's false advertising diverts patients away from FDA-approved MOUNJARO® and ZEPOUND® to Mochi Health's compounded drugs, causing Lilly economic harm. Mochi Health's false advertising is intended to capitalize on consumers' interest in GLP-1s by convincing them that Mochi Health's compounded drugs are a suitable alternative to FDA-approved medicine. While Mochi Health has not yet produced sales data in this litigation, other sellers have made estimates of the size of the compounded tirzepatide market. In December 2024, the Association for Pharmacy Compounding (APC) acknowledged that forty compounding pharmacies had "collectively dispensed 125,000 compounded tirzepatide prescriptions over the past month."[160] According to APC, this represented "a fraction of compounders preparing these medications."[161] To put this into perspective, FarmaKeio, a compounding pharmacy stated that it would suffer "$1,750,000-$2,000,000 in lost revenue per month" due to FDA removing tirzepatide from the shortage list.[162]

189.    Underscoring these lost sales, Mochi Health has, on information and belief, engaged in Search Engine Optimization campaigns to link Mochi Health with Eli Lilly's medications. For example, when individuals search for Lilly's MOUNJARO® and ZEPBOUND®, Mochi Health's advertisements pop up as sponsored results. These advertisements explicitly state that Mochi Health offers "Compounded Tirzepatide."

---

[160] FDA, *Resolution of Tirzepatide Injection Product Shortage and Supply Status* (Dec. 19, 2024), https://www.fda.gov/media/185577/download (quoting Letter from Tenille Davis, OFA Chief Advocacy Officer to FDA Commissioner Robert Califf et al. (Dec. 17, 2024)).

[161] *Id.*

[162] *Decl. of Dan DeNeui in Supp. of Pls.' Mot. for Prelim. Injun. and Stay Pending Review, Outsourcing Facilities Ass'n et al.*, 4:24-cv-00953, Dkt. No. 67, ¶ 19 (App. 002-003) (N.D. Tex. Jan. 28, 2025).

FIRST SECOND AMENDED COMPLAINT                                            CASE NO.: 3:25-CV-03534-JSC



190.    These efforts drive customers to Mochi Health's advertisements and websites, where they are exposed to Mochi Health's false advertising. Each and every one of Mochi Health's false claims can lead to lost sales for Lilly:

- Mochi Health's false and misleading description of its products as "personalized," "customized," "tailored," or otherwise made uniquely for a patient convinces at least some visitors to Mochi Health that its compounded tirzepatide is preferable to a "one-size-fits-all" FDA-approved medicine. Those visitors then choose Mochi Health's compounded tirzepatide products instead of Lilly's FDA-approved tirzepatide medicines, resulting in lost sales for Lilly.

FIRST SECOND AMENDED COMPLAINT                                    CASE NO.: 3:25-CV-03534-JSC

- Mochi Health's false and misleading description of its compounded tirzepatide as "safe and effective" convinces at least some visitors to Mochi Health that its compounded tirzepatide is a suitable alternative to FDA-approved medicine. Those visitors then choose Mochi Health's compounded tirzepatide products instead of Lilly's FDA-approved tirzepatide medicines, resulting in lost sales for Lilly. *Clorox Co. v. Reckitt Benckiser Grp. PLC*, 398 F. Supp. 3d 623, 644 (N.D. Cal. 2019) (find that the safety and effectiveness of a product are material to consumer choice); *McNeilab, Inc. v. Am. Home Prods. Corp.*, 848 F.2d 34, 38 (2d Cir. 1988) (same).

- Mochi Health's false and misleading description of its compounded tirzepatide as supported by clinical trials, like the SURMOUNT-1 and SURPASS trials, convinces at least some visitors to Mochi Health that its compounded tirzepatide has been proven safe and effective in a clinical trial. Those visitors then choose Mochi Health's compounded tirzepatide products instead of Lilly's FDA-approved tirzepatide medicines, resulting in lost sales for Lilly.

- Mochi Health's false and misleading description of its compounded tirzepatide products as "[b]est weight loss treatment of 2025," "#1 in GLP-1s," or otherwise superior to Lilly's FDA-approved medicines convinces at least some visitors to Mochi Health that its compounded tirzepatide is superior to FDA-approved medicines. Those visitors then choose Mochi Health's compounded tirzepatide products instead of Lilly's FDA-approved tirzepatide medicines, resulting in lost sales for Lilly.

**B.    Mochi Health's Unlawful Conduct Has Caused Harm to Lilly's Goodwill and Reputation**

191.    Mochi Health's unlawful conduct causes harm to Lilly's reputation and goodwill as well as economic injury. *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118, 138 (2014) (Lanham Act confers standing on a plaintiff where "the defendant damages the [plaintiff's] product's reputation by, for example, equating it with an inferior product."); *Kwikset Corp. v. Superior Court*, 246 P.3d 877, 885 (Cal. App. Ct. 2011) (a party has standing to raise a corporate practice of medicine claim when they "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact,

FIRST SECOND AMENDED COMPLAINT    CASE NO.: 3:25-CV-03534-JSC

i.e., *economic injury,* and (2) show that that economic injury was the result of, i.e., *caused by,* the unfair business practice[.]").

192.    As an initial matter, under the Trademark Modernization Act of 2020, Congress amended Section 34(a) of the Lanham Act to clarify and codified that there is a presumption of irreparable harm in requests for injunctive relief under the Lanham Act, and that extends to all false advertising claims brought under the Lanham Act, including literally false claims, impliedly false claims, and claims about a defendant's own products or services. Thus, when Lilly proves Mochi Health's claims false, it is entitled to a presumption of harm.

193.    Moreover, here, Mochi Health is making claims of superiority over Lilly's medicines. For example, Mochi Health is posting advertisements where Mochi Health customers compare their results on its Tirzepatide Mix to Lilly's medicines.[163] Likewise, Mochi Health promotes itself as "#1 for GLP-1s" or "the best obesity medicine of 2025,"[164] all of which necessarily imply better results from Mochi Health's product. This direct comparison—expressly in Mochi's favor—means that Mochi's conduct creates real harm to Lilly's reputation. *Guardant Health, Inc. v. Natera, Inc.*, No. 21-CV-04062-EMC, 2025 WL 2106522, at *17 (N.D. Cal. July 28, 2025) (directly comparative false advertising creates presumption of harm).

194.    Additionally, Mochi Health's unlawful conduct causes patients to falsely believe that its compounded products are made with their unique needs in mind—while contrasting Mochi Health's practices with the more traditional medicine companies—consumers will necessarily conclude that Lilly's FDA-approved tirzepatide medicines, which come in 18 different administrations, are one-size-fits-all medicines that do not effectively address their medical needs. Given that consumers do not necessarily understand that "tirzepatide" products do not have a single safety and effectiveness profile in whatever API it comes from, consumers would not know that a bad experience with Mochi's product does not necessarily translate to all tirzepatide products, including Lilly's. Thus, to the extent Mochi Health's product is unsafe or ineffective—which is a significant risk given its unregulated

---

[163]  https://www.instagram.com/reel/DQc1wV5DFZw/

[164]  *See supra* ¶¶ 167–168.

FIRSTSECOND AMENDED COMPLAINT                                    CASE NO.: 3:25-CV-03534-JSC

foreign sourcing and patient reports of adverse events already—these statements cause patients to believe that Lilly's tirzepatide is unsafe and ineffective (when it is not), undermining Lilly's brand and customer goodwill.

195.    Patients are being harmed by Mochi's medicines, which causes harm to Lilly's reputation and goodwill. As recently as November 6, 2025, a reddit user, and Mochi Health patient, posted a picture indicating that they are suffering from severe rashes due to Mochi's Tirzepatide Mix.[165]

196.    Within hours of posting, many redditors commented that they experienced similar reactions. For example, one commenter said, "I literally had the same thing happen when mine came from DCA pharmacy!!!."[166] Another Mochi Health patient commented, "Omg.... I'm having a similar but smaller reaction from my DCA vial. It was the 2nd shot from it."[167] A third Mochi Health patient commented, "Hi! I take tirzepitide [sic] with nicinamide (spelled that wrong) from DCA and have an injection site reaction like yours."[168] A fourth Mochi Health patient commented, "Omg same thing with mine. . . . I went to the Dr, had ro [sic] get antibiotics for mine and it is going to scar."[169] A fifth Mochi Health patient commented, "Yes !!!! I had the same exact same thing happen to me with dca this month."[170]

197.    Consumers associate these sorts of reactions from Mochi Health's drugs with tirzepatide generally, including with Lilly's medicines, and not just Mochi Health's medicines. In fact, consumers have contacted Lilly to report adverse events from taking compounded products. Consumers have also reported that taking compounded tirzepatide has resulted in trips to the emergency room and hospitalization. They have also reported receiving compounded tirzepatide without information regarding proper and safe administration and storage of the medicine. In multiple such cases, consumers

---

[165]  vdubbyachic2020, *Allergic reaction,* REDDIT (Nov. 5, 2025), https://www.reddit.com/r/JoinMochiHealth/comments/1opihnv/allergic_reaction/.

[166]  *Id.*

[167]  *Id.*

[168]  *Id.*

[169]  *Id.*

[170]  *Id.*

FIRSTSECOND AMENDED COMPLAINT                                   CASE NO.: 3:25-CV-03534-JSC

have reported that they were not aware they had been taking compounded tirzepatide. Consumers have also reported feeling scammed after finding out that they were not taking Lilly's FDA-approved medicines.

198.    Indeed, such reports have been made to Lilly about Mochi Health's Tirzepatide Mix. For example, one consumer notified Lilly that they experienced nausea the day after the injection. Similarly, a different consumer reported nausea from Mochi's compounded tirzepatide. A third customer reported pain shooting down her left arm and "felt like she had an elephant on her chest and couldn't breathe" after injecting Mochi's compounded tirzepatide. After injecting herself a second time, this same patient experienced symptoms of a myocardial infarction. Other callers have expressed confusion that when they search for Lilly's Medicines ads for Mochi Health's products come up. These adverse events harm Lilly because they necessarily cause patients to question the risk of taking *any* tirzepatide-based medicine, including Lilly's FDA-approved MOUNJARO® and ZEPBOUND®.

199.    None of this is surprising. An independent medical study showed "significantly higher reporting odds of several [adverse events], including abdominal pain, diarrhea, nausea, suicidality, and cholecystitis," as well as "higher reporting odds of hospitalization, related to GI events" for users of compounded drugs.[171] This is particularly true with respect to compounded tirzepatide drugs, like those sold by Mochi Health, that contain untested, unproven, and unsafe additives that alter the tirzepatide compound contained in the drug. Yet false advertising of the kind that Mochi Health engages in proximately causes customers to associate their negative experiences with compounded tirzepatide—like Mochi Health's compounded tirzepatide—with Lilly. The frequency with which Lilly receives these calls, and the severity of the events reported makes clear that false promises made by compounded tirzepatide drug retailers like Mochi Health cause serious harm to the reputation and goodwill that Lilly has built in its brand.

200.    Lilly's reputational harm is compounded by Mochi Health's unlawful corporate practice of medicine. Mochi Health actively steers patients who would otherwise buy Lilly's MOUNJARO® and

---

[171] Kenneth L. McCall et al., *Safety Analysis of Compounded GLP-1 Receptor Agonists: A Pharmacovigilance Study Using the FDA Adverse Event Reporting System*, Expert Opinion on Drug Safety (Apr. 29, 2025), https://pubmed.ncbi.nlm.nih.gov/40285721/.

FIRSTSECOND AMENDED COMPLAINT                                              CASE NO.: 3:25-CV-03534-JSC

ZEPBOUND® to its Tirzepatide Mix. What is more, Mochi Health's practice of swapping patients en mass to various compounded pharmacies increases this harm, opening patients up to adverse events due to swaps.[172]

201.    For instance, the patient who experienced symptoms of a myocardial infarction received her Mochi medication from Aequita, while the patient who experienced the severe rash only did so *after* Mochi Health switched the patient to a new compounding pharmacy.[173] On information and belief, these are just a few examples of customers who were harmed by Mochi Health's practices. Mochi customers who received Mochi's Tirzepatide Mix from Aequita Pharmacy have contacted Lilly regarding adverse events, demonstrating that Mochi Health customers associate its pharmacy's improperly compounded medications with Lilly.

## VII.    EACH DEFENDANT AGREED TO, AND AIDED, A CONSPIRACY TO ENGAGE IN THE CORPORATE PRACTICE OF MEDICINE AND TO FALSELY ADVERTISE KNOCKOFF TIRZEPATIDE PRODUCTS

202.    Defendants designed and executed a common plan to engage in the corporate practice of medicine while falsely advertising the resulting products as "personalized," safe, and effective. As alleged *supra* ¶¶ 3–6, 67–81, Ms. Ahmad, Mr. Chaibi, and Ms. Ahmad's father (Rana Ahmad) hold interlocking positions at the head of each Defendant entity, controlling every link in the chain—from the advertising platform (Mochi Health) that attracted patients through false promises of "personalized," safe, and effective compounded tirzepatide, to the prescribing entities (Mochi Medical) whose providers wrote prescriptions influenced by Mochi Health's business relationships rather than clinical judgment, to the raw-ingredient importer (USA Distribution LLC) and pharmacy (Aequita) that mass-produced and shipped the resulting standardized product under the Mochi brand. *See Wyatt v. Union Mortg. Co.*, 24 Cal. 3d 773, 785 (1979) (concurrence inferred from "tightly knit, family-oriented business operation" under close personal control). Each Defendant is a separately organized corporate entity, yet each agreed to this common plan, knew of and intended to aid its unlawful purpose, and committed overt acts in

---

[172] vdubbyachic2020,    *Allergic    reaction,*    REDDIT    (Nov.    5,    2025), https://www.reddit.com/r/JoinMochiHealth/comments/1opihnv/allergic_reaction/

[173] *Id.* (@vdubbyachic2020 "I've been with Mochi for over a year now and this just started with the new pharmacy").

FIRSTSECOND AMENDED COMPLAINT                                    CASE NO.: 3:25-CV-03534-JSC

furtherance of it, as demonstrated by sustained, coordinated participation in the unlawful conduct over many months—conduct far exceeding mere association.

203. **Mochi Medical's Agreement To, and Participation In, the Conspiracy.** Mochi Medical did not merely associate with Mochi Health—in order to unfairly bolster its profits, Mochi Medical agreed to participate in a scheme in which a lay corporation unlawfully influenced medical decisions and falsely advertised its services. Mochi Medical and its principals knew that Mochi Health is a corporation: the same person (Myra Ahmad) led both Mochi Medical, P.A. and Mochi Health Corporation, and thus Mochi Medical's principals knew that while the Mochi Medical entities are organized as a Professional Corporation and Professional Association, Mochi Health is a general corporation, and thus barred under California law from influencing the practice of medicine. Indeed, the appointed director of Mochi Medical CA, P.C. is Rana Ahmad—Ms. Ahmad's father—who permits Ms. Ahmad, the CEO of Mochi Health, to make business and operational decisions on the P.C.'s behalf. *See supra* ¶¶ 5, 68, 75. This arrangement—in which a corporate entity and non-physician influences a professional corporation through a family relationship—is itself evidence of an agreement to participate in the scheme to engage in the corporate practice of medicine.

204. Moreover, as alleged *supra* ¶¶ 83–90, Mochi Health hired Mochi Medical's providers through postings advertised as "Current openings at Mochi Health," trained them on Mochi Health's own "structured" protocols, housed their patient records in Mochi Health's "custom-built" EMR, and served as their exclusive source of patient referrals. No independent medical practice accepts these conditions from an unlicensed corporation. An independent practice hires its own providers, develops its own treatment protocols, and generates its own patient base. Mochi Medical surrendered each of these core professional functions to a corporation—a deliberate choice that reflects agreement to participate in the common scheme to engage in the corporate practice of medicine.

205. Mochi Medical's agreement is further demonstrated by what its providers did with their prescription pads. As alleged *supra* ¶¶ 7–11, 120–45, at least six times in thirteen months, every patient's prescription changed simultaneously—in dosage, formulation, or dispensing pharmacy—tracking Mochi Health's evolving business partnerships rather than any clinical assessment.

68

In December 2024, every patient's dose changed to nonstandard amounts (*e.g.*, 8.8 mg instead of 10 mg). Mochi Health—not Mochi Medical's providers—announced these changes "appl[ied] to u/everyone" and required "no extra steps." To the extent that Mochi Medical's providers signed those prescriptions, they could not have reasonably believed that hundreds of patients independently required the identical dose change on the same day without clinical indication—especially after Mochi Health admitted the additives were "not clinically significant" and told patients "[e]ven if you want to choose a different pharmacy, the option is not there." At the very least, Mochi Medical's providers accepted Mochi Health's directives when they allowed their patients to stay on the new prescriptions. A medical practice that receives a corporate directive to change every patient's prescription to the same nonstandard dose and then executes that directive—not once but at least six times across thirteen months, without objection—has not merely learned of an unlawful scheme. It has agreed to carry it out.

206.    Mochi Medical specifically intended to further the conspiracy's objective of enabling corporate control over the practice of medicine because Mochi Medical's very existence as a revenue-generating practice depended on patient volume generated by Mochi Health's platform. Without the arrangement, Mochi Medical would have had fewer patients and less revenue. Mochi Medical thus agreed to the conspiracy for its own individual advantage and not solely on behalf of Mochi Health: by serving as the prescribing entity, Mochi Medical generated its own revenue from patient consultations and prescriptions, revenue that flowed to Mochi Medical's own practice and its principal Rana Ahmad. The corporate practice of medicine was the engine of Mochi Medical's business: it was Mochi Health's unlawful control over prescribing—not independent physician referrals or patient choice—that ensured a steady volume of consultations, and allowed Mochi Medical to generate revenue without the overhead of building its own practice. Mochi Medical thus had every reason to intend that the corporate practice of medicine continue, because its revenue stream would suffer the moment Mochi Health lost its ability to direct patients and prescriptions to Mochi Medical's providers.

207.    Mochi Medical also agreed to participate in Mochi Health's false advertising. Rather than declining Mochi Health's marketing services, Mochi Medical affirmatively agreed to use Mochi Health to falsely market its business because the false advertising directly benefited Mochi Medical's own

FIRSTSECOND AMENDED COMPLAINT                                    CASE NO.: 3:25-cv-03534-JSC

bottom line. Mochi Medical's own former CEO, Myra Ahmad, had a role in developing or approving the false advertisements, and did so specifically to increase revenue at Mochi Medical. The false claims of "personalized" and safe and effective treatments appeared on the same website through which Mochi Medical's providers were recruited and its patients were referred. *See supra* ¶¶ 83–89. Those false statements attracted patients to Mochi Medical, giving Mochi Medical a direct financial stake in the continued dissemination of those claims and a motive to aid the conspiracy's success.

208.     Rana Ahmad and Mochi Medical's providers also knew the personalization and safety and effectiveness claims were false from firsthand experience. As trained providers, they knew that clinical trial data generated from one specific drug product cannot be extrapolated to a different, untested compounded formulation containing additional ingredients whose interactions with tirzepatide have never been studied. *See supra* ¶¶ 54-58. They also knew—because they personally experienced it—that they were not exercising independent clinical judgment to "customize" each patient's treatment. Instead, Mochi Medical's providers were limited to prescribing from a narrow menu of standardized formulations pre-selected by Mochi Health; the providers did not independently determine which additives would be included in a patient's medication or what dosage the patient would receive. *See supra* ¶¶ 120–22, 131–36. Those decisions were made at the corporate level based on which compounding pharmacy Mochi Health was using at any given time. And when Mochi Health directed the en masse prescription changes, Mochi Medical's providers implemented them, confirming that the medications were not "custom-prepared to meet an individual patient's specific needs" as advertised. *See supra* ¶¶ 151–65. Yet Mochi Medical's providers continued prescribing—repeatedly issuing prescriptions for a standardized product that they knew was falsely advertised as "personalized." In doing so, Mochi Medical actively furthered the false advertising by completing the sales the advertising initiated, and reinforcing, through its providers' prescriptions, the false impression of individualized care.

209.     Mochi Medical's overt acts in furtherance of the conspiracy include: issuing uniform, nonstandard prescriptions during each of the at least six en masse switches across five pharmacy partners (Empower, Southend, Aequita, Red Rock, and Lexington); prescribing from a limited,

70

corporate-selected menu of standardized formulations rather than exercising independent clinical judgment to tailor treatment to each patient's needs; using Mochi Health's corporate EMR and diagnostic protocols to prescribe compounded tirzepatide; permitting an unlicensed corporation to hire, train, and falsely advertise for Mochi Medical providers; and delivering to patients the very standardized product Mochi Health falsely advertised as "personalized" and "custom-prepared"; all to bolster Mochi Medical's profits. None of these acts constitutes the ordinary practice of medicine. Each reflects Mochi Medical's knowing and intentional participation in a scheme to practice medicine unlawfully, in violation of California's ban on the corporate practice of medicine, and to sell that scheme's products through false advertising, in violation of the Lanham Act.

210.    **Aequita's Agreement To, and Participation In, the Conspiracy.** Aequita Pharmacy LLC and Aequita Corporation (collectively, "Aequita") knowingly agreed to and participated in the same unlawful scheme, and did so for its own individual advantage. As alleged *supra* ¶¶ 76–78, Mr. Chaibi (Myra Ahmad's husband) holds every officer position at Aequita Corporation, which owns Aequita Pharmacy, and an office building in the same Totem Valley Business Center as Aequita's primary address is labeled "Mochi." The Washington Department of Health found that Aequita's listed pharmacist-owner was "owner in name only" and that Ms. Ahmad and Mr. Chaibi "actually funded and controlled the pharmacy operations."[174] Aequita thus did not operate as an independent pharmacy that happened to fill Mochi Medical's prescriptions for Mochi Health's patients—it functioned as a co-conspirator whose principals intentionally used its pharmacy operations to further the conspiracy's twin objectives; enabling the corporate practice of medicine (which is what directed prescriptions to Aequita in the first place) and promoting the resulting products through false advertising (which is what generated the patient demand that filled those prescriptions).

211.    Aequita had its own powerful economic incentive to join the conspiracy and acted for its own individual advantage: By serving as one of Mochi Health's primary compounding pharmacies,

---

[174] *See* Chris Ingalls, *'Raid' video reveals Kirkland drugmaker's secret warehouse*, KING 5 (last updated Apr. 7, 2026), https://www.king5.com/article/news/investigations/investigators/raid-reveals-kirkland-washington-drugmakers-secret-warehouse-selling-skinny/281-27533582-28d3-4d52-9368-5a018b3deac6.

71

Aequita stood to generate—and did generate—substantial revenue from filling thousands of prescriptions per day, revenue that directly benefited Mr. Chaibi as Aequita Corporation's sole officer and owner. Critically, Aequita's revenue depended on the corporate practice of medicine. Independent physicians, exercising independent judgment, would choose their own pharmacies based on quality, reliability, and patient need. It was only because Mochi Health unlawfully influenced prescribing decisions—directing where prescriptions were sent based on corporate business relationships rather than clinical judgment—that Mochi Health could steer thousands of prescriptions per day to Aequita, enriching the husband of Mochi Health's CEO. Aequita thus had every reason to intend that the corporate practice of medicine continue: without it, Mochi Health could not have delivered the prescription volume on which Aequita's business depended.

212. When Mochi Health redirected all patients to Aequita in November 2024, Aequita received thousands of identical prescriptions for nonstandard doses (*e.g.*, 8.8 mg instead of 10 mg) all at once—and filled every one. *See supra* ¶¶ 8, 120–25. No independent pharmacy receiving 20,000 identical prescriptions per day, and packaging each in a uniform blue Mochi-branded box, could believe the products were "custom-prepared to meet an individual patient's specific needs" or "tailored" specifically for patients. *See supra* ¶¶ 151–65. An independent pharmacy would have flagged the inconsistency between those advertising claims and its own operations; nonetheless, Aequita filled the orders without objection because it was a participant in the scheme, not a bystander.

213. Whistleblowers' reports confirm that Aequita Pharmacy agreed to the conspiracy to mass manufacture and dispense compounded tirzepatide at Mochi Health's direction—in blatant violation of the prohibition on the corporate practice of medicine. Former Aequita employees have reported that pressure to "maximiz[e] output of shipments" came from none other than "***San Francisco-based Mochi Health***," and that the emphasis was on "making money, 100% making money."[175] Another former employee reported Mochi Health's CEO, Ms. Ahmad, ordered Aequita employees to compound

___

[175] *See* Chris Ingalls, *Kirkland startup pharmacy hires unlicensed workers to handle GLP-1 medications, whistleblowers say*, KING 5 (last updated Mar. 16, 2026), https://www.king5.com/article/news/investigations/investigators/diet-drug-startup-day-laborers-contaminated-vials-glp1-kirkland-washington/281-3487cab6-1adc-4b07-92ce-3659b21ea794.

72

FIRSTSECOND AMENDED COMPLAINT                                        CASE NO.: 3:25-cv-03534-JSC

products despite knowing they lacked the required licensure and training to do so.[176] This is direct evidence of the corporate practice of medicine in action: an unlicensed corporation dictating operational decisions at a pharmacy. That Aequita accepted these directives—rather than refusing to take orders from a lay corporation on how to run its pharmacy operations—confirms that Aequita intended to further the very corporate control that delivered its revenue. The more prescriptions Aequita filled at Mochi Health's direction, the more revenue it generated for itself and for Mr. Chaibi personally. Moreover, by cutting corners, Aequita aimed to permit Mochi Health and Mochi Medical to sell compounded tirzepatide at prices undercutting Lilly's medicines. In fulfilling its role in the conspiracy, Aequita thus increased the ill-gotten gains for all members of the conspiracy.

214.    Aequita carried out the agreed plan with gusto. It used frozen popsicles (Otter Pops) instead of medical-grade cold packs, imported cheaper glassware from Alibaba that would break during shipment, and hired unlicensed day laborers from Home Depot and Lowes parking lots to package and ship medications and access confidential patient records.[177] The Washington State Department of Health thus described Aequita as "a company cutting corners at nearly every level of its operation."[178] Aequita did all of this at Mochi Health's direction,[179] further demonstrating that an unlicensed corporation was dictating a pharmacy's operations at the direct expense of patient safety.[180] A pharmacy that accepts

[176] Chris Ingalls, *CEO behind controversial diet drug company dodges questions for months — until now*, King 5 (last updated May 7, 2026) (statement made between 2:34 and 2:42 minute mark of video, with relevant context between the 2:27 and 2:50 minute mark), https://www.king5.com/article/news/investigations/investigators/ceo-behind-controversial-diet-drug-company-dodges-questions-mochi-kirkland/281-25a8fd75-e1eb-419b-a8c1-d70ab952407a.

[177] *See id.*

[178] *See* Chris Ingalls, *'Raid' video reveals Kirkland drugmaker's secret warehouse*, KING 5 (last updated Apr. 7, 2026), https://www.king5.com/article/news/investigations/investigators/raid-reveals-kirkland-washington-drugmakers-secret-warehouse-selling-skinny/281-27533582-28d3-4d52-9368-5a018b3deac6.

[179] *See* Chris Ingalls, *Kirkland startup pharmacy hires unlicensed workers to handle GLP-1 medications, whistleblowers say*, KING 5 (last updated Mar. 16, 2026), https://www.king5.com/article/news/investigations/investigators/diet-drug-startup-day-laborers-contaminated-vials-glp1-kirkland-washington/281-3487cab6-1adc-4b07-92ce-3659b21ea794.

[180] Chris Ingalls, *CEO behind controversial diet drug company dodges questions for months — until now*, King 5 (last updated May 7, 2026) (statement made between 2:10 and 2:13 minute mark of video), https://www.king5.com/article/news/investigations/investigators/ceo-behind-controversial-diet-drug-company-dodges-questions-mochi-kirkland/281-25a8fd75-e1eb-419b-a8c1-d70ab952407a.

73

directives from an unlicensed company and cuts corners on patient safety to maximize that company's output—generating substantial revenue for itself and its co-conspirators—has not merely filled prescriptions in the ordinary course of business. It has agreed to participate in a common scheme to engage in the corporate practice of medicine, and it has done so because that scheme is what delivered thousands of prescriptions per day to its door.

215.    Aequita's affirmative concealment further demonstrates its agreement to further the conspiracy. Aequita maintained a secret warehouse to store Chinese-sourced peptide powders it was not yet licensed to import and moved products there to evade state inspectors.[181] It imported active pharmaceutical ingredients from China through USA Distribution LLC—governed by Ms. Ahmad—and stripped the labels to disguise their foreign origin. *See supra* ¶¶ 11, 52, 115. A defendant that hides products, relabels imports, and moves inventory to evade inspectors is not filling prescriptions in the ordinary course of business. It is concealing a joint scheme. *See AREI II Cases*, 216 Cal. App. 4th 1004, 1022 (2013) (attempts to conceal support inference of active agreement to participate in conspiracy).

216.    Aequita went further, actively disseminating the false claims. The co-branded "partnership" announcement—posted on Mochi Health's website and bearing Aequita's name—touted "custom-made formulations" that mirrored the broader false advertisements made throughout the conspiracy. By approving that announcement, Aequita lent its name to the very claims it knew to be false from its own industrial-scale operations. Aequita's own website similarly held itself out as engaging in "customizing medications"—a claim irreconcilable with its role filling 20,000 identical prescriptions per day. This active dissemination of false advertising, combined with Aequita's knowledge that the claims were false, demonstrates not just knowledge of the false advertising scheme but agreement to participate in it and intent to aid its success.

217.    Aequita's overt acts in furtherance of the conspiracy include: compounding and dispensing tens of thousands of identical, nonstandard-dose prescriptions per day; packaging them under

---

[181] *See* Chris Ingalls, *'Raid' video reveals Kirkland drugmaker's secret warehouse,* KING 5 (last updated Apr. 7, 2026), https://www.king5.com/article/news/investigations/investigators/raid-reveals-kirkland-washington-drugmakers-secret-warehouse-selling-skinny/281-27533582-28d3-4d52-9368-5a018b3deac6.

74

the Mochi brand in uniform boxes; co-branding a "partnership" announcement touting "custom-made formulations"; holding itself out on its own website as "customizing medications" while mass-producing standardized products; permitting Mochi Health to list Aequita jobs on Mochi Health's own website and to respond to patient inquiries directed to Aequita; unlawfully compounding products using unlicensed day laborers at Mochi Health's direction; maintaining a secret warehouse and relabeling Chinese-sourced ingredients; and using substandard materials to cut costs at the direction of Mochi Health's executives.

218.    **Injury**. As alleged throughout this complaint, the conspiracy diverted sales from Lilly's FDA-approved MOUNJARO® and ZEPBOUND® by foreclosing patient and provider choice through corporate prescription directives and by falsely promoting standardized compounded drugs as "personalized," safe, and effective. Each Defendant's participation was a substantial factor in causing Lilly's injury: Mochi Health attracted patients through false advertising and controlled the prescribing enterprise; Mochi Medical's providers issued the prescriptions that converted the advertising into sales; and Aequita mass-produced and dispensed the standardized product under the Mochi brand. As a direct and proximate result of the conspiracy, Lilly has suffered and will continue to suffer significant monetary damages and discernible competitive injury in an amount to be determined at trial.

**FIRST CAUSE OF ACTION**
**Unfair Competition**
**(Unlawful Corporate Control of Practice of Medicine and Prescription Practices)**
**in Violation of the California Unfair Competition Law,**
**Cal. Bus. & Prof. Code §§ 17200 *et seq.***
**(Against Mochi Health)**

219.    202. Lilly repeats and realleges each and every allegation above as if fully set forth herein.

220.    203. The violations of law described in this Complaint have been, and are being, carried out and directed wholly or in part within the City and County of San Francisco and other locations within the State of California where Defendants do business.

221.    204. California Business and Professions Code § 17200 prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

75

222.    205. The unlawful, unfair, and deceptive business practices that Mochi Health employs to prescribe and sell their compounded tirzepatide drugs constitute violations of the California Unfair Competition Law.

223.    206. Mochi Health has engaged within the last four years and continues to engage in unfair and unlawful business acts or practices in violation of Section 17200. Such acts and practices include, but are not limited to, the following:

- Unlawfully engaging in and aiding and abetting the unlawful and unlicensed practice of medicine by corporations and unlicensed persons within the State of California and other states;

- Unlawfully engaging in and aiding and abetting the unlawful prescription of medicines, including modifying the formulation and dosage, without an appropriate prior examination by a physician and without the identification of a medical indication for the modification;

- Unlawfully engaging in and aiding and abetting the unlawful prescription of medications with additives and changing additives in the prescribed drug without an appropriate prior examination by a physician and without the identification of a medical indication for the modification; and

224.    207. The business practices that Mochi Health has employed to prescribe and sell compounded tirzepatide drugs constitute "unlawful, unfair or fraudulent" conduct under the California Unfair Competition Law, by permitting corporate interests to exert undue control over aspects of the physician / patient relationship, as described in Section IVIV, *supra*. The business practices further constitute "unlawful, unfair or fraudulent" conduct under the California Unfair Competition Law by adding and modifying additives to drug products and doses without regard to the individualized needs of a particular patient.

225.    208. Mochi Health's unfair and unlawful conduct is interfering with Lilly's ability to conduct its business. As a direct and proximate result of Mochi Health's unfair business practices, Lilly is suffering immediate and continuing, competitive, irreparable injury for which no adequate remedy at law exists.

226.    209. As a direct and proximate result of Mochi Health's deceptive and unlawful practices, Mochi Health has obtained an unfair and illegal business advantage, thereby benefitting and profiting from sales it made as a result of the goodwill associated with Lilly's MOUNJARO® and ZEPBOUND® tirzepatide medicines. Lilly has suffered and will continue to suffer monetary damages

FIRSTSECOND AMENDED COMPLAINT    CASE No.: 3:25-CV-03534-JSC

that can be measured and quantified, including lost sales, as well as discernible competitive injury by the loss of goodwill.

227. ~~210.~~ Lilly is entitled to all remedies available under the California Unfair Competition Law, including injunctive relief, restitution, and attorneys' fees.

**SECOND CAUSE OF ACTION**
**False or Misleading Advertising and Promotion**
**in Violation of 15 U.S.C. § 1125(a)(1)(B)**
**(Against Mochi Health)**

228. ~~211.~~ Lilly repeats and realleges each and every allegation above as if fully set forth herein.

229. ~~212.~~ Mochi Health's commercial advertising claims described herein are false or misleading in violation of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

230. ~~213.~~ Mochi Health has made materially false or misleading descriptions of fact, as well as false or misleading representations of fact that have influenced and are likely to continue influencing purchasing decisions—specifically, decisions to purchase Mochi Health's tirzepatide product instead of Lilly's FDA-approved medicines.

231. ~~214.~~ Mochi Health's false and deceptive statements and business practices actually deceive or have the tendency to deceive consumers.

232. ~~215.~~ Mochi Health has caused their false and deceptive statements to enter interstate trade or commerce.

233. ~~216.~~ As a direct and proximate result of Mochi Health's false and deceptive statements and practices, Lilly is suffering immediate and continuing irreparable injury for which there is no adequate remedy at law.

234. ~~217.~~ As a direct and proximate result of Mochi Health's false and deceptive statements and practices, Lilly has suffered and will continue to suffer significant monetary damages, including lost sales, and discernible competitive injury by the loss of goodwill.

235. ~~218.~~ Given Mochi Health's conduct, this is an exceptional case under 15 U.S.C. § 1117.

236. ~~219.~~ Lilly is entitled to injunctive relief as well as monetary damages, and other remedies provided by Sections 1116, 1117, and 1118, including Mochi Health's profits, treble damages, reasonable attorneys' fees, costs, and prejudgment interest.

### THIRD CAUSE OF ACTION
### Civil Conspiracy
### (Against All Defendants)

237. ~~220.~~ Lilly repeats and realleges each and every allegation above as if fully set forth herein.

238. ~~221.~~ Defendants entered into a common plan and agreement and acted in concert to unlawfully make, prescribe, and sell compounded tirzepatide drugs in violation of the California Unfair Competition Law and the Lanham Act.

239. ~~222.~~ Defendants participated in an unlawful scheme to make, prescribe, and sell compounded tirzepatide, including through Ms. Ahmad's and Mr. Chaibi's overlapping control of Defendants and affiliated entities, through non-physician influence and control over prescribing decisions, and by modifying the formulation, dosage and titration schedule of compounded drugs prescribed to Defendants' customers.

240. ~~223.~~ As a direct and proximate result of Defendants' unlawful practices, Lilly has suffered and will continue to suffer significant monetary damages and discernible competitive injury by the loss of goodwill.

241. ~~224.~~ As a result of Defendants' conspiracy, Lilly has been damaged in an amount to be determined at trial.

### JURY DEMAND

Lilly hereby demands a jury trial for all issues so triable.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Lilly prays that this Court enter judgment in Lilly's favor on Lilly's claims and award Lilly relief including:

1.    An order declaring that:

~~FIRST~~SECOND AMENDED COMPLAINT                                CASE NO.: 3:25-CV-03534-JSC

i.    Mochi Health engaged in unfair and unlawful trade practices, including the unlawful corporate practice of medicine, corporate control of prescription practices, and unlawful prescription and sale of injectable tirzepatide;

ii.   Mochi Health engaged in false and deceptive advertising and promotion, in violation of 15 U.S.C. § 1125(a)(1)(B); and

iii.  Mochi Health, Mochi Medical, and the Aequita Defendants engaged in a conspiracy to unlawfully prescribe and sell compounded tirzepatide drugs.

2.    An injunction preliminarily and then permanently enjoining and restraining Defendants and their officers, agents, employees, and attorneys and all persons acting in concert or participation with any of them from:

i.    Claiming or representing that Mochi Health's tirzepatide drugs are custom-made for a patient's specific needs;

ii.   Citing Lilly's clinical testing to support the safety and effectiveness of Defendants' unapproved compounded tirzepatide;

iii.  Engaging in any acts of false advertising or unfair competition with respect to any tirzepatide product;

iv.   Engaging in the corporate practice of medicine; and

v.    Conspiring with anyone to do any of the above actions.

3.    An order requiring Defendants and their officers, agents, employees, and attorneys and all persons acting in concert or participation with any of them, to engage in corrective advertising by informing consumers that:

i.    Defendants' compounded tirzepatide product has never been demonstrated to be safe or effective;

ii.   Defendants' compounded tirzepatide product has never been studied in clinical trials;

iii.  Defendants' compounded tirzepatide product does not have any proven therapeutic effect;

iv.   Defendants' compounded tirzepatide product is not superior to any FDA-approved tirzepatide drug product; and

v.    Lilly's clinical testing regarding Lilly's FDA-approved injectable tirzepatide medicines provide no support for the safety, effectiveness, or quality of Defendants' compounded tirzepatide product.

4.    An order directing Defendants to file with this Court and serve on Lilly's attorneys, thirty (30) days after the date of entry of any injunction, a report in writing and under oath setting forth in detail the manner and form in which it has complied with the Court's injunction.

79

FIRSTSECOND AMENDED COMPLAINT

CASE NO.: 3:25-CV-03534-JSC

5.    An order requiring Defendants to account for and pay to Lilly any and all profits arising from the foregoing acts of false advertising.

6.    An order requiring Defendants to pay Lilly compensatory damages in an amount as yet undetermined caused by the false advertising and trebling such compensatory damages for payment to Lilly in accordance with 15 U.S.C. § 1117 and other applicable laws.

7.    An order requiring Defendants to pay Lilly restitution in an amount as yet undetermined caused by the corporate practice of medicine for payment to Lilly in accordance with California Unfair Competition Law and other applicable laws.

8.    An order for pre-judgment and post-judgment interest on all damages.

9.    An order requiring Defendants to pay Lilly's costs and attorneys' fees in this action pursuant to California Unfair Competition Law in accordance with 15 U.S.C. § 1117, California Code of Civil Procedure § 1021.5, and any other applicable provision of law.

10.    Other relief as the Court may deem appropriate.

[Signature page follows.]

FIRSTSECOND AMENDED COMPLAINT                                    CASE NO.: 3:25-CV-03534-JSC

Dated: ~~November 14~~May 8, 202~~5~~6

Respectfully submitted,

KIRKLAND AND ELLIS LLP

*/s/ David I. Horowitz*

David I. Horowitz (S.B.N. 248414)
Yungmoon Chang (S.B.N. 311673)
KIRKLAND & ELLIS LLP
2049 Century Park East
Suite 3700
Los Angeles, CA 90067
Telephone: (310) 552-4200
dhorowitz@kirkland.com
yungmoon.chang@kirkland.com

Gregg F. LoCascio (appearance *pro hac vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave. NW
Washington, DC 20004
Telephone: (202) 389-5000
glocascio@kirkland.com

James F. Hurst (*pro hac vice*)
Diana M. Watral (*pro hac vice*)
~~Ryan Moorman (*pro hac vice*)~~
~~Robin McCue (*pro hac vice*)~~
James R.P. Hileman (*pro hac vice*)
~~Tasha Francis Gerasimow~~Robin McCue (*pro hac vice*)
Nicholas M. Ruge (*pro hac vice*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
james.hurst@kirkland.com
~~diana.watral~~jhileman@kirkland.com
~~ryan~~diana.~~moorman~~watral@kirkland.com
robin.mccue@kirkland.com
~~jhileman@kirkland.com~~
~~tasha.gerasimow@kirkland.com~~
nicholas.ruge@kirkland.com

Joshua L. Simmons (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
joshua.simmons@kirkland.com
jeanna.wacker@kirkland.com

*Attorneys for Plaintiff*
*ELI LILLY AND COMPANY*

81